1                    UNITED STATES DISTRICT COURT
                      DISTRICT OF MASSACHUSETTS
2

3

UNITED STATES OF AMERICA            )
4                                   )
   vs.                              )  Criminal Action
5                                   )
   HERZZON SANDOVAL,                )  No. 15-10338-FDS
6  EDWIN GUZMAN,                    )
   CESAR MARTINEZ,                  )
7  ERICK ARGUETA LARIOS,           )
                    Defendants      )
8

9

BEFORE:  THE HONORABLE F. DENNIS SAYLOR, IV
10

11

                        JURY TRIAL DAY 9
12

13

                         TESTIMONY ONLY
14

15

        John Joseph Moakley United States Courthouse
16                      Courtroom No. 2
                        1 Courthouse Way
17                      Boston, MA 02210

18              9th day of February, 2018

19

20

21

22

23              Valerie A. O'Hara
                Official Court Reporter
24  John Joseph Moakley United States Courthouse
                1 Courthouse Way, Room 3204
25              Boston, MA 02210
                E-mail: vaohara@gmail.com

1    APPEARANCES:

2    For The United States:

3        United States Attorney's Office, by CHRISTOPHER J. POHL,
     ASSISTANT UNITED STATES ATTORNEY, and KELLY BEGG LAWRENCE,
4    ASSISTANT UNITED STATES ATTORNEY, 1 Courthouse Way, Suite 9200,
     Boston, Massachusetts 02110;

5

6    For the Defendant Herzzon Sandoval:

7        Foley Hoag LLP, by MARTIN F. MURPHY, ESQ. and
     MADELEINE K. RODRIGUEZ, ATTORNEY,
     155 Seaport Boulevard, Boston, Massachusetts 02210;

8

9    For the Defendant Edwin Guzman:

10       Lawson & Weitzen, by SCOTT P. LOPEZ, ESQ.,
     88 Black Falcon Avenue, Suite 345, Boston, Massachusetts 02210

11   For the Defendant Erick Arueta Larios:

12       THOMAS J. IOVIENO, ESQ., 345 Neponset Street
     Canton, MA 02021;

13

14   For the Defendant Cesar Martinez:

15       Stanley W. Norkunas, 11 Kearney Square,
     Howe Building, Suite 202, Lowell, Massachusetts 01852.

16       ROBERT M. SALTZMAN, ESQ., 1 Central Street, Suite 5,
     Stoneham, Massachusetts 02180.

17

18

19

20

21

22

23

24

25

1                              I N D E X

2    WITNESS                      DIRECT   CROSS  REDIRECT  RECROSS
     JOSE HERNANDEZ MIGUEL
3
       By Mr. Pohl
4      By Mr. Iovieno                  4

5

6                              EXHIBITS

7                            None marked.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| | |
|---|---|
| 1 | <u>TESTIMONY ONLY</u> |
| 2 | THE COURT:  Mr. Iovieno. |
| 3 | <u>CROSS-EXAMINATION</u> |
| 4 | BY MR. IOVIENO: |
| 5 | Q.   Good morning, sir. |
| 6 | A.   Good morning. |
| 7 | Q.   My name is Thomas Iovieno.  I represent Mr. Larios.  You |
| 8 | know who Mr. Larios is? |
| 9 | A.   Yes. |
| 11:48AM 10 | Q.   And you've identified him as Lobo? |
| 11 | A.   Yes. |
| 12 | Q.   And you've been charged in this indictment along with |
| 13 | these defendants also, correct? |
| 14 | A.   Yes. |
| 15 | MR. IOVIENO:  Could I have Exhibit 12, please. |
| 16 | Q.   And this is Danger, correct? |
| 17 | A.   Yes. |
| 18 | Q.   And he's also known as Smiley? |
| 19 | A.   Yes. |
| 11:48AM 20 | Q.   And he's your brother? |
| 21 | A.   Yes. |
| 22 | Q.   And he was also charged in this indictment, correct? |
| 23 | A.   Yes. |
| 24 | Q.   And he is now in El Salvador, correct? |
| 25 | A.   Yes. |

1    Q.   And you've made a deal to cooperate with the government,

2    correct?

3    A.   Yes.

4           MR. IOVIENO:  Could I have Exhibit 49.1.

5           THE CLERK:  Is it in?

6           MR. IOVIENO:  It is.

7    Q.   And you've identified this document, 49.1, as a copy of

8    the plea agreement you reached with the government, correct?

9    A.   Yes.

11:49AM 10    Q.   And you were represented by an attorney during this

11    process, right?

12    A.   Yes.

13    Q.   And that was Mr. Barron?

14    A.   Yes.

15    Q.   And he's in the courtroom here today, isn't he?

16    A.   Yes.

17    Q.   And he's been in the courtroom throughout the three days

18    of your testimony, correct?

19    A.   Yes.

11:49AM 20    Q.   And this is one of the documents that you and Mr. Barron

21    discussed when you reached your agreement with the government,

22    but there's also another document, correct?

23    A.   Yes.

24           MR. IOVIENO:  And could I have Exhibit 49.2, please.

25    Q.   And this is your cooperation agreement that you reached

1    with the government, correct?

2    A.    Yes.

3    Q.    And it's your understanding from these agreements that you

4    agreed to assist the government in testifying here, correct?

5    A.    Yes.

6    Q.    And you made certain promises to the government, right?

7    A.    I don't understand the question.

8    Q.    Well, you testified yesterday that you agreed to provide

9    truthful testimony, correct?

11:51AM 10    A.    Yes.

11    Q.    And in return for your cooperation, the government made

12    promises to you, right?

13    A.    Yes.

14    Q.    And you're expecting a reduced sentence in this case,

15    correct?

16    A.    Yes.

17    Q.    Turn to paragraph 2, please.  And you understand that the

18    government will also in addition to recommending a reduced

19    sentence would also give you immigration benefits for you and

11:51AM 20    your family, correct?

21    A.    Yes.

22        MR. IOVIENO:  And could I have paragraph 5, please.

23    Q.    Now, you began this process, I believe, and correct me if

24    I'm wrong, you began this process in May of 2016, correct?

25    A.    Yes.

1    Q.   And that's when you began, you indicated you were willing

2    to cooperate and you made that fact known to the government?

3    A.   Yes.

4    Q.   And you attended certain meetings with the government at

5    that time, around May of 2016, correct?

6    A.   Yes.

7    Q.   And when you did that, it was called what is called the

8    proffer.  Are you familiar with that term, "proffer"?

9         THE INTERPRETER:  Should I translate the word

11:53AM 10   "proffer"?

11   Q.   Well, you had a meeting with the government, with you and

12   your attorney?

13   A.   Yes.

14   Q.   And you signed an agreement, a letter agreement?

15   A.   Yes.

16   Q.   And that agreement, and it is your understanding from that

17   agreement that anything you said during your meetings with the

18   government would not be used against you?

19   A.   Yes.

11:53AM 20   Q.   And that was true with all your meetings with the

21   government, correct?

22   A.   Yes.

23   Q.   And you've had a number of meetings with the government

24   and your attorney present, correct?

25   A.   Yes.

Q.    And during those meetings, your attorney is present,
you're present, there's agents present, there's representatives
from the United States Attorney's Office, they're present in a
room, right?

A.    Yes.

Q.    And you had an interpreter?

A.    Yes.

Q.    And you understood that anything you said in those
meetings could not be used against you, right?

A.    Yes.

Q.    And you understood that to be called immunity, immunity
from prosecution from those offenses that you may or may not
have talked about?

A.    Yes.

Q.    And recently in order to prepare for your testimony here
today, you had a number of meetings in December and January of
2018 and late December of 2017 with the government, correct?

A.    Yes.

Q.    And during those meetings, it was also relayed to you or
promised to you that your family would be protected to the best
of the government's ability, correct?

A.    Yes.

Q.    And that was both here and in El Salvador, right?

A.    Yes.

Q.    And did you also have discussions about entering into the

1    witness protection program?

2    A.    Yes.

3    Q.    So, in return for your cooperation in this case, you

4    expect to get a reduced sentence?

5    A.    Yes.

6    Q.    And you expect to remain in the United States?

7    A.    Yes.

8    Q.    And you won't be prosecuted for anything you told the

9    government?

11:56AM 10    A.    Yes.

11    Q.    And your family will also, to the extent that you have any

12    family members in the United States, will get to stay here,

13    correct?

14    A.    Yes.

15    Q.    And the government will seek to protect both your family

16    here in the United States as well as yourself and also family

17    members in El Salvador?

18    A.    Yes.

19    Q.    And do you know how many times you met with the government

11:57AM 20    throughout the course from May of 2016 up until your testimony

21    here today?

22    A.    Many times.

23    Q.    And you understood during the times that you met with the

24    government that there were agents taking notes of what you were

25    saying?

1    A.    Yes.

2    Q.    And have you seen copies of those reports or any reports

3    generated from those notes?

4    A.    Yes.

5    Q.    And how many times would you say -- well, strike that.  In

6    May, when you began this process, did they show you a copy of a

7    report that was written in Spanish or was it interpreted to

8    you?

9    A.    It was translated.

11:58AM 10    Q.    And you've seen approximately six of those reports; is

11    that fair to say?

12    A.    I don't understand the question.

13    Q.    Well, there were many reports that you reviewed, correct?

14    A.    Yes.

15    Q.    And you had numerous meetings, May, June, July, August,

16    November of 2016 with the government, correct?

17    A.    Yes.

18    Q.    And, for instance, I don't want to go through each

19    incident, but with respect to say the East Coast Program, that

11:59AM 20    was a topic you discussed at some of those meetings, right?

21    A.    Yes.

22    Q.    And specifically as it relates to the drug protection

23    detail programs that you testified about, those details were

24    discussed during these proffer meetings, right?

25    A.    Yes.

1    Q.   And you wanted to be truthful in everything you told the

2    government, right?

3    A.   Always.

4    Q.   And you had to be truthful during those proffer meetings

5    to get the promises that they were relaying to you, right?

6    A.   Yes.

7    Q.   And as you prepared to testify here today, did you have --

8    over the past three days, did you have meetings with the

9    government in order to prepare for your testimony?

12:00PM 10          THE INTERPRETER:  Could you repeat the question for

11   the interpreter?

12   Q.   Yes.  Prior to your testimony today, in the recent weeks,

13   have you met with the government?

14   A.   Yeah.

15   Q.   And you met with the government on numerous occasions

16   during the past few weeks, right?

17   A.   Yes.

18   Q.   And you went over various topics that you were going to

19   discuss and testify to, right?

12:00PM 20   A.   Yes.

21   Q.   And there were a number of people in the room when this

22   was going on, right?

23   A.   Yes.

24   Q.   And they would ask you questions, and you'd give responses

25   to those questions, correct?

1    A.    Yes.

2    Q.    And you would essentially practice your testimony, right?

3          MR. POHL:  Objection.

4          THE COURT:  I'll allow it.

5    A.    I don't understand the question.

6    Q.    Well, they would ask you questions about what you were

7    going to testify to here at trial, right?

8    A.    The questions I was going to be asked, they never told me

9    in the questions what I was going to answer.

12:01PM 10   Q.    But you talked about the topics you were going to discuss

11   at the trial, right?

12   A.    Yes.

13   Q.    And that took a number of weeks to do because you talked

14   about a lot, right?

15   A.    Yes.

16   Q.    Well, let's go back to your name, your street name,

17   "Muerto."  Okay.  You told us that you got your street name

18   Muerto when you were jumped into the Seaside gang in

19   Los Angeles, right?

12:02PM 20   A.    Yes.  I already had that nickname since I was a little

21   boy, but I kept the same nickname.

22   Q.    Okay.  Well, you testified the other day -- did you not

23   testify and you were under oath when you testified?

24   A.    Yes.

25          MR. IOVIENO:  Just for the witness, your Honor.  This

1    is page 129, line 4.

2    Q.    Yes:  "Okay.  Did you get it?"

3              MR. POHL:  I'm sorry, we can't see that.

4              THE COURT:  The document camera.

5              MR. IOVIENO:  The document camera, I'm sorry.

6              THE CLERK:  Oh, I'm sorry.

7              MR. POHL:  Thank you.

8    Q.    I'm sorry, page 29 line 2:  Okay.  Did you have a street

9    name at that time?

12:03PM 10    A.    Yes.

11    Q.    "Okay.  Did you get it at the time that you or you being

12    to use it after you were jumped in?"  Answer:  "That name you

13    are given after you become a homeboy."

14              Question:  "Right.  What was the name you used after

15    you became a homeboy with MS-13?"  Answer:  "Muerto."

16              THE INTERPRETER:  Could you move the document a little

17    towards the left so I can see it.  Do you want me to read it?

18              MR. IOVIENO:  Yes, I'm sorry.  Read it to the witness.

19    Q.    And you testified the other day after you became a homeboy

12:05PM 20    in Los Angeles?

21    A.    Yes.

22    Q.    And, in fact, you told the agents in October of 2016 that

23    you had that name since you were about four years old?

24              THE INTERPRETER:  Did you say four?  Six?

25    Q.    Four years old when you were a young child?

1    A.    Yes.

2    Q.    That's what you told the agents back in 2016?

3    A.    Yes.

4    Q.    And you got that name because you were trying to steal

5    mangos back in El Salvador?

6    A.    Yes.

7    Q.    And the owner, a young girl, the owner of the tree threw a

8    rock, and you fell out of the tree, right?

9    A.    No, we were hitting the mangos, and the woman came out,

12:06PM 10   and she told us not to do that, and she told us to stop

11   throwing rocks at the mangos, and we took off running.  I stood

12   there, and my cousin ran farther, so I stayed standing there,

13   and she started throwing rocks at me.  And I told her she

14   wasn't hitting me, and then she threw a rock that I realized

15   was going to hit me, so I turned and ran, and it hit my back,

16   and I fell, and I don't recall that, but I was told that I fell

17   down, and it was like I was dead there, and the woman came out

18   and she came and said to a woman that threw the rock, "You

19   killed him," and that's when I was called "Muerto," "dead."

12:07PM 20   Q.    And that was when you were back in El Salvador, right?

21   A.    Yes.

22   Q.    And "Muerto" means dead, right?

23   A.    Yes, dead.

24   Q.    You didn't tell us yesterday or the day before when you

25   were asked that question, correct?

1    A.    I don't remember.

2    Q.    Well, you didn't tell us that yesterday because we just

3    read it.

4    A.    Yes.

5    Q.    You said you got your name Muerto because you became a

6    homeboy, and that wasn't correct, was it?

7    A.    They didn't give me the name, I gave myself that name,

8    which was the name I already had.

9    Q.    Well, you didn't tell the story about the mango tree and

12:08PM 10    being a young kid when you were asked about getting the name,

11    right?

12    A.    No.

13    Q.    So you didn't tell the truth, right?

14          MR. POHL:  Objection.

15          THE COURT:  Sustained.

16    Q.    Well, when you were in Los Angeles, you said you were good

17    at fighting, right?

18    A.    Uh-huh, yes.

19    Q.    Before you became a homeboy with the Seaside gang, you

12:08PM 20    didn't -- you went out and fought a bunch of people, right?

21          THE INTERPRETER:  Can you repeat the last part of the

22    question for the interpreter?

23    Q.    You were good at fighting before you became a homeboy,

24    right?

25    A.    Yes.

1   Q.   And you earned what they called street credit?

2   A.   Yes.

3   Q.   And that's the reason why you became a homeboy with

4   Seaside, correct?

5   A.   Yes.

6   Q.   And you testified, did you not, correct me if I'm wrong,

7   that the reason you became a homeboy, you stabbed someone with

8   a three-blade knife?

9   A.   Yes.

12:09PM 10   Q.   And it's true, sir, that you didn't stab someone with a

11   three-blade knife until after you became a homeboy, right?

12   A.   I don't remember.

13        MR. IOVIENO:   This is just for the witness, your

14   Honor.

15   Q.   We talked a few minutes ago about the reports that you

16   were aware of from your interviews with the government and the

17   agents.  You recall those reports.  I know you didn't write the

18   reports, right?

19   A.   No.

12:10PM 20   Q.   But the reports were about what you told the agents,

21   right?

22   A.   Yes.

23   Q.   I want to show you, and if you could just read this

24   section to yourself.  It's highlighted.

25        THE INTERPRETER:   In other words, the interpreter will

1    read it quietly?

2              MR. IOVIENO:  With the Court's permission, yes.

3              THE COURT:  Yes.

4              THE INTERPRETER:  The highlighted part?

5              MR. IOVIENO:  Yes.

6    Q.    Have you read that to yourself or it's been interpreted to

7    you?

8    A.    Yes.

9    Q.    And it's fair to say you stabbed that person after you

12:11PM 10    were jumped into the Seaside gang in Los Angeles, right?

11    A.    I don't remember.

12    Q.    You don't remember, although when you gave this

13    information to the agents and they wrote it down and you

14    testified yesterday or the day before that it happened, and

15    that was the reason why you became a homeboy?

16              MR. POHL:  Objection.

17              THE COURT:  Sustained as to the form.

18    Q.    Well, you testified yesterday that it happened, and it was

19    the reason you became a homeboy in Los Angeles?

12:12PM 20    A.    Yes.

21    Q.    And you didn't have any problem remembering it yesterday?

22    A.    No.

23    Q.    But today you don't remember when that occurred, right?

24    A.    No.

25    Q.    So your testimony the other day about that was inaccurate?

1          MR. POHL:  Objection.

2          THE COURT:  Overruled.

3     A.   Excuse me.

4     Q.   Your testimony about when you stabbed the individual with

5     the three-blade knife either yesterday or the day before was

6     inaccurate?

7     A.   I did stab him.

8     Q.   Okay.  But it wasn't the reason you became a homeboy?

9     A.   I don't remember.

12:13PM 10   Q.   Well, I'm not questioning whether you stabbed the

11    gentleman, I'm sure you did stab him, but I'm just suggesting

12    to you that you testified yesterday that was the reason you

13    became a homeboy, and today you don't remember.  Is that a fair

14    statement?

15    A.   Yes.

16    Q.   And you would agree with me during your preparations with

17    the government, did you discuss those issues about how you

18    became a homeboy in Los Angeles and how you got your name?

19    A.   Yes.

12:14PM 20   Q.   And were you told to answer a certain way?

21    A.   No.

22    Q.   So, it's fair to say that you became a homeboy because you

23    were good at fighting in Los Angeles, you were fighting other

24    gangs, in both gangs, right?

25    A.   Yes.

1   Q.   And in order to become a homeboy, you don't have to

2   necessarily have to killed someone, correct?

3   A.   No.

4   Q.   And you haven't killed anybody, right?

5   A.   No.

6         MR. IOVIENO:  Can I have Exhibit 28, please.  One

7   moment, your Honor.  Could we turn to page 6, please.

8   Q.   Okay.  You testified yesterday that you reviewed a lot of

9   transcripts, right?

12:16PM 10   A.   Yes.

11   Q.   You identified voices on recordings, right?

12   A.   Yes.

13   Q.   And one of the voices that you identified was your voice,

14   right?

15   A.   Yes.

16   Q.   And with respect to this section here, this is you

17   speaking, correct, "Muerto"?

18   A.   Yes.

19   Q.   "Yeah, dude, but what's the use of a program, dude?  I was

12:16PM 20   running around down there with a gun that has been given to me,

21   and the program itself took it from me, dude.  No, dude.  Fuck.

22   I went, and I did about four killings with that same program

23   down there.  I left that program, dude.  What good did it do

24   me?  None, homeboy.  A guy that was with me here, that guy did

25   favors for the dudes from the program down below, dude, for

1    Cuervo from Silver, he did errands, dude, and the guy came as

2    we got off the airplane, and he said to me, hey, dude, I'm

3    going to give you a .357 as a gift, dog, and when they took me

4    to kill."  And then the recording ends.

5    Q.    So, you stated in this recording that you killed four

6    people?

7    A.    If I had killed four people, how would I be able to leave

8    a program?  I'm no one to leave a program.

9    Q.    Well, if you killed four people, how did you make an

12:18PM 10    agreement with the government?

11              MR. POHL:  Objection.

12              THE COURT:  Sustained.

13    Q.    So you didn't really kill four people, did you?

14    A.    No.

15    Q.    And you were just bragging about that, right?

16    A.    Bragging.

17    Q.    And you were trying to get status within the group that

18    you were with, right?

19    A.    Yes.

12:18PM 20    Q.    And that's pretty common, isn't it?

21    A.    There's another video where it says I killed three people.

22    Q.    And you didn't kill those three people either, did you?

23    A.    I didn't kill anybody.

24    Q.    You talk about killing people because you want to get

25    status within the group, right?

1    A.    If I had killed -- if I had killed people, I'd be higher

2    up than a runner.

3    Q.    But at these meetings that you go to that you've testified

4    to in the last three days, it's not unusual for the members and

5    specifically you to talk about and brag about and embellish in

6    order to get status within the group, right?

7    A.    When there are more people with you among the dudes, you

8    can't lie.

9    Q.    I'm sorry, I missed that.

12:20PM 10    A.    When there's more than one dude in the group, then you

11    can't lie because people know.

12    Q.    You can lie in the meetings; is that what you just said?

13    I'm sorry.

14    A.    Cannot lie.

15    Q.    Because other people know if it's true or not, right?

16    A.    Yes.

17    Q.    But you didn't kill four people?

18    A.    No.

19    Q.    And you didn't kill three people that is in another video

12:20PM 20    that you said that?

21    A.    No.

22    Q.    And you manufacture things during these meetings because

23    you want to gain status within the group, right?

24    A.    Yes.

25    Q.    Now, let's talk about when you were in Los Angeles, and I

1    think you testified that you came here because your sister's

2    husband passed away?

3    A.    Yes.

4    Q.    And you came here in 2007, and you stayed for about six

5    months, right?

6    A.    No, in 2007, I stayed here.

7    Q.    But you came prior to that for a little bit of time, a few

8    months, I don't know if it was four months, five months, but it

9    was just a short period of time?

12:21PM 10          THE INTERPRETER:  Before?

11   Q.    Before you came permanently, you had already made one trip

12   over here, right?

13   A.    I had come more than one time before.

14   Q.    To visit your sister, right?

15   A.    Yes.

16   Q.    And you had met some of the members of the Eastside group,

17   right?

18   A.    Yes.

19   Q.    And you hung out with them a little bit, right?

12:22PM 20   A.    The first time I only met them, but I didn't hang out with

21   them much.

22   Q.    And when you came back in 2007 permanently, you then met

23   more of them, correct?

24   A.    Yes.

25   Q.    And with respect to Lobo you didn't meet him until 2013,

1    right?

2    A.    I had seen Lobo in the street, but I had never talked to

3    him.  I only actually talked to him after he was jumped in.

4    Q.    That was in 2013, right?

5    A.    Approximately.

6    Q.    Okay.  And you testified yesterday that you hardly hung

7    out with him at all prior to meeting him in 2013?

8    A.    Yes.

9    Q.    So from 2007 to 2013, six years, depending on where within

12:23PM 10   the year you met him, you didn't even know Lobo, right?

11   A.    No.

12   Q.    And I think you mentioned that you were deported in 2009,

13   right?

14   A.    Yes.

15   Q.    And you stayed in El Salvador until about 2012, so about

16   three years?

17   A.    Something like that.

18   Q.    And just one other point before we talk about some other

19   things is that you mentioned yesterday that you had a gun, you

12:24PM 20   were given a gun?

21   A.    I don't understand the question.

22   Q.    Well, you mentioned that you had a gun but you didn't let

23   the clique know you had a gun?

24   A.    I don't understand the question.

25   Q.    I'll get to it a different way, but I just wanted

1    to -- let's talk about something.  Let's talk about from 2007

2    when you got here, you talked about a couple of incidents, and

3    I'll just -- I just want to go over them briefly with you.  Do

4    you remember you talked about an incident where you hit someone

5    over the head with a beer bottle?

6    A.   Yes.

7    Q.   And you said that you testified that you were driving in a

8    vehicle and you were drinking beers?

9    A.   Yes.

12:25PM 10    Q.   I think you said they were Heineken beers, right?

11    A.   Yes.

12    Q.   And you saw some chavalas wearing red?

13    A.   One.

14    Q.   And you pulled over, whoever was driving pulled over the

15    car, right?

16    A.   He pulled over.  He stopped almost at the stop sign.

17    Q.   And you said, "Let's get him," right?

18    A.   Yes.

19    Q.   And you jumped out of the car and ran after the

12:25PM 20    individual, right?

21    A.   Yes.

22    Q.   And you hit him with a beer bottle and you kicked him?

23    A.   Yes.

24    Q.   And then you said the other person had two full Heineken

25    bottles?

```
 1    A.    Two or three.

 2    Q.    Well, you said two yesterday?

 3    A.    Yes.

 4    Q.    He hit him over the head with two full Heineken bottles

 5    that he carried from the car, right?

 6    A.    We had been drinking the beer.  I don't know if the

 7    bottles were full or empty.

 8    Q.    Well, you said yesterday they were full?

 9    A.    Okay, they're full.

10    Q.    Is that true or you don't remember?  Is that something

11    else you don't remember?

12    A.    No, I remember.

13    Q.    Because when Mr. Pohl asked you questions, you didn't have

14    a problem remembering anything?

15    A.    Yes.

16    Q.    And Lobo wasn't there at all for this, right, you didn't

17    even know him?

18    A.    No.

19    Q.    Now, you talked about another incident at Maverick

20    Station?

21    A.    Yes.

22    Q.    And would you agree with me that Maverick Station, it's a

23    pretty busy train station?

24    A.    Yes.

25    Q.    And the area around Maverick Square is pretty congested
```

1    and busy?

2    A.    Yes.

3    Q.    And isn't it true, sir, that you had gone to a barbecue

4    earlier that day, you had gone to a cookout?

5    A.    Yes.

6            MR. IOVIENO:  May I approach, your Honor?

7            THE COURT:  Yes.

8            MR. IOVIENO:  It's Exhibit 50 for the record.

9    Q.    You identified this yesterday, correct?

12:28PM 10    A.    Yes.

11    Q.    And this is your machete?

12    A.    Yes.

13    Q.    And you generally carry that around with you, right?

14    A.    I hardly ever was with a machete.  I had a knife instead.

15    I always kept the machete at the house.

16    Q.    Well, did you tell the agents when you get the proffer

17    interview that you generally always carried the machete on a

18    hook inside your pants?

19    A.    No.  I was explaining how the dudes would use the -- put

12:29PM 20    away the machete, how they carried them.

21    Q.    Because it would be pretty difficult to put that down your

22    pants, right?

23    A.    Yes.

24    Q.    And you didn't have that with you when you were chasing

25    the gentleman with the Heineken bottles, right?

1    A.    No.

2    Q.    But when you chased the -- you chased some chavalas who

3    were on the bus at Maverick Square, right?

4    A.    Yes.

5    Q.    Just so we're clear, you didn't have that machete with you

6    at that time, right?

7    A.    No.

8    Q.    You had a bat?

9    A.    Yes.

12:30PM 10    Q.    And you got the bat, and who else was there with you?

11    A.    Checha, Loquillo and Renegalde (ph).

12    Q.    So that's three other people besides yourself, right?

13    A.    Yes, and the other one that we were going to pick up was

14    Gaspirin.

15    Q.    And you had a bat?

16    A.    Yes.

17    Q.    And someone else had a machete?

18    A.    Yes.

19    Q.    And someone had a knife?

12:30PM 20    A.    Yes.

21    Q.    How large a knife did they have?

22    A.    It was a blade.

23    Q.    And you walked down into Maverick Square carrying those

24    items with you, right?

25    A.    Yes.

1    Q.    No one stopped you?

2    A.    No.

3    Q.    And you ran into after the chavalas who had gotten off the

4    bus, right?

5    A.    No, it wasn't the ones that were on the bus.

6    Q.    They were just in the street?

7    A.    We were going on our way to get something when there was

8    some chavalas going towards Maverick, and that's where we

9    chased them.

12:31PM 10    Q.    So you were going to get something, carry it back, the

11    other people carrying a machete and a knife, and you were going

12    to get something, carry those items?

13    A.    We were going to get Gaspirin because Gaspirin was on the

14    bus, and supposedly there were some chavalas on the bus as

15    well, so Gaspirin called and told us to wait for him there in

16    case the chavalas tried to do something to him, but the

17    chavalas then didn't get off the bus.

18    Q.    Well, you walked into the square carrying those weapons,

19    and this was in the middle of the day?

12:32PM 20    A.    We didn't go all the way to the station, we just sort of

21    were towards the entrance, and there we met Caballo who was

22    there.

23    Q.    Again, you bragged about the killings, correct, the

24    killings that you said you didn't do, you bragged about that,

25    right?

```
 1              THE INTERPRETER:  I'm sorry, the interpreter --
 2   Q.   You bragged about the killings you didn't do at meetings?
 3   A.   The murders, I don't understand what your question is.
 4   Q.   Did you brag about this incident like you bragged about
 5   killing three people?
 6   A.   I didn't kill anyone there.
 7   Q.   I'm not asking if you killed anybody, but you said you
 8   bragged about it.  You didn't tell the truth at the meeting,
 9   right?
10              MR. POHL:  Objection.
11              THE COURT:  Sustained in that form.
12   Q.   When we talked about you killing three people down in
13   El Salvador, that wasn't true, right?
14              MR. POHL:  Objection.  It's been asked and answered.
15              THE COURT:  Overruled.
16   A.   That's not true.
17   Q.   You're right, you didn't kill the people?
18   A.   No.
19   Q.   Right.  You bragged about it at the meeting?
20   A.   Yes.
21   Q.   Just like these two incidents here, you talked about it
22   with the group, right?
23   A.   Yes.
24   Q.   And you talked about those incidents here with us
25   yesterday and today, right?
```

12:33PM (line 10)
12:34PM (line 20)

1    A.    I didn't.

2    Q.    And with respect to that incident, Lobo again was not --

3    he was not around, right?

4    A.    No.

5    Q.    Because you didn't know him then, right?

6    A.    No.

7    Q.    Now, you talked about you identified some MS tattoos on

8    some people, right?

9    A.    Yes.

12:35PM 10    Q.    And I think you testified that you had to ask permission

11    to get a tattoo that says MS-13?

12    A.    One has to ask permission from the runner.

13    Q.    And Lobo doesn't have any MS-13 tattoos, correct?

14    A.    Not that I know of.

15    Q.    Now, when you were deported in 2009, you went back to

16    El Salvador, and you stayed there for about three years, right?

17    A.    About two years.

18    Q.    And you came back using a coyote, right?

19    A.    Yes.

12:35PM 20    Q.    And during the period of time you were in El Salvador, you

21    had some periodic contact with some people from Eastside,

22    right?

23    A.    Yes.

24    Q.    And during that period of time, you had no contact from

25    Lobo, right?

1    A.    No.

2    Q.    Because, again, you didn't know him?

3    A.    No.

4    Q.    All right.  Then when you came back, I think you testified

5    that you were -- you came back, you hung around with some of

6    the members from Eastside?

7    A.    I don't understand the question.

8    Q.    Well, you came back, and I think you said you hung around

9    with some people from Somerville, right, when you first came

12:36PM 10    back?

11    A.    From Somerville?

12    Q.    Yes.

13    A.    I don't understand your question.

14    Q.    You don't remember that from yesterday.  Let me strike

15    that.  After you came back from El Salvador, after you had that

16    coyote bring you back, did you spend some time with some people

17    who weren't Eastside members but people in Somerville who were

18    other members from other cliques?

19    A.    No.

12:37PM 20    Q.    So you came back, in any event, you came back and you hung

21    around with some members of Eastside when you came back in

22    2012, right?

23    A.    Yes.

24    Q.    Okay.  And at some point you met Lobo in 2013, right?

25    A.    Yes.

1    Q.    But prior to that, you had been jumped in, again, if you

2    will, or jumped in for the first time to Eastside, right?

3    A.    Yes.

4    Q.    And that was in a parking lot in Cambridge, you said I

5    think it was outside, and it was some movie theaters around

6    that area, right?

7    A.    Yes.

8    Q.    And Lobo wasn't there for that, right?

9    A.    Yes.

12:38PM 10    Q.    He was not there, right?

11    A.    He was there.

12    Q.    He was there when you got jumped in in 2012?

13    A.    I wasn't jumped in 2012, I was jumped in 2013.

14    Q.    Okay.  So that occurred in the parking lot in Cambridge,

15    and at that point in time you had met Lobo, right?

16    A.    Lobo was already jumped in then.

17    Q.    I understand, I'm not talking about Lobo being jumped in,

18    I'm talking about you.

19    A.    Yes.

12:39PM 20    Q.    Just so we're clear, you were initially jumped in to

21    Seaside in Los Angeles, right?

22    A.    Yes.

23    Q.    And when you came here, you had a conversation with some

24    of the Eastside people, and it was decided that you would have

25    to be jumped again to Eastside?

A.   Yes.

Q.   Okay.  And that is what I was referring to that occurred outside the movie theater, that was outside, right?

A.   Yes.

Q.   And just so we're clear, Lobo was there for that is your testimony, right?

A.   Yes.

Q.   But it's fair to say after you met Lobo, you didn't really see him a lot, right?

12:40PM          THE INTERPRETER:  I'm sorry.

Q.   After you met Lobo, you really didn't see him a lot?

A.   After I met him, I did see him often.

Q.   Okay.  But he missed a lot of meetings, Lobo, right?

A.   I don't remember.

     MR. IOVIENO:  Could I have Exhibit 24, please.

Q.   Turn to page 2, please.  "Casper:  So that was the second reason we'll be watching out for Psycho.  The other thing was that we wanted an explanation from Checha and Lobo.  You guys knew about the last thing, and you knew that everyone has to

12:41PM respect it.  We have said at work to call ahead of time if you are going to work, and there's no problem, but you guys didn't call or anything.  Something else is that we have heard rumors about you.  Where have you been?  We hope you will tell us where you were.

     THE INTERPRETER:  Your Honor, may the interpreter read

1   that?

2           THE COURT:  Yes.

3   Q.   Okay.  Is it your understanding from that that Casper

4   wanted to address Lobo and Checha not showing up?

5   A.   They had missed one meeting.

6   Q.   Okay.  But they had missed the meeting, right?

7   A.   Yes.

8   Q.   Okay.  And Casper specifically asked where you have been?

9   A.   Yes.

12:43PM 10  Q.   And he wanted an explanation for the group for them to

11  explain themselves where they had been, what they had been

12  doing, where they had been?

13  A.   Yes.

14  Q.   Because if you don't show up, you could be disciplined,

15  right?

16  A.   Yes.

17  Q.   And let's talk about CW-1.  You knew him as Pelon, right?

18  A.   I don't understand the question.

19  Q.   When did you first meet Pelon?

12:43PM 20  A.   Around 2013.

21  Q.   Around the same time you met Lobo, right?

22  A.   Are you referring to Pelon from the Eastside clique?

23  Q.   Well, you subsequently have learned that there was an FBI

24  informant in Eastside, correct?

25  A.   Yes.

1    Q.    And that was Pelon?

2    A.    Yes.

3    Q.    And that's who I'm talking about.  Do you understand?

4    A.    Yes.

5    Q.    Was there another Pelon?

6    A.    No.

7    Q.    So you met him in 2013 around the same time you met Lobo?

8    A.    Almost, yes.

9    Q.    But it's fair to say you didn't really hang around with

12:44PM 10    Lobo, right?

11    A.    Who didn't hang?

12    Q.    You.

13    A.    No, we didn't hang out often, but we always saw each other

14    at meetings.

15    Q.    And you hung around a lot with Pelon though, right?

16    A.    Yes.

17    Q.    And because Pelon was buying and selling drugs, right?

18    A.    Yes.

19    Q.    And you were going along with Pelon acting as protection,

12:45PM 20    right?

21    A.    Yes.

22    Q.    And this went on during 2013, 2014, right?

23    A.    Yes.

24    Q.    Okay.  At that point in time, I think you testified you

25    were introduced to Gordo?

1    A.    I don't understand the question.

2    Q.    Well, you were introduced with Pelon to a drug dealer

3    named El Gordo?

4    A.    No, I already knew Gordo.  I took Pelon over to Gordo.

5    Q.    Okay.  So Pelon had just come onto the scene, if you will,

6    and you took him and introduced him to El Gordo, right?

7    A.    Yes.

8    Q.    And Pelon had some large amount of cash on him to do this

9    stuff, right?

12:46PM 10    A.    Yes.

11    Q.    And you were brought along to protect that money, right?

12    A.    The money or the drugs?

13    Q.    Well, both.  You were to protect both?

14    A.    Yes.

15    Q.    And you did that about six or seven times I think you

16    testified?

17    A.    Several times.

18    Q.    And Pelon made money doing this, correct?

19    A.    Yes.

12:47PM 20    Q.    And he shared that with you, right?

21    A.    Yes.

22    Q.    And you and Pelon kept quiet about this, right?

23    A.    Yes.

24    Q.    You didn't want the others to know you were making money

25    selling drugs, right?

1    A.    I don't understand the question.

2    Q.    Well, you didn't want to share the money with them, right?

3    A.    The money that we were earning, of course.

4    Q.    It's your money, right?

5    A.    Yes.

6    Q.    And you were doing this for personal gain to put the money

7    in your own pocket, right?

8    A.    We were doing it for the things that one needs.

9    Q.    For living, for living expenses?

12:48PM 10    A.    For living expenses and anything else.

11    Q.    Right.  And it's fair to say during this period of time,

12    2013, 2014, you and Pelon were concerned about the lack of

13    interest by the other Eastside members of going out on the

14    street, right?

15            MR. POHL:  Objection.

16            THE COURT:  Well, he can't testify about what someone

17    else was thinking.  Why don't you rephrase.

18    Q.    Well, during the time you hung out with Pelon, you had a

19    number of conversations with him, right?

12:49PM 20    A.    Yes.

21    Q.    You were very close with Pelon, right?

22    A.    Yes.

23    Q.    And do you recall at a meeting in January of 2014

24    complaining that no one is out on the street?

25    A.    Yes.

1    Q.    Okay.  And when you say no one was out on the street, you

2    were complaining at the meeting that other members of Eastside,

3    they weren't going out and committing acts of violence,

4    correct?

5    A.    What we were saying is that they were preferring others.

6         THE INTERPRETER:  Can I ask the witness to repeat the

7    answer, your Honor?

8         THE COURT:  Yes.

9         THE INTERPRETER:  "Could you repeat your question," he

12:50PM 10   said.  Could you repeat the question?

11        MR. IOVIENO:  Could we have it read back?

12        THE COURT:  Why don't you put it to him again.  It was

13   about people out on the street.

14   Q.    You complained at the meeting about other members of

15   Eastside, they were not going to go out on the street and

16   committing acts, right?

17   A.    Yes.

18   Q.    And that was in a meeting in about, around January, early

19   January of 2014?

12:51PM 20   A.    I don't remember.

21        MR. IOVIENO:  Can I have Exhibit 20, please, page 3.

22   Q.    "Muerto:  Unintelligible.  Here we are thinking about

23   things like that, dude, everyone has to participate at the

24   party, dude.  There's nothing more important than going out

25   like that in the street."

1        "Casper:  No one has made rules that we all have to go

2  out every day into the street like that, we all have to go out

3  but on different days so everyone goes out, but they go out on

4  different days.  We can't go out in groups."

5  Q.   So you were talking about then, it's your understanding

6  you were talking about people not going out on the street?

7  A.   Yes.

8  Q.   And you had said earlier, "Muerto:  Everyone talks big,

9  but when it's time to go out to the street to do something, no

12:52PM 10  one shows up.  That pisses me off."

11        "Tigre:  No one is in the street."

12        So there was some descension going on, no one was

13  going out on the street other than you and Pelon, correct?

14  A.   Everybody goes out on the street.  The thing was that

15  people weren't going out altogether because we're all MS-13,

16  and what's MS-13 supposed to do?  Are they supposed to just be

17  sleeping at home?

18  Q.   Some of them were sleeping at home, right?

19  A.   Everybody had their own little group with whom they would

12:53PM 20  go out.

21  Q.   And everybody had a job, a lot of people had jobs to do,

22  right?

23  A.   We all had jobs.

24  Q.   And they had families, right?

25  A.   Yes.

1    Q.    And they were with their families and they were working in

2    the community, right?

3    A.    And also at the meetings.

4    Q.    So they were going to meetings, working?

5    A.    Uh-huh.

6    Q.    Taking care of their families?

7    A.    When one joins MS-13, what they do is be in the street.

8    If they go to the meetings, it's because they're aware of

9    everything that is happening.

12:54PM 10    Q.    This is yours, right?

11             MR. POHL:  Objection, your Honor.

12             THE COURT:  Overruled.

13    Q.    Exhibit 50 belongs to you, right?

14    A.    Yes.

15    Q.    And you told us that you went out on the street and you

16    hit people over the head with beer bottles?

17    A.    On one occasion that happened.

18    Q.    Okay.  Well, you've been out on more than one occasion?

19    A.    Yes.

12:54PM 20    Q.    And you've stabbed people?

21    A.    Yes.

22    Q.    And you've hit people with bats?

23    A.    Yes.

24    Q.    So you're out on the street?

25    A.    We are in the street.

1        THE COURT:  Hold on.  Hold on.  Make sure the

2    translator has time.

3        MR. IOVIENO:  I'm sorry.

4    A.    We are in the street.

5    Q.    But you complained that people weren't going out on the

6    street?

7    A.    They weren't going out with us, but they're saying that

8    they were going out with others.

9    Q.    And people say things at the meeting, we've already gone

12:55PM 10    over that, they brag, right?

11    A.    Always and outside, too.

12    Q.    People brag and embellish all the time?

13    A.    Yes.

14    Q.    They may be saying we're going to go out on the street,

15    but you don't see them out on the street, do you?

16    A.    If I hadn't seen them out in the street, then I would have

17    never seen them also when they were just hanging out at the

18    bars and all that having fights.

19    Q.    Okay.  But it's not a crime to hang out at a bar, is it?

12:56PM 20    A.    For whom?  Do you mean for MS it's not a crime?

21    Q.    For anybody to hang out a bar is not a crime, is it, sir?

22    A.    If an MS-13 member is going to a bar, it's only for one

23    thing, and that's to look for chavalas.

24    Q.    Well, that's your statement, okay.  That's what you do?

25    A.    Everyone.

```
 1    Q.    But that's what you did?

 2    A.    Everyone in MS did that.

 3    Q.    That's your opinion?

 4    A.    It's not my opinion, I've heard and seen how the dudes go

 5    out to the bars and get into fights.

 6    Q.    Okay.  So some people go out to bars and they get into

 7    fights?

 8    A.    Where was Lobo's gun taken?  At Casa Mariachi.

 9    Q.    I'll talk about the gun later.  We'll talk about the gun,
```

12:57PM 10    trust me.  I know you want to talk about the gun, but we'll

```
11    talk about it.  So you go to a bar, and you get into a fight.

12    That's not unusual, is it?

13    A.    I don't understand the question.

14    Q.    You don't understand, it's not unusual for people to get

15    into a bar fight, it happens all the time?

16    A.    Only among gangs because I never had a fight with a

17    civilian.

18    Q.    Well, just because someone wears a red shirt, does that

19    mean they're in a gang?
```

12:58PM 20    A.    No.

```
21    Q.    So you attack people who wore red clothing?

22    A.    Yeah, but one knows who's a gang member and who isn't.

23    Q.    And you know that for a fact everyone you've attacked is a

24    gang member?

25    A.    Yes.
```

1    Q.    And it's because they wear the color red?

2    A.    Not all of them were dressed in red.

3          MR. IOVIENO:  Your Honor, would this be a good time to

4    stop?  I'm moving onto another area?

5          THE COURT:  Let me see counsel at sidebar about the

6    schedule.

7                              - - - -

8

9                  C E R T I F I C A T E

10   UNITED STATES DISTRICT COURT )

11   DISTRICT OF MASSACHUSETTS ) ss.

12   CITY OF BOSTON )

13

14          I do hereby certify that the foregoing transcript was

15   recorded by me stenographically at the time and place aforesaid

16   in Criminal Action No. 15-10338-FDS, UNITED STATES vs. HERZZON

17   SANDOVAL, et al., and thereafter by me reduced to typewriting

18   and is a true and accurate record of the proceedings.

19          Dated this 9th day of February, 2018.

20                          s/s Valerie A. O'Hara

21          _____

22                          VALERIE A. O'HARA

23                          OFFICIAL COURT REPORTER

24

25