1                    UNITED STATES DISTRICT COURT
                      DISTRICT OF MASSACHUSETTS
2

3

UNITED STATES OF AMERICA              )
4                                     )
vs.                                   ) Criminal Action
5                                     )
HERZZON SANDOVAL,                     ) No. 15-10338-FDS
6 EDWIN GUZMAN,                       )
CESAR MARTINEZ,                       )
7 ERICK ARGUETA LARIOS,               )
                    Defendants        )
8

9

BEFORE:  THE HONORABLE F. DENNIS SAYLOR, IV
10

11

12                         JURY TRIAL DAY 11

13                         TESTIMONY ONLY

14

         John Joseph Moakley United States Courthouse
15                        Courtroom No. 2
                          1 Courthouse Way
16                        Boston, MA 02210

17                   13th day of February, 2018

18

19

20

21

22

23                       Valerie A. O'Hara
                      Official Court Reporter
24       John Joseph Moakley United States Courthouse
                    1 Courthouse Way, Room 3204
25                        Boston, MA 02210
                    E-mail: vaohara@gmail.com

1    APPEARANCES:

2    For The United States:

3        United States Attorney's Office, by CHRISTOPHER J. POHL,
     ASSISTANT UNITED STATES ATTORNEY, and KELLY BEGG LAWRENCE,
4    ASSISTANT UNITED STATES ATTORNEY, 1 Courthouse Way, Suite 9200,
     Boston, Massachusetts 02110;
5
     For the Defendant Herzzon Sandoval:
6
         Foley Hoag LLP, by MARTIN F. MURPHY, ESQ. and
7    MADELEINE K. RODRIGUEZ, ATTORNEY,
     155 Seaport Boulevard, Boston, Massachusetts 02210;
8
     For the Defendant Edwin Guzman:
9
         Lawson & Weitzen, by SCOTT P. LOPEZ, ESQ.,
10   88 Black Falcon Avenue, Suite 345, Boston, Massachusetts 02210

11   For the Defendant Erick Arueta Larios:

12       THOMAS J. IOVIENO, ESQ., 345 Neponset Street
     Canton, MA 02021;
13
     For the Defendant Cesar Martinez:
14
         Stanley W. Norkunas, 11 Kearney Square,
15   Howe Building, Suite 202, Lowell, Massachusetts 01852.

16       ROBERT M. SALTZMAN, ESQ., 1 Central Street, Suite 5,
     Stoneham, Massachusetts 02180.
17

18

19

20

21

22

23

24

25

1                         I N D E X

2   WITNESS                        DIRECT   CROSS   REDIRECT   RECROSS

3    JOSE HERNANDEZ MIGUEL
     By Mr. Murphy                           5
4    By Mr. Lopez                           21

5

6   EXHIBITS                               FOR I.D.   IN EVIDENCE

7    227                                                 76

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<div align="center">TESTIMONY ONLY</div>

1

2          THE CLERK:  All rise for the jury.

3          (JURORS ENTERED THE COURTROOM.)

4          THE CLERK:  Thank you.  You may be seated.  Court is

5  now back in session.

6          THE COURT:  All right.  Good morning, everyone.

7  Apparently we had an issue with the commute rail, which is one

8  of the things we have to deal with if you live in Boston.

9          Before we get started, ladies and gentlemen, there was

09:14AM 10  an article this morning in the Boston Globe, both in paper and

11  online, about -- basically about this case or MS-13.

12          Did any of you see it or read it?  Everyone is shaking

13  their head.  Let me remind you again that you are not to read

14  anything like that.  If you are interested, you can have

15  someone set aside the article in paper form, or you can

16  probably find it electronically after the trial, but again,

17  during the trial, it's important that you not expose yourself

18  to media reports.

19          THE COURT:  All right.  Mr. Murphy, are you ready?

09:14AM 20          MR. MURPHY:  May I proceed, your Honor?

21          THE COURT:  Yes.

22          And do you understand, sir, that you're still under

23  oath?

24          THE WITNESS:  Yes.

25          THE COURT:  Mr. Murphy.

1          MR. MURPHY:  Your Honor, may we display the chalk that

2   I was using at the end of the day on the document camera?

3          THE COURT:  Yes.

4          MR. MURPHY:  I can proceed without it, your Honor.

5          THE COURT:  Okay.  Is it possible to reboot?

6          THE CLERK:  I did this morning, but I can do it again.

7          THE COURT:  Why don't you proceed, Mr. Murphy, while

8   we're fiddling with this.

9          MR. MURPHY:  Thank you.

10                 JOSE HERNANDEZ MIGUEL, RESUMED

11                  CROSS-EXAMINATION, CONTINUED

12   BY MR. MURPHY:

13   Q.   So when we broke yesterday, we were talking about the

14   events of May 12, 2013.  Do you recall that, sir?

15   A.   Yes.

16   Q.   And after Brujo called you from the park, Pelon called

17   Domingo and told him that you were going to pick him up and

18   that he should bring a knife, correct?

19   A.   I don't recall if Pelon was the one that called Domingo.

09:16AM 20   I know a call went out.  I don't remember if it was myself that

21   made the call or Pelon.

22          MR. MURPHY:  Your Honor, may I approach and do it the

23   old fashioned way in light of the document camera?

24          THE COURT:  Yes.

25          MR. MURPHY:  So, Ms. Huacuja, I'd ask you to read that

1    sentence to the witness in Spanish, please.

2              (Interpreter interpreted in Spanish.)

3    Q.    And, sir, does that help you remember that it was Pelon

4    who called Domingo and told him to bring the knife?

5    A.    I don't recall that Pelon called him.  The call went out,

6    and it was either I called or Pelon called, but I don't recall

7    Pelon calling because he was driving.

8    Q.    I'm sorry, I couldn't hear.

9    A.    He was driving.

09:18AM 10    Q.    You did tell the FBI and Mr. Pohl and the other folks that

11    you met with on July 15, 2016 that it was Pelon who made the

12    call, correct?

13    A.    I don't recall.

14    Q.    You recall, sir, that that's what the report states,

15    however, correct?

16    A.    That's what the report says.

17    Q.    And either you or Pelon told Domingo to bring the knife,

18    correct?

19    A.    To Domingo?

09:18AM 20    Q.    Yes.

21    A.    Yes.

22    Q.    So either one of you did tell him, you agree, to bring the

23    knife that day, correct?

24    A.    Yes.

25    Q.    And then you went to Highland Park in Chelsea, correct?

A.    Yes.

Q.    And you told us that after the folks you've identified as chavalas saw you, they ran, correct?

A.    No, not when they saw us.  We got into like the front of the park.  When they saw us, they stood up, and one of them moved forward sort of like telling the others to attack me, and that's when I said La Mara Salvatrucha.

Q.    And, sir, there came a time that morning when the 18th Street members who were there saw that Domingo was attempting to pull out a knife and then fled, correct?

A.    Yes.

Q.    And when that happened, sir, one 18th Street member ran towards the park's parking lot, but Pelon grabbed him and started beating him, correct?

A.    No, I don't recall Pelon hitting him.  He was the last one to come towards the park, and he was the last one to get out of the car.

Q.    Well, sir, when you met with the FBI and Mr. Pohl and the State Police on July 15, 2016, what you told them was that one 18th Street member ran towards the park's parking lot, but Pelon grabbed him and started beating him.  Isn't that correct, sir, that's what you told the FBI on that day?

A.    I don't recall having said that Pelon grabbed him.

        MR. MURPHY:  May I approach, your Honor?

        THE COURT:  Yes.

1          MR. MURPHY:  And with the Court's permission, I'd ask

2     Ms. Huacuja to read that sentence in Spanish to the witness,

3     beginning with 1.

4     Q.   And, sir, does reading that help you remember that what

5     you said was that one 18th Street member ran towards the park's

6     parking lot, but Pelon grabbed him and started beating him?

7     A.   I don't recall having said that Pelon grabbed him.

8     Q.   But you agree, sir, that that's what the report states,

9     correct?

09:23AM 10     A.   That's what the report says.

11     Q.   And you agree, sir, don't you, that you took Domingo's

12     knife and stabbed the 18th Street member while Pelon held him

13     down?

14     A.   I never saw Pelon there, and I never saw Pelon holding the

15     18 there.  I did stab the 18.

16     Q.   You told the State Police and the FBI and Mr. Pohl on

17     July 15, 2016, did you not, sir, that Pelon held the 18th

18     Street member down while you stabbed him?

19     A.   Not that I recall.

09:24AM 20          MR. MURPHY:  May I approach, your Honor?

21          THE COURT:  Yes.

22          MR. MURPHY:  And with the Court's permission, I'd ask

23     Ms. Huacuja to read the sentence that begins with "Hernandez

24     Miguel."

25     Q.   And, sir, does that help you remember that on July 15,

1    2016, what you told the FBI and the State Police and Mr. Pohl

2    was that you took Domingo's knife and stabbed the 18th Street

3    member while Pelon held him down?

4    A.    I don't remember ever saying that I stabbed the 18 while

5    Pelon was holding him because the 18th was on the floor.  He

6    was on the ground almost under a car like he was trying to get

7    under the car.  How was Pelon going to be holding him under the

8    car?

9    Q.    Sir, you agree though that that's what the report states,

09:26AM 10    that Pelon was holding him down while you were stabbing him,

11    correct?

12    A.    That's what the report says.

13    Q.    Thank you, sir.  Now, let me turn to a different subject,

14    the subject of a clique gun.  Now, you testified that you

15    recall that Mr. Larios, Lobo, had the gun taken away from him

16    by the police in January of 2015, correct?

17    A.    Yes.

18    Q.    And before that, at some point in 2014, an individual

19    named Tigre had the clique gun, correct?

09:27AM 20    A.    That was not the clique gun.  That was Tigre's gun.

21    Q.    Well, haven't you said, sir, that Tigre accidentally shot

22    off the clique gun in a car in 2014, sir?  Wasn't that your

23    testimony on direct examination?

24    A.    It wasn't the clique gun, it belonged to Tigre, but the

25    clique did take it from him, that's correct.

10

1    Q.   And that was because, sir, that he had accidentally shot

2    the gun inside a car, correct?

3    A.   And he was also drunk.

4    Q.   When he was drunk, correct?

5    A.   Yes.

6    Q.   And he had almost hit someone named Vincentino, correct?

7    A.   Yes.

8         MR. MURPHY:  And I don't know, your Honor, whether the

9    camera would work for exhibits that have been admitted.

09:28AM 10        THE CLERK:  We can try it.

11        MR. MURPHY:  We can try it.  I'd ask that Exhibit 10

12    which is in evidence be displayed.

13        THE COURT:  Okay.  It's working.

14        MR. MURPHY:  Thank you, your Honor.

15    Q.   And looking at Exhibit 10, sir, who is that?

16    A.   Vincentino.

17    Q.   And so Vincentino's gun was taken away from him because he

18    had shot it in a car while he was drunk, correct?  I'm sorry,

19    let me ask a different question.

09:29AM 20    A.   Vincentino did not have a gun.

21    Q.   Vincentino was the person who was almost shot, correct?

22    A.   Yes.

23    Q.   The person who shot the gun accidentally while drunk was

24    Tigre, correct?

25    A.   Yes.

1    Q.    And if we could look at Exhibit 7.  That's Tigre, correct?

2    A.    Yes.

3    Q.    And is it fair to say that Tigre had a drinking problem,

4    sir?

5    A.    I don't know.

6    Q.    Well, he was drunk when he shot the gun in the car in

7    2014, correct?

8    A.    Yes.

9    Q.    And on direct examination, you testified about a clique

09:30AM 10    meeting that took place in 2015 where he was corrected, I think

11    was your word, for having fallen off the wagon, correct?

12    A.    Yes.

13    Q.    And we saw a video that was in the dark of him actually

14    being corrected, correct?

15    A.    Yes.

16    Q.    And he had been corrected, to use your word, because he

17    had fallen off the wagon, correct?

18    A.    Yes.

19    Q.    He had been ordered by the clique not to drink, correct?

09:31AM 20    A.    Yes.

21    Q.    But he drank anyway, correct?

22    A.    Yes.

23    Q.    Now, after the clique -- after the gun was taken away from

24    Tigre because he shot it when he was drunk in the car, it went

25    to Mr. Larios, correct?

1       THE INTERPRETER:  The gun?

2       MR. MURPHY:  The gun, yes.

3   A.   The runners passed it over to him.

4   Q.   Fair enough, sir.  And it was taken away from him in

5   January 2015?

6   A.   Yes.

7   Q.   And he was asked about the circumstances of it being taken

8   away from him at a clique meeting in February 2015 that we

9   talked about yesterday?

09:32AM 10  A.   Yes.

11  Q.   And there was more conversation about the clique gun at a

12  clique meeting in March, sir; isn't that correct?

13  A.   Yes.

14      MR. MURPHY:  And if we could go to what's been marked

15  in evidence as Exhibit 24.

16  Q.   Would you look at the first page.  And that's a transcript

17  that you testified about on direct examination of a clique

18  meeting that took place on March 29, 2015, correct?

19  A.   Yes.

09:33AM 20  Q.   And if we turn to page 6, you'd agree, sir, that there was

21  a discussion at that clique meeting about the clique gun,

22  correct?

23  A.   Yes.

24  Q.   The police had taken it, correct?

25  A.   Yes.

```
 1   Q.   And no one had yet replaced it, correct?

 2   A.   Yes.

 3   Q.   And there was a discussion about gathering money for a

 4   clique gun, correct?

 5   A.   Yes.

 6   Q.   But Mr. Sandoval said it's more important to raise money

 7   to bring someone back into the country than it was to gather

 8   money for a clique gun, correct?

 9   A.   Yes, but he also said that Lobo had to pay for the gun on
10   his own.

11   Q.   Because he was the one who had lost it to the police,

12   correct?

13   A.   Yes.

14   Q.   Now, there was another discussion about the clique gun at

15   a clique meeting in October, correct?

16   A.   Yes.

17   Q.   And that was on October 28th, if we take a look at

18   Exhibit 28?

19   A.   Yes.

20   Q.   And so that's more than 10 months after the gun had been

21   taken from Mr. Larios?

22   A.   Yes.

23   Q.   Still no clique gun, correct?

24   A.   Not yet.

25   Q.   And Mr. Larios had brought a clique gun, had brought a
```

09:34AM 10

09:35AM 20

1    gun, but it didn't have a clip, correct?

2    A.    Yes.

3    Q.    And you thought that showed a lack of respect, correct?

4    A.    Yes.

5    Q.    And what does it mean for a gun not to have a clip, sir?

6    A.    Well, if it has no clip where are you going to put the

7    shots?

8    Q.    So it doesn't work without a clip, correct?

9    A.    It doesn't work.

09:36AM 10          (Witness spoke in Spanish that was not translated.)

11          MR. MURPHY:  With respect to your Honor, I do not

12    believe there was a question pending.

13          THE COURT:  All right.  Go ahead.  Put another

14    question.

15    Q.    You got a gun for the clique in December of 2015, correct?

16          THE INTERPRETER:  Could you explain to the interpreter

17    who do you refer to as "you."

18    Q.    You, sir, got a gun for the clique in September of 2015?

19    A.    I didn't get a gun for the clique.  It was Negro that got

09:37AM 20    it.

21    Q.    And you came to hold that gun, correct?

22    A.    Yes.

23    Q.    And the reason that gun was obtained was because the

24    members of ESLS wanted to protect themselves from members of

25    the Everett clique because members of the Everett clique were

1    upset with ESLS for refusing to join the East Coast Program?

2    A.    It wasn't only for that.  It was also because there was no

3    weapon and the dudes were asking for a gun.

4    Q.    And you talked to the FBI and the State Police about that

5    gun on May 31, 2016, correct?

6    A.    Yes.

7    Q.    And what you told the agents and the officers present was

8    that the gun was purchased by and belongs to the ELS clique,

9    the gun was purchased by ESLS for members to protect themselves

09:38AM 10    from members of the Everett Loco Salvatrucha MS-13 clique,

11    members of the ELS were upset with ESLS for refusing to follow

12    the MS-13 East Coast Program; that's what you told the police?

13              THE INTERPRETER:  May the interpreter --

14              MR. MURPHY:  Oh, certainly.  May I approach, your

15    Honor?

16              THE COURT:  Yes.

17    Q.    That, sir, is what you told the State Police and the FBI

18    and the U.S. Attorney's Office on May 19, 2016, correct?

19    A.    Yes.

09:40AM 20    Q.    Now, on direct examination, sir, to switch to another

21    topic, Mr. Pohl asked you questions about the shooting in

22    Chelsea in December 2014.  Do you recall that?

23    A.    I don't understand the question.

24    Q.    Do you recall, sir, being asked about an event where a gun

25    was brought to Vida Loca?

1    A.    Yes.

2    Q.    And that was in December 2014, sir?

3    A.    Yes.

4    Q.    And Mr. Norkunas asked you some questions about that as

5    well, correct?

6    A.    Yes.

7    Q.    You were not disciplined by the clique, sir, for deciding

8    not to go to bring the gun to Vida Loca, correct?

9    A.    No.

09:41AM 10    Q.    But some time after the shooting, Vincentino -- if we

11    could go back to Exhibit 10 -- he was corrected, correct?

12    A.    Yes.

13    Q.    And he was corrected because before the shooting,

14    Vida Loca had been in a fist fight with the man that he later

15    shot, and Vincentino did not help Vida Loca during that fist

16    fight, correct?

17    A.    Yes.

18    Q.    And after the shooting, the individual known as Crazy came

19    to one of your clique meetings, correct?

09:42AM 20    A.    Yes.

21    Q.    And he complained that Vincentino hadn't come to

22    Vida Loca's defense during this fist fight, correct?

23    A.    That Vida Loca had said that we needed to correct

24    Vincentino because Vincentino had not helped when he had had

25    the fight there, and so Crazy had shown up to make sure that

1    Vincentino would be corrected.

2    Q.    And Crazy also said if you don't correct him, either me or

3    Vida Loca will, correct?

4            THE INTERPRETER:  Vida Loca or who else?

5            MR. MURPHY:  Or Crazy.

6    A.    Yes.

7    Q.    And at that point, you knew that Vida Loca had shot and

8    killed somebody only a day or two before?

9    A.    Yes, I had already heard that.

09:44AM 10   Q.    Now, you testified on direct examination about the

11   individual Joel Martinez who you knew as Animal?

12   A.    Yes.

13   Q.    And you said that Animal had a problem with the Everett

14   clique because when he first came to this country, he had been

15   hanging around with 18th Street members, correct?

16   A.    Yes, that Animal said to me.

17   Q.    And Animal was from El Salvador, correct?

18   A.    Yes.

19   Q.    And you knew, sir, that Animal had entered the country

09:44AM 20   illegally, correct?

21   A.    I don't know.

22   Q.    Did you talk about that with Animal?

23   A.    Not that I can recall.

24   Q.    Did you ever ask Animal whether he had any working papers?

25   A.    We never spoke about that.

18

1    Q.    And do you know, sir, where Mr. -- where Animal entered

2    the United States?

3    A.    I don't know.

4    Q.    You, sir, were in the country illegally, however, correct?

5    A.    Yes.

6    Q.    And you had been deported, correct?

7    A.    Yes.

8    Q.    And you know, sir, based on your own experience that if a

9    person is in the country illegally, they can be arrested by ICE

09:45AM 10    for any reason at any time, correct?

11            MR. POHL:  Objection.

12            THE COURT:  I'll let him -- it's not a legal opinion.

13    I'll let him testify as to his understanding.

14    A.    Yes.

15    Q.    And that was your experience, sir, correct?

16    A.    Yes.

17    Q.    Now, you testified on direct examination that the purpose

18    and the mission of MS-13 is to kill chavalas, correct?

19    A.    Yes, attack chavalas and any other rival.

09:46AM 20    Q.    And tell us, sir, is it the mission to attack or to kill?

21    A.    One never knows if you're going to kill him or just wound

22    him.

23    Q.    Is it the goal to try to kill chavalas?

24    A.    When you're with chavalas, you can't be sure if you're

25    going to kill him, or if you're just going to wound him.

```
 1    Q.    But I'm asking you, sir, about what you say the goals of
 2    MS-13 are.  Is it the goal or the mission of MS-13 to kill or
 3    just to attack?
 4    A.    To kill and to attack.
 5    Q.    Now, you've been a member of MS-13, according to your
 6    testimony, for 13 years?
 7    A.    More or less, 12, something like that.
 8    Q.    And it's fair to say, sir, that you've remained for that
 9    period, until your arrest, you were a member in good standing,
10    correct?
11    A.    I don't understand the question.
12    Q.    You were never kicked out of MS-13, correct?
13    A.    No.
14    Q.    And during that period, it's fair to say that the number
15    of rival gang members that you killed was exactly zero,
16    correct?
17    A.    Yes, zero.
18    Q.    And after you came to Massachusetts, you stabbed one rival
19    gang member, correct?
20    A.    Yes.
21    Q.    Just one, correct?
22    A.    Yes.
23    Q.    And that was on May 12, 2015, correct?
24    A.    Yes.
25    Q.    After Pelon drove you to Highland Park in Chelsea,
```

1    correct?

2    A.    Yes.

3    Q.    And you agree, sir, that it was your hand on that knife,

4    sir, correct?

5    A.    Yes.

6    Q.    And it was your decision to use it that day, correct?

7    A.    Yes.

8    Q.    And according to you, sir, no one talked you into doing

9    that, correct?

09:49AM 10    A.    Yes.

11    Q.    Because no one talks you into doing anything, right?

12    A.    Everyone who belongs to MS, that's what we do.

13    Q.    But, sir --

14    A.    In MS, all there is is violence, nothing else.

15    Q.    So, sir, it was your hand on the knife?

16    A.    Yes.

17    Q.    And you did this, as you testified yesterday, at the end

18    of the day, on your own account, correct?

19    A.    Yes.

09:50AM 20         MR. MURPHY:  May I have a moment, your Honor?

21         THE COURT:  Yes.

22         MR. MURPHY:  Thank you, your Honor.

23         THE COURT:  All right.  Mr. Lopez.

24

25

<div align="center">CROSS-EXAMINATION</div>

BY MR. LOPEZ:

Q.   Good morning, Mr. Hernandez Miguel.

A.   Good morning.

Q.   My name is Scott Lopez.  I represent Edwin Guzman.  We've never met before, right?

A.   No.

Q.   Now, you were born in El Salvador?

A.   Yes.

Q.   And you lived in El Salvador until you were about 14?

A.   Yes.

Q.   Did you live with your parents?

A.   Yes.

Q.   With your mother?

A.   Yes.

Q.   Your father?

A.   Yes.

Q.   And when you were 10 years old, you were first exposed to MS-13?

A.   I don't understand the question.

Q.   Well, when you were -- I think you testified on direct that you first learned about MS-13 when you were 10 years old?

A.   Yes.

Q.   They were in your neighborhood?

A.   Yes, everywhere they were.

1    Q.    Everywhere.  And when you were 14 years old, your uncle

2    came to El Salvador to visit your parents?

3    A.    Yes.

4    Q.    And your uncle lived in the United States?

5    A.    Yes.

6    Q.    Had you met your uncle before you were 14?

7    A.    Yeah, my uncle would visit regularly.

8    Q.    And what do you mean by regularly?

9    A.    Every year.

09:53AM 10    Q.    Was there a particular time of year that he would come and

11    visit?

12    A.    I don't know, whenever he wanted to, I guess.

13    Q.    What's your uncle's name?

14    A.    Tomas Miguel.

15    Q.    And now at some point when you were 14 and your uncle came

16    to visit, he told you that he would help you so you could help

17    your family?

18    A.    Yes.

19    Q.    Did he explain to you what he meant by that, while he was

09:54AM 20    in El Salvador?

21    A.    Yes.

22    Q.    What did he tell you?

23    A.    That he would help me to come here so that I would work

24    and help my parents with money.

25    Q.    So, I think you testified that you decided to come to the

1    United States?

2    A.    I don't understand the question.

3    Q.    Well, did you make the decision to come to the

4    United States at age 14 or did your parents make that decision

5    for you?

6    A.    No, my parents told me that if I wanted to come, it was up

7    to me.    That it was my decision.

8    Q.    But were they -- did they want you to help by working in

9    the United States?

09:55AM 10   A.    There was an opportunity.    Not everybody gets the

11   opportunity to come to the United States.

12   Q.    So you wanted to come to the United States to work?

13   A.    Yes.

14   Q.    And to send money back home for your family?

15   A.    Yes.

16   Q.    Now, before you moved to the United States, did you know

17   where your uncle lived?

18   A.    I don't understand.

19   Q.    Before you moved from El Salvador to the United States,

09:56AM 20   did you know where your uncle lived in the United States?

21   A.    I had heard that he lived in California.

22   Q.    Had you ever been to the United States before?

23   A.    No.

24   Q.    In any event, you came to the United States?

25   A.    Yes.

24

1    Q.    How did that make you feel?

2    A.    Everything was different, everything was better.

3    Q.    Did you feel --

4         THE INTERPRETER:  I'm sorry, there was an answer.

5    A.    I had two jobs and I would get money and I would send it

6    to my parents.

7    Q.    Did you feel abandoned by your parents?

8    A.    No.

9    Q.    Did you think how could my parents send me away if they

09:57AM 10    loved me?

11    A.    No.

12    Q.    Now, I think you said that your father didn't pay for the

13    coyote, your uncle did?

14    A.    My uncle.

15    Q.    And do you know what your uncle wanted in return for

16    helping you?

17    A.    I don't understand the question.

18    Q.    Well, I mean your uncle was helping.  What did he want in

19    return?

09:57AM 20    A.    No, my uncle helped many people.

21    Q.    But he made you work?

22         THE INTERPRETER:  I'm sorry.

23    Q.    Your uncle made you work?

24    A.    He didn't force me to work, one has to work to remain

25    active.

1    Q.    I didn't say anything about forcing you, but you came here

2    to work and you, in fact, worked, right?

3    A.    Yes.

4    Q.    And did he make you do chores around the house?

5            THE INTERPRETER:  Make you do?

6            MR. LOPEZ:  Yes.

7    A.    No.

8    Q.    And he didn't send you to school?

9    A.    No.

09:58AM 10    Q.    What type of job -- you said you had two jobs.  What types

11    of jobs did you have when you first came here at age 14?

12    A.    As a dishwasher and also working at a Mexican restaurant

13    making burritos.

14    Q.    And approximately how many hours a week were you working

15    at age 14?

16    A.    I worked about seven hours a day, seven hours at each job.

17    Q.    So, 14 hours a day?

18    A.    Yes.

19    Q.    Seven days a week?

09:59AM 20    A.    No, five days a week.

21    Q.    Five days a week.  So 14 hours a day, five days a week?

22    A.    Yes.

23    Q.    And how much money were you making that you brought home?

24    A.    Quite a bit.

25    Q.    How much?

1    A.    I don't remember.

2    Q.    Give me a ballpark.

3    A.    About 700, because you get paid every two weeks.

4    Q.    And were you paying taxes on that money you were earning

5    in the United States?

6    A.    I don't remember.

7    Q.    How much of that money did you send to your parents every

8    week?

9    A.    I don't remember, but I always helped them.

10:01AM 10    Q.    So there wasn't a particular amount that you had to send

11    to them every week?

12    A.    No, because I still had to pay for the trip.

13    Q.    So you had to pay back your uncle for the coyote?

14    A.    Of course.  No one gives money out as a gift.

15    Q.    So, you paid for the coyote, not your uncle?

16    A.    My uncle paid for it and then I paid him back.

17    Q.    Did you also pay your uncle rent?

18    A.    Yes.

19    Q.    Did you pay him for the food you ate?

10:01AM 20    A.    Yes.

21    Q.    And whatever was left over, you sent to your parents?

22    A.    Yes, I always sent them.

23    Q.    And how much were you allowed to keep for yourself?

24    A.    Whatever was necessary for me.

25    Q.    Well, what does that mean?  Explain.

1    A.    I would pay the rent, I would pay my uncle back, I would

2    send money to my mother, and I would have maybe 100 or 150 left

3    over.

4    Q.    Now, I think you testified that when you were 16, you

5    started high school?

6    A.    Yes, I also went to high school.

7    Q.    And that was about two years after you arrived in the

8    United States?

9    A.    Yes.

10:03AM 10    Q.    And when you were in high school -- well, strike that.

11    Before you went to high school, did anyone attempt to teach you

12    English?

13    A.    No.

14    Q.    And so when you went to high school, you didn't understand

15    English?

16    A.    That's why I went, to study English.

17    Q.    So you were taught English in high school for the first

18    time?

19    A.    That's why I went.

10:03AM 20    Q.    Okay.  Now, when you went to high school -- by the way,

21    did you participate in any afterschool sports?

22    A.    Yes.

23    Q.    What sports did you participate in?

24    A.    Soccer.

25    Q.    And did you work a job after school?

1    A.    Yes.

2    Q.    And how many hours a week did you work a job after school?

3    A.    I would start the job at 4:30 and get out around midnight.

4    Q.    And then you'd go to school the next day?

5    A.    Yes.

6    Q.    How did you do in school?  What kind of grades did you

7    receive?

8            MR. POHL:  Objection, Judge.

9            THE COURT:  I'm struggling with the relevance of any

10:04AM 10   of this, Mr. Lopez.

11           MR. LOPEZ:  Let me move on, your Honor.

12   Q.    When you went to high school, you were the new kid in

13   town?

14   A.    There were many people that were new.

15   Q.    Did kids make fun of you?

16   A.    No.

17   Q.    Did kids pick fights with you?

18   A.    Not in the first days.

19   Q.    How long did it take before kids started to pick fights

10:05AM 20   with you?

21   A.    I made some friends among the Surenos, and when I started

22   hanging out with the Surenos, then the Nortenos started picking

23   fights.

24   Q.    And you learned to fight back?

25   A.    I didn't learn to fight, only to defend myself.

1    Q.    To protect yourself?

2    A.    Yes.

3    Q.    That was your first -- the first time that there was

4    violence in your life?

5    A.    I don't remember.

6    Q.    Now, I think you said at some point you met Curly?

7    A.    Yes.

8    Q.    And you testified that Curly was the word for the Seaside

9    clique?

10:06AM 10    A.    Yes.

11    Q.    And how old was Curly when you met him?

12    A.    I don't know.

13    Q.    Was he older than 16?

14    A.    Yes, he was older than 25.

15    Q.    Older than 25?

16    A.    I think so.

17    Q.    And you were 16?

18    A.    Yes.

19    Q.    And you started hanging out with him?

10:07AM 20    A.    Yes.

21    Q.    Kind of took you under his wing?

22    A.    I don't understand.

23    Q.    Kind of became like a big brother to you?

24    A.    Yes, once you start hanging out with MS-13 dudes, that's

25    what they do.  They treat you in such a way that you feel safe

        1    with them.

        2    Q.    Because he was a homie?

        3    A.    Yes.

        4    Q.    And you were his little homie?

        5    A.    Yes.

        6    Q.    And he gave you alcohol to drink?

        7    A.    What I recall is that we only smoked marijuana.

        8    Q.    And he was the one that provided the marijuana?

        9    A.    No, sometimes I would get it on my own.

10:08AM 10    Q.    Okay.  And sometimes he would provide what he had for you?

       11    A.    Yes.

       12    Q.    Would it be fair to say that you admired him?

       13    A.    Yes.

       14    Q.    That you trusted him?

       15    A.    I respected him because any time that a dude is jumped

       16    into MS-13, you respect him, especially if he's a runner.

       17    Q.    And he made you a homeboy, right?

       18    A.    Yes.

       19    Q.    How did that make you feel?

10:09AM 20    A.    I felt fine.  Whenever anyone is jumped into MS-13, after

       21    the beating, one feels happy with the dudes.

       22    Q.    Did it make you feel strong?

       23    A.    Yes, once you become a member of MS-13, one's life is

       24    different because there are rules in MS-13.

       25    Q.    And so did it make you feel important?

1    A.    Perhaps I did not feel important since I was just a

2    newcomer.

3    Q.    Well, I think you said that it made you feel like your

4    other homeboys were your brothers, right?

5    A.    Yes.

6    Q.    Kind of like your family?

7    A.    Like family, yes.

8    Q.    And they would have your back?

9    A.    Yes.  Yes, and in the same way they protect you, you have

10:10AM 10    to protect them as well.

11    Q.    And so you didn't have to worry about being attacked at

12    school anymore, did you?

13    A.    In school, it was different because Curly couldn't go into

14    the school nor could the other dudes there.

15    Q.    Well, did you tell your uncle that you became a homeboy?

16    A.    No.

17    Q.    Did you tell your parents that you became a homeboy?

18    A.    No.

19    Q.    And at some point after you became a homeboy, you stabbed

10:11AM 20    someone, right?

21    A.    Yes.

22    Q.    And I think you testified that you were 17 at the time?

23    A.    Yes.

24    Q.    And you were with Curly?

25    A.    Yes.

1    Q.    Did Curly tell you to stab the person?

2    A.    No.

3    Q.    Did he ask you to stab the person?

4    A.    No.

5    Q.    You just knew that you had to stab the person?

6    A.    We were at the parking lot at a party and Curly was

7    surrounded, so I had taken a piss when I heard them asking

8    Curly what did he flash, so I went up there, and when I saw

9    that there were a lot of guys there, I said, "What's up?"  And

10:12AM 10    when the guy turned around I saw -- I knew him.  I knew he was

11    a Norteno.

12    Q.    So if I'm hearing you correctly, Curly was in trouble?

13    A.    Yes.

14    Q.    He was surrounded by Nortenos?

15    A.    Yes.

16    Q.    And you came to his defense?

17    A.    We weren't going together, but what happens is I had

18    stopped to take a leak and since he was going in and he was

19    ahead of me, he got attacked first.

10:13AM 20    Q.    So when you stabbed someone for the first time, it was

21    because Curly was being attacked, right?

22    A.    They weren't attacking him, they were just saying what's

23    up, like what was he flashing because he was wearing very loose

24    clothing.

25    Q.    How many Nortenos were around Curly?

```
 1    A.    I think there were three, but there were more from over
 2    there to over here.
 3    Q.    And it was just you and Curly?
 4    A.    No, there was a Sureno with us as well.
 5    Q.    So three on three?
 6    A.    Yes.
 7    Q.    And you stabbed one of the Nortenos?
 8    A.    Yes.
 9    Q.    Did the Nortenos attempt to stab you or Curly before you
10    stabbed them?
11    A.    No.
12    Q.    So you were the aggressor?
13    A.    No, because they had Curly surrounded.  That's why I went
14    there.
15    Q.    Because you thought they were going to stab Curly?
16    A.    Yes.
17    Q.    So you thought you were defending Curly?
18    A.    Being a member of MS-13, you can't allow for another dude
19    to lose.
20    Q.    Sir, what I'm trying to get to is your state of mind when
21    you stabbed the Norteno.
22          MR. POHL:  I object, Judge.  I think he answered that
23    question.
24          THE COURT:  Again, I'm having trouble seeing the
25    relevance of any of this, but I'll allow it, go ahead.
```

1    Q.   When you stabbed the Norteno, did you think that you were

2    protecting Curly?

3    A.   Well, what I did was because Curly was -- they were going

4    to attack Curly, so before they attacked Curly, I did that.

5    Q.   You struck first?

6    A.   Exactly, because they had him surrounded.  Once you're

7    surrounded in that way, that means that they're going to beat

8    you up.

9    Q.   Now, Mr. Hernandez Miguel, are you familiar with MS-13

10:16AM 10    rules regarding older or mature members of the gang?

11   A.   I don't understand the question.

12   Q.   Well, have you ever heard the term "calmado"?

13   A.   Yes, I've heard that.

14   Q.   And that's when older members are allowed to retire, so to

15   speak?

16   A.   That hardly occurs.

17   Q.   But there's a rule that allows for it, right?

18   A.   There is no rule saying that somebody can get beat,

19   calmado.  It's only the clique might tell someone to calm down,

10:18AM 20   to calmado.

21   Q.   So calmado means to calm down?

22   A.   Like to take it easy.

23   Q.   And someone who's allowed to calm down isn't expected to

24   go out and participate in gang activities, right?

25   A.   Nowhere.

```
 1    Q.    And usually it's members who are married?

 2    A.    No.

 3    Q.    Starting families?

 4    A.    Most of the dudes have children.

 5    Q.    Get legitimate jobs?

 6    A.    Most of the dudes have jobs.

 7    Q.    Buy homes?

 8    A.    That doesn't matter, according to the gang rules, the MS

 9    rules.

10    Q.    And those who are calmed down refuse to participate in

11    gang activities, right?

12    A.    I don't understand the question.

13    Q.    Since you were about 16 years old, you have lived a life

14    of crime?

15    A.    I don't understand the question.

16    Q.    Well, I think you said your first stabbing was when you

17    were 17 years old?

18    A.    Yes.

19    Q.    And since that time, you've been committing other crimes,

20    right?

21    A.    Anyone who belongs to MS-13, that's what we do.

22    Q.    Sir, I'm not talking about anyone besides you.  You have

23    lived a life of crime since you were 17 years old, correct?

24    A.    Anyone who belongs to MS-13, that's what they do.

25               MR. LOPEZ:  Move to strike the answer, your Honor.
```

36

1          THE COURT:  All right.

2     Q.   Sir, I'm going to ask again.  You, Mr. Hernandez Miguel,

3     have lived a life of crime since you were 17 years old,

4     correct?

5     A.   Yes.

6     Q.   And you've lived a life of crime and violence?

7     A.   You learn violence in MS-13.

8     Q.   And you learned violence?

9     A.   From MS.

10:21AM 10  Q.   And you lived a life of violence, right?

11    A.   Because I was an MS-13 and that's what MS-13 does.  They

12    bring you in for violence and you have to be in committing

13    violence.

14    Q.   Sir, you're the one testifying.

15    A.   Yes.

16    Q.   I'm not asking anyone else who may be a member of MS-13

17    about their life.  I'm asking about your life, right?

18    A.   Yes.

19    Q.   And you have lived a life of violence?

10:22AM 20  A.   I'm telling you that that's what one learns in MS-13.

21    Q.   I'm not asking where you learned it.  I'm saying -- I'm

22    asking you did you live one, live a life of violence?

23    A.   Exactly what I'm telling you that I learned that in MS-13

24    because had I not joined MS-13, that's not what I would have

25    learned.

1    Q.    So your answer is yes?

2    A.    Yes.

3    Q.    And, in fact, you lived a life of crime, violence, and

4    lies, right?

5              THE INTERPRETER:  I'm sorry, what was the last part?

6              MR. LOPEZ:  Lies.

7    A.    I don't understand.

8    Q.    Well, you know what a lie is?

9    A.    Yes.

10:23AM 10   Q.    Like when you told the Eastside clique that you had

11   committed three murders, that was a lie, right?

12   A.    Yes.

13   Q.    And so you've lived a life of crime, violence and lies

14   since you were 17 years old, right?

15   A.    Yes, I learned it in MS-13.

16   Q.    And you became very good at all three, didn't you?

17   A.    I don't understand the question.

18   Q.    Well, during your life of crime, you learned ways to avoid

19   being responsible for your criminal conduct, right?

10:24AM 20   A.    I don't understand.

21   Q.    During your life of crime, did you learn ways not to be

22   caught?

23   A.    Yes.

24   Q.    Because the most important thing in your life has always

25   been what's in the best interest of Mr. Hernandez Miguel,

1   right?

2   A.    I don't understand the question.

3   Q.    Well, the most important thing in your life is doing

4   what's best for you, right?

5   A.    Yes.

6   Q.    And one of the things you became very good at was lying,

7   right?

8   A.    I don't even understand your question.

9   Q.    Well, did you get very good at lying to other people?

10:25AM 10   A.    No, I don't understand.

11   Q.    Well, did you lie to people involved in law enforcement?

12   A.    Not that I know of.

13   Q.    Did you lie to people involved in immigration enforcement?

14   A.    Not that I know of.  I don't know.

15   Q.    Because the most important thing for you was to stay out

16   of trouble, right?

17   A.    I don't understand the question.

18   Q.    Well, sir, do you know what a lie is?

19        MR. POHL:  Objection.

10:26AM 20        THE COURT:  I think we've been over this quite a bit,

21   Mr. Lopez.

22   Q.    Well, would you agree with me that you would lie whenever

23   you needed to get something you wanted?

24   A.    No, I don't understand.

25   Q.    Well, when you lie, you are trying to convince the other

1    person that you're talking to that you're telling the truth,

2    right?

3    A.    I don't understand the question.

4    Q.    Well, when you lie, and you've lied in the past, have you

5    tried to convince the other person that you were lying so that

6    you were telling them the truth?

7            MR. POHL:  Objection.

8            THE COURT:  I'll hear the answer.

9    A.    As far as I know, I have not lied.

10:27AM 10    Q.    You've never lied?

11    A.    That I know of.  I don't understand what you're talking to

12    me about.

13    Q.    Well, can someone tell that you're lying by looking at

14    you?

15            THE COURT:  All right.  You're just beating this to

16    death, Mr. Lopez.  Why don't you move onto a different topic.

17    Q.    Mr. Hernandez Miguel, do you consider yourself an honest

18    person?

19            MR. POHL:  Objection.

10:28AM 20            THE COURT:  All right.  I'll allow this, but you need

21    to move onto a different topic, Mr. Lopez.

22    A.    When all of us who are in MS-13, when we are in MS-13,

23    we're not honest-honest.

24    Q.    Mr. Hernandez Miguel, would you lie to avoid a long prison

25    sentence?

```
 1   A.   No.

 2   Q.   Now, I think you've testified that you were not a drug

 3   dealer?

 4   A.   I don't understand the question.

 5   Q.   Well, did you or did you not sell cocaine to others?

 6   A.   I did not sell cocaine.  I would be paid $100.

 7   Q.   And that was with the deals you did with Pelon?

 8   A.   Yes.

 9   Q.   So, Pelon made you do it?

10   A.   No.

11           THE COURT:  All right.  Let's take our break.

12           THE CLERK:  All rise.

13           (JURORS EXITED THE COURTROOM.)

14           (A recess was taken.)

15           THE CLERK:  All rise for the jury.

16           (JURORS ENTERED THE COURTROOM.)

17           THE CLERK:  Thank you.  You may be seated.  Court is

18   now back in session.

19           THE COURT:  Mr. Lopez.

20           MR. LOPEZ:  Thank you, your Honor.

21   Q.   When we left, Mr. Hernandez Miguel, I was asking you about

22   your involvement with selling cocaine.

23   A.   Yes.

24   Q.   And I think you testified that you only sold -- or strike

25   that -- you didn't sell cocaine but that you would get $100
```

10:30AM (line 10)
10:49AM (line 20)

1    from Pelon when you provided him with security during his drug

2    transactions?

3    A.    Yes.

4    Q.    And you understand you're under oath?

5    A.    Yes.

6    Q.    And you're required to tell the truth?

7    A.    Yes.

8    Q.    And if you don't tell the truth, the government can decide

9    not to give you the benefit of your plea agreement, right?

10:50AM 10    A.    Yes.

11    Q.    Or your cooperation agreement?

12    A.    Yes.

13    Q.    So I ask you during the time you were a member of

14    Eastside, did you supply MS-13 gang members with cocaine in the

15    amounts of $40 bags and $100 bags?

16         THE INTERPRETER:  I'm sorry, $40 or --

17         MR. LOPEZ:  -- $100.

18    A.    Sometimes I had some and I used it and sometimes I was

19    there when others were there and they also used it.

10:51AM 20    Q.    But did you sell it to other gang members in the amounts

21    of $40 bags and $100 bags?

22    A.    I don't recall having sold it.  I do recall that we used

23    it.

24    Q.    And would you typically, after a drug customer called you

25    to place an order, call a runner to deliver drugs and collect

1    the money?

2        THE INTERPRETER:  I'm sorry, could you repeat the

3    question for the interpreter?

4        MR. LOPEZ:  Yes.

5    Q.    Would you typically, after a drug customer called you to

6    place an order, call a runner to deliver drugs to the customer

7    and collect your money?

8    A.    I don't understand the question.

9    Q.    Well, did you use a runner to sell drugs?

10:52AM 10    A.    I've never sold drugs.

11   Q.    Never, ever?

12   A.    No.  We did use drugs.

13   Q.    Now, do you know a man by the name of Mauricio Sanchez?

14   A.    Yes, that's Tigre.

15   Q.    That's Tigre.  And starting in the summer of 2015, did you

16   begin supplying him with cocaine?

17   A.    We used drugs with him as well.

18   Q.    Well, didn't Mr. Sanchez or Tigre pick up $40 and $80 bags

19   of cocaine from your residence?

10:53AM 20    A.    Not that I can recall.

21   Q.    So you didn't sell Tigre $40 and $80 bags of cocaine in

22   the summer of 2015?

23   A.    Not that I can recall.

24   Q.    And who's Chentino?

25   A.    Vincentino.

```
 1    Q.    Vincentino?

 2    A.    Yes.

 3    Q.    And did you use Vincentino as your runner?

 4    A.    Not that I can recall.

 5    Q.    You don't have any memory of that?

 6    A.    Vincentino, no.

 7    Q.    Well, did you -- did he go by both names, Chentino and

 8    Vincentino?

 9    A.    I know him as Vincentino.

10:54AM 10   Q.    And during the summer of 2015, did you provide him with

11    five or six $40 bags of cocaine on a weekly basis to supply

12    your customers?

13    A.    Not that I can recall.

14    Q.    And if I told you that Tigre told that to the

15    government --

16            MR. POHL:  Objection.

17    Q.    -- during one of its proffers?

18            THE COURT:  Well, sustained.

19    Q.    Now, during the time that you weren't selling cocaine, you

10:55AM 20   learned ways not to be held responsible, right?

21    A.    I don't understand the question.

22    Q.    Well, I think you said that you didn't use Vincentino as a

23    runner, right?

24    A.    Vincentino has never been a runner.  The runners are

25    Casper and Playa.
```

         1   Q.   The runner for your drug operation, your delivery boy?

         2   A.   I don't know.

         3   Q.   You didn't use a delivery boy in your drug operation?

         4   A.   No.

         5   Q.   And you didn't use a delivery boy to avoid responsibility

         6   in case he got caught with the drugs?

         7   A.   No.

         8   Q.   In case he got caught with your drugs?

         9   A.   Not that I can recall.

10:57AM 10   Q.   Now, one of the other ways that you tried to avoid being

        11   held responsible for things you did was to use false names,

        12   right?

        13   A.   No, I used a name for work.

        14   Q.   So the only reason you used a false name was for work?

        15   A.   I used it to work.

        16   Q.   And what name did you use for work?

        17   A.   I don't remember.

        18   Q.   Was it Jose Hernandez?

        19   A.   That's my name.

10:57AM 20   Q.   Was it Jose Damian Hernandez Miguel?

        21   A.   That's my name.

        22   Q.   Was it Jose Miguel Hernandez?

        23   A.   That's my name.

        24   Q.   Was it Jose Damian Hernandez?

        25   A.   That's my name.

1    Q.    Was it Jose Miguel?

2    A.    That's also my name.

3    Q.    Those are all your names?

4    A.    Yes.

5    Q.    And you use all of those names?

6    A.    Well, that's my name.  Why wouldn't I use it?

7    Q.    Now, during your life of crime, you've tried to avoid

8    situations where you would get involved with confidential

9    informant?

10:58AM 10    A.    I don't understand the question.

11    Q.    Well --

12          THE COURT:  Ask it in a non-argumentative way and

13    maybe you'll make some headway, Mr. Lopez.

14    Q.    Well, you testified that MS had rules with respect to

15    confidential informants?

16    A.    Yes.

17    Q.    And did you have an understanding as to whether or not you

18    should work with confidential informants?

19    A.    I don't understand.

10:59AM 20    Q.    Do you know what a confidential informant is?

21    A.    Yes.

22    Q.    And in this case, Pelon was working with the government as

23    a confidential informant, right?

24    A.    Yes.

25    Q.    And you became friends with him, right?

```
 1    A.    Yes.

 2    Q.    Really good friends?

 3    A.    Yes.

 4    Q.    Like best friends?

 5    A.    Yes.

 6    Q.    And you introduced him to Mr. Guzman?

 7    A.    I didn't introduce them.  I went to hang out and he also

 8    arrived.

 9    Q.    Did you bring Pelon to the Eastside clique?

11:00AM 10    A.    No, I got there and I was hanging out with Pelon.  I would

11    go where Pelon went.  We were always together and the dudes

12    always saw him with me and so they started taking his phone

13    number and then he started going out with all of them.  One day

14    I arrived to the garage with Pelon --

15          MR. LOPEZ:  Your Honor, I move to strike what he's

16    talking about now.

17          THE COURT:  I think he's answering the question.

18          MR. LOPEZ:  Well, the question was did he bring him to

19    the clique?

11:01AM 20          THE COURT:  And he's explaining, you interrupted when

21    he said one day I arrived to the garage with Pelon, and then

22    you interrupted him, so I'll let him continue.

23    Q.    Finish, sir.

24    A.    One day I arrived to the garage with Pelon and the dudes

25    were there hanging out, and several already knew him, so Casper
```

1    grabbed him and said we have to jump this guy in, and so Casper

2    jumped him in.  I never told him to jump him in.

3    Q.    I don't believe I asked you that question, but so are you

4    saying the very first time you saw Pelon at a clique meeting,

5    he was jumped in?

6    A.    No, that's not what I'm saying.

7    Q.    In fact, you wanted him to be jumped into the Eastside

8    clique, right?

9    A.    At no time did I speak with the runners about jumping him

11:02AM 10    in.  The runner jumped him in because he wanted to.  He said

11    that he was ready to be jumped in.  And Pelon said no, no, no,

12    don't jump me in, later, but he jumped him in right then and

13    there.

14    Q.    So, sir, if I'm understanding you correctly, Pelon was

15    known to members of the clique before you brought him there,

16    correct?

17    A.    He was hanging out with me, Pelon, and because of that,

18    the dudes in the clique met him.

19    Q.    And according to you, you were indifferent about whether

11:03AM 20    he should be jumped in, right?

21    A.    I didn't care if they jumped him in or not.

22    Q.    Now, at that point in time was he your best friend?

23    A.    He was with me.

24    Q.    And I think you said you brought him to the meeting,

25    right?

1    A.    I never took him to the meeting.  When I took him there,

2    the dudes were just hanging out at the garage.

3    Q.    How did you feel when you found out he was a government

4    informant?

5              MR. POHL:  Objection.

6              THE COURT:  Sustained.  Sustained.

7    Q.    Did you feel betrayed?

8              MR. POHL:  Objection.

9              THE COURT:  Sustained.

11:04AM 10          MR. LOPEZ:  Your Honor, may I approach?

11             THE COURT:  All right.

12             (THE FOLLOWING OCCURRED AT SIDEBAR:)

13             THE COURT:  Yes.

14             MR. LOPEZ:  I believe I'm allowed to probe his state

15   of mind, his bias, and his motives here.

16             THE COURT:  His bias against whom, against Pelon?

17             MR. LOPEZ:  Against Pelon and against the Eastside

18   clique.

19             THE COURT:  Mr. Pohl.

11:05AM 20          MR. POHL:  I don't know.  Pelon's not a witness.  I

21   don't know what the relevance of his bias is, and I don't think

22   there's been any demonstration that he's biased against anyone.

23             THE COURT:  All right.  I'll allow it.  There's so

24   much here about this witness' subjective feelings and things

25   that are not relevant, and it's a little distracting, but I

1    will allow this.  When you ask witnesses an argumentative

2    question on cross, you're likely to get an argumentative answer

3    or an evasive answer.  And, you know, if that's your strategy,

4    it's all right, but it's really repetitive and difficult to

5    listen to sometimes, but I'll allow this.

6         MR. LOPEZ:  Thank you, your Honor.

7         (SIDEBAR CONFERENCE WAS CONCLUDED)

8         THE COURT:  All right, go ahead, Mr. Lopez.  I'll

9    allow it.  Overruled.

11:06AM 10   Q.   Did you feel betrayed?

11   A.   I realized it when I was arraigned here, I realized it was

12   him.

13   Q.   And did you feel betrayed?

14   A.   At that moment, I didn't understand why he had done that.

15   Q.   Now, you testified that in 2009 you were deported back to

16   El Salvador?

17   A.   Yes.

18   Q.   And you came back with the help of a coyote?

19   A.   I came by myself, but at the border, I paid a coyote to

11:07AM 20   cross over.

21   Q.   And did you go through Guatemala?

22   A.   Yes.

23   Q.   And Mexico?

24   A.   Yes.

25   Q.   Have you ever told anyone that you were born in Guatemala?

1    A.    Not as far as I can recall, I never said that.

2    Q.    What about Honduras?

3    A.    No.

4    Q.    What about the United States?

5    A.    No.

6    Q.    Have you ever told anyone you were an American citizen?

7    A.    Not that I can recall.  Had I been a citizen, I wouldn't

8    have been deported.

9    Q.    Now, you've been asked a lot of questions about the

11:08AM 10    proffer agreement that you signed in May of 2016, and

11    essentially you understood that by signing that agreement,

12    which was marked as Exhibit 48, anything that you told the

13    agents or the U.S. Attorney's Office couldn't be used against

14    you, right?

15    A.    Yes.

16          MR. LOPEZ:  If I could have a moment, your Honor.  I'm

17    trying not to repeat what's already been asked.

18          THE COURT:  Yes.

19    Q.    Now, in your October 2016 proffer, did you tell the

11:09AM 20    government that you were not required to kill to become a

21    homeboy?

22    A.    One has to attack somebody to gain respect from the

23    homeboys.

24    Q.    Sir, the question I asked you is whether or not you told

25    the government that you did not have to kill in order to be a

1    homeboy?

2    A.    I don't remember.

3    Q.    Right.  I'll come back to that.  Now, you testified that

4    you came to Mass in 2004 after your sister's husband died?

5    A.    Yes.

6    Q.    Do you know when he died?

7    A.    I don't remember.

8    Q.    Did you attend the funeral?

9    A.    No.

11:10AM 10    Q.    When you came to Massachusetts in 2004, were you living

11    with your sister?

12    A.    Yes.

13    Q.    And I think you testified that around some time later you

14    met Mr. Guzman for the first time?

15    A.    Yes.

16    Q.    And he did not introduce himself as a runner, right?

17    A.    At that time he did not tell me he was a runner.

18    Q.    Okay.  And if he was, the rules of the gang would have

19    required him to tell you that, right?

11:11AM 20    A.    Well, the main runner was Casper and he did tell me that

21    he was a runner.

22    Q.    Let me try again.  As far as you knew, the rules of the

23    gang would have required to introduce himself as a runner if he

24    was, in fact, the runner, right?

25    A.    The runner was Casper.  He was the main person.

1   Q.   So, are you distinguishing between Mr. Sandoval as the

2   runner and Mr. Guzman as the runner?

3   A.   Yes, because there's the runner and then there's the

4   second one.

5   Q.   And during your testimony in this case, you referred to

6   them as the runner in the singular?

7   A.   Yes.

8   Q.   And the runners in the plural?

9   A.   Runners.  Casper is the first and Playa is the second.

11:13AM 10   Q.   Were you present when Mr. Guzman became the second?

11   A.   No.

12   Q.   So you're relying upon what other people told you about

13   his status, right?

14   A.   How would I not know since I was a member of the Eastside?

15   How would I not know who runs the clique?

16   Q.   Sir, were you present when he became the second in

17   command?

18   A.   No.

19   Q.   And in --

11:13AM 20   A.   Because when I arrived, he was already a runner.

21   Q.   When you arrived in 2004?

22   A.   No, when I took the word with them.

23   Q.   But in 2004, if he was second in command, the rules of

24   MS-13 would have required him to announce his status, correct?

25   A.   No, because the main one who's first is the principal and

1    he is the one that has to identify himself.  The second one is

2    there in case the first one is not.

3    Q.   But I thought you testified on direct that when members

4    meet each other, they tell each other their name and their

5    status, right?

6    A.   No, you say the alias.

7    Q.   And you don't tell your other members whether you're a

8    homeboy, a paro, or a chequeo?

9    A.   One says it because if you flash the Mara sign, then

11:15AM 10   you're in the Mara, in MS.  If one is not in MS, one cannot

11   greet another dude with the flashings of the MS.

12   Q.   So if one is in MS and he's meeting another MS member who

13   he hasn't met before, he tells him his name and his status in

14   the gang; be that homeboy, paro, or chequeo?

15   A.   One says from what clique one is.

16   Q.   In addition to what clique they're from --

17   A.   Yes.

18   Q.   -- do they also tell you whether or not they are first or

19   second in command?

11:16AM 20   A.   On that occasion, that did not happen.  When Casper

21   introduced him, he did because Curly had also told him.

22   Q.   So, to be clear, in 2004, when you first met Mr. Guzman,

23   he did not tell you he was second in command, right?

24   A.   I don't remember.

25   Q.   You don't remember?

```
 1    A.   No.

 2    Q.   Do you remember when you came here in 2004?

 3    A.   No.

 4    Q.   Was it in the beginning of the year?

 5    A.   I don't remember.

 6    Q.   End of the year?

 7    A.   I don't remember.

 8    Q.   You testified that you stayed in Massachusetts for six or

 9    seven months?

11:17AM 10  A.   No, what I said was that I went back and forth from

11    Los Angeles to here and that I had remained permanently in

12    2007.

13    Q.   So, between 2004, when you first came here, and 2007, how

14    many times did you go back and forth?

15    A.   About two times, maybe three.

16    Q.   The last time that you went back to California, what year

17    was it?

18    A.   I think it was around 2006.

19    Q.   But you testified that you returned to Massachusetts two

11:18AM 20  years later, right?

21    A.   I said that I was in between, back and forth, during that

22    period of time from Massachusetts to L.A., and in 2007 I

23    remained permanently in Massachusetts.

24    Q.   When in 2007?

25    A.   I don't remember.
```

1    Q.   You don't remember the date?

2    A.   No.

3    Q.   Do you remember the month?

4    A.   No.

5    Q.   Do you remember the season?

6    A.   I think it might have been summer.

7    Q.   And you said that at some point you saw Mr. Guzman again?

8    A.   Yes.

9    Q.   And do you remember when that was?

11:19AM 10    A.   I think the first time I saw him again was in Everett at

11    Tecolote's.

12    Q.   And do you remember when that was?

13    A.   No, I don't.

14    Q.   How about the month?

15    A.   No, I don't remember the month, but it was a short while

16    after I had returned.

17    Q.   And at some point I think you testified that Mr. Sandoval

18    asked you to start hanging out with the Eastside clique?

19    A.   Yes.

11:20AM 20    Q.   And you started hanging out with them?

21    A.   Yes.

22    Q.   When was that?

23    A.   I think it was around 2008.

24    Q.   What month?

25    A.   I don't remember.

```
 1   Q.   Early 2008?

 2   A.   I don't remember the month.

 3   Q.   Do you remember the season?

 4   A.   It was during the summer.

 5   Q.   So there wasn't any snow on the ground?

 6   A.   I don't remember.

 7   Q.   But you do remember the conversation you had with

 8   Mr. Guzman -- I mean, with Mr. Sandoval, right?

 9   A.   Yes.

11:21AM 10   Q.   And when you had that conversation, were you alone with

11   him?

12   A.   No, there were a whole bunch of dudes hanging out there.

13   Q.   And were you drinking when you were hanging out?

14   A.   Smoking and also drinking.

15   Q.   Smoking marijuana?

16   A.   Yes.

17   Q.   And drinking alcohol?

18   A.   Yes.

19   Q.   And were you doing cocaine as well?

11:22AM 20   A.   I don't remember.

21   Q.   Well, you testified earlier that you used to bring cocaine

22   and share it with others?

23   A.   Which year are you referring to?

24   Q.   The year that you say this conversation occurred.

25   A.   Yeah, but that doesn't mean that wherever I went I was
```

1    handing cocaine out to everybody.

2    Q.    So you then say that at some point later, you

3    were -- strike that.  You then get deported, right?

4    A.    Yes.

5    Q.    And you didn't become -- at the time you were deported,

6    were you already a homeboy?

7    A.    Yes.

8    Q.    Of the Eastside clique?

9    A.    I had the word with Eastside clique.

11:23AM 10    Q.    And when did that happen?

11    A.    A few days after I spoke with Casper because I used to

12    hang out with the dudes in Somerville, and Casper asked me why

13    wouldn't I take the word with the Eastsides since my clique was

14    not in Boston that I should take the word with the Eastsides.

15    Q.    And what day did that conversation occur?

16    A.    Like I told you, it was around summertime.

17    Q.    Well, what month in the summer?

18    A.    I don't know what month it was.

19    Q.    Where did the conversation take place?

11:24AM 20    A.    At Tecolote's house.

21    Q.    And you say you don't remember the month, but it might

22    have been some time in the summer?

23    A.    Yes.

24    Q.    Now, you also testified that after you became a member,

25    there were meetings that were held on a regular basis?

1    A.    After I had the word with the Eastsides?

2    Q.    Yes.

3    A.    Yes.

4    Q.    And sometimes they were once a month?

5    A.    Yes.

6    Q.    Sometimes they were twice a month?

7    A.    Yes.

8    Q.    And sometimes they were every week?

9    A.    When there was an issue with one of the dudes, it would be

11:25AM 10    more often.

11    Q.    And what year were these meetings taking place?

12    A.    Which year?

13    Q.    Yes.

14    A.    MS-13 does meetings all the time, not just every year.

15    Q.    So, in 2008 these meetings were being held?

16    A.    Yes.

17    Q.    And in 2009?

18    A.    Yes.

19    Q.    Now, you were deported in 2009, right?

11:26AM 20    A.    Yes.

21    Q.    And I think Mr. Murphy asked you if you knew when you were

22    arrested by Immigration and Customs Enforcement?

23    A.    Yes.

24    Q.    Do you remember the date of your arrest?

25    A.    No.

1    Q.   Do you remember where you were?

2    A.   Yes.

3    Q.   Where were you?

4    A.   In East Boston with the Everetts.

5         THE INTERPRETER:  I'm sorry, with the -- on Everett

6    Street.

7    A.   On Everett Street.

8    Q.   Because you lived on Everett Street?

9    A.   Yes.

11:27AM 10    Q.   What number Everett Street?

11    A.   87.

12    Q.   And they came to your house?

13    A.   Yes.

14    Q.   Were you living there alone?

15    A.   With my sister.

16    Q.   And they took you away?

17    A.   Yes.

18    Q.   And how long did they hold you before they deported you?

19    A.   I don't remember.

11:27AM 20    Q.   Well, do you remember when you arrived in El Salvador in

21    2009?

22    A.   I don't remember.

23    Q.   You don't remember the date?

24    A.   No.

25    Q.   Do you remember the month?

1    A.    I think it was July.

2    Q.    So, it was the summer again?

3    A.    I think so.

4    Q.    Now, in 2008, you claim that you beat up a black male in

5    front of the Taco Loco on Broadway Street in Somerville.  Do

6    you remember that?

7    A.    We had a fight there.

8    Q.    Because you thought the black male was making hand signals

9    at you?

11:28AM 10    A.    No, we were in Spooky's car.  It was myself, Spooky,

11    Caballo, and Demente, and it was Caballo that hit him and

12    Demente.

13    Q.    And you didn't notice the police detective across the

14    street when this fight occurred, did you?

15    A.    No, we didn't notice that the detective was there.

16    Q.    And after the fight, the detective stopped the car you

17    were in, right?

18    A.    Yes.

19    Q.    But you were not arrested?

11:29AM 20    A.    They kept us there, they took us out of the car and

21    checked each one of us, but they only arrested Caballo because

22    they found some knife or knives in his feet.

23    Q.    And would it be fair to say that before you were involved

24    with that assault, you didn't ask permission from Mr. Sandoval

25    to do it?

1    A.    How could I call him during the fight saying that I'm in a

2    fight?

3    Q.    And you didn't ask Mr. Guzman for permission to be

4    involved in that fight?

5    A.    No.

6    Q.    Now, you also testified that before you were deported,

7    that you and Mr. Guzman assaulted a chavala?

8    A.    Yes.

9    Q.    Do you recall the date of this alleged attack?

11:30AM 10    A.    No.

11    Q.    Do you remember the month?

12    A.    No, I don't.

13    Q.    Do you remember the season?

14    A.    It was around summer.

15    Q.    So, did this assault occur -- you think it occurred in the

16    summer of 2009?

17    A.    It was before I was deported.

18    Q.    Six months before you were deported?

19    A.    I don't remember.

11:31AM 20    Q.    But you do recall that you were living in East Boston?

21    A.    Yes.

22    Q.    Near the Maverick Station?

23    A.    Yes.

24    Q.    On Everett Street?

25    A.    Yes.

62

```
         1    Q.    And I think you testified, and I quote, "We had talked to
         2    Playa."  Do you remember testifying to that?
         3    A.    Can you repeat the question?  I don't remember that.
         4    Q.    You testified, to be more specific, on February the 6th
         5    that, "We had talked to Playa"?
         6    A.    I spoke to Playa that he was going to pick me up to go
         7    hang out in Revere.
         8    Q.    And you further testified that, "We were going to hang out
         9    with the dudes in Revere"?
11:33AM 10    A.    Yes.
        11    Q.    Who was the "we"?
        12    A.    Playa and myself.
        13    Q.    So when you said "We had talked to Playa," you meant I had
        14    talked to Playa?
        15    A.    Playa picked me up.  It was only Playa and myself in the
        16    car.
        17    Q.    So, when you used the word "we," you meant "I"?
        18    A.    I said that I had called Playa and that Playa had come to
        19    pick me up so that we could go hang out in Revere.
11:34AM 20          MR. LOPEZ:  Your Honor, may I have the Elmo just for
        21    the witness.
        22          Ms. Huacuja, can you read the first line through the
        23    first sentence.
        24          THE INTERPRETER:  Line 1?
        25          MR. LOPEZ:  Line 1 through line 4 through the end of
```

1    the sentence.

2    Q.    Now, sir, do you see that in line 1 you said, and I quote,

3    "We had talked with Playa"?

4              THE INTERPRETER:  Could you tell me which line?

5    Q.    Starting the last word on the first line, "We had talked

6    with Playa."  Do you see that, sir?

7    A.    Yes.

8    Q.    Is that what you said?

9    A.    I was at home, I was the only one at home, and the only

11:35AM 10    one that came to pick me up was Playa.

11    Q.    Is that what you said, sir?

12    A.    What I said was that I had spoken to Playa so that we

13    would go hang out in Revere.

14    Q.    Sir, did you say, quote, "We had talked with Playa"?

15    A.    How would I say "we" if only "I" was there?

16    Q.    So you're saying the transcript is inaccurate?

17    A.    I don't know.

18    Q.    In any event, you also said, and I quote, "We were going

19    to hang out with the dudes in Revere," right?

11:36AM 20    A.    Yes.

21    Q.    And, again, when you used the word "nosotros," you meant

22    "I"?

23    A.    I don't understand the question.

24    Q.    When you used the word "we," you meant "I"?

25    A.    The two of us were going -- it was Playa and myself.

Q. So the point is that it was just you and Mr. Guzman?
A. Yes.
Q. No one else?
A. No.
Q. There was no "we," there was no third person?

THE COURT: You've asked this question many, many times. Let's move on.

MR. LOPEZ: There is a point, your Honor.

Q. There was no third person that was with you and Mr. Guzman at the time that this alleged assault occurred, correct?
A. Only the two of us.
Q. And you testified that before you left Boston going towards Revere, under some bridges, you saw a chavala walking all dressed in red, right?
A. We saw him because he was walking down the street.
Q. But you said that you were heading from East Boston going towards Revere?
A. Yes.
Q. Under some bridges?
A. Yes.
Q. Bridges, meaning more than one?
A. Yes, because down there, there are bridges.
Q. And you testified that this assault took place under those bridges?
A. Yes.

1   Q.   Now, can you describe what it looked like under the

2   bridges where you say this attack occurred?

3   A.   We were going, heading towards Revere, and the chavala ran

4   from the street he was on towards some bridges that were over

5   there.

6   Q.   Some bridges, plural?

7   A.   A bridge where cars go over.

8   Q.   And what did it look like underneath the bridge?

9   A.   What do you mean?

11:39AM 10   Q.   What did you observe underneath the bridge?

11   A.   The chavala that was walking there.

12   Q.   Well, did you observe any cars under the bridge?

13   A.   I don't remember.

14   Q.   A parking lot?

15   A.   I think so.

16   Q.   Concrete?

17   A.   Yes, I think so.

18   Q.   Can you describe for me based on your memory from that day

19   what underneath the bridge looked like?

11:40AM 20   A.   The foundations there when we followed the chavala, the

21   chavala took off running, and he tried to get under a bridge

22   that was over there, and there's like cement there and all

23   that.

24   Q.   And you caught up to him underneath the bridges?

25   A.   I think it was before going in there because the guy took

1    off running, but he was running towards where the bridges were.

2    Q.    And when you caught up to him, was he under the bridges?

3    A.    He was running towards the -- underneath the bridge, the

4    bridge was above.

5    Q.    Now, I notice during your direct that you didn't testify

6    as to the type of car Mr. Guzman was driving on that day when

7    you say he picked you up, right?

8    A.    No.

9    Q.    Now, in preparing for your testimony in this case, did you

11:42AM 10    discuss the type of car that Mr. Guzman was driving?

11    A.    I don't remember.

12    Q.    In any event, you were in Mr. Guzman's car?

13    A.    Yes.

14    Q.    And you saw a chavala?

15    A.    Yes.

16    Q.    And you said "That's a chavala"?

17    A.    Yes.

18    Q.    And then you said to Mr. Guzman, "We have to attack him"?

19    A.    I said, "There's a chavala, let's get him."

11:42AM 20    Q.    And you told Mr. Guzman to pull over?

21    A.    Before we reached the stop sign -- when we reached the

22    stop sign, I opened the door.  He got out on his own account.

23    I didn't tell him to stop.

24    Q.    So you didn't tell Mr. Guzman to pull over?

25    A.    I told him, "Let's get the chavala."

1    Q.    So you didn't say to him, you didn't tell him to pull

2    over?

3    A.    Well, if I said, "Let's get the chavala," in effect I was

4    saying let's stop the car.

5           MR. LOPEZ:  Your Honor, can I have the Elmo for the

6    witness again.

7           Ms. Huacuja, can you read line 9 beginning with the

8    word "and."

9           THE INTERPRETER:  Should I go to the next line?

11:44AM 10           MR. LOPEZ:  No, just that line.

11           THE INTERPRETER:  Okay.

12    Q.    Ms. Huacuja read that line to you?

13    A.    Yes.

14    Q.    And does that line say, "So I told Playa to pull over"?

15    A.    Yes.

16    Q.    So you did tell him to pull over?

17    A.    I told him, "Let's get the chavala," and when we came to

18    the stop sign, he had to stop, and I said, "Let's get him."

19    Q.    So, you then chased the chavala?

11:44AM 20    A.    Yes.

21    Q.    And he tried to run away under the bridges?

22    A.    Yes.

23    Q.    You caught him?

24           THE INTERPRETER:  I'm sorry, when you say "you," do

25    you --

1    Q.    You, meaning Mr. --

2    A.    Yes.

3    Q.    And you smashed his face with a bottle?

4    A.    Yes.

5    Q.    And you testified that the chavala was on the floor when

6    Mr. Guzman came and hit him with a bottle as well?

7    A.    Yes, and also with the feet, with his feet.

8    Q.    So, you hit him with one beer bottle?

9          THE INTERPRETER:  I'm sorry?

11:45AM 10    Q.    You, Mr. Hernandez Miguel, hit him with one beer bottle?

11    A.    Yes.

12    Q.    And you claim that Mr. Guzman also hit him with one beer

13    bottle?

14    A.    Yes.

15    Q.    Now, this assault you said took place under some bridges?

16    A.    Yes.

17    Q.    More than one bridge?

18    A.    I don't know how many bridges there are there.  I just saw

19    that there were bridges.

11:46AM 20    Q.    So you're not sure if it was more than one bridge?

21    A.    There's a bridge overhead that goes towards Revere coming

22    out of the highway.

23    Q.    And it was a bridge to Revere?

24    A.    Yes.

25    Q.    Do you know the name of the bridge where this assault took

1    place, allegedly took place?

2    A.    No.

3    Q.    Now, in your October proffer, you said that Mr. Guzman was

4    driving a Toyota SUV.  Do you remember saying that?

5    A.    Yes.

6    Q.    And you knew that pursuant to the proffer, you were

7    required to tell the government everything you knew?

8    A.    Yes.

9    Q.    All the details you knew?

11:47AM 10    A.    Yes.

11    Q.    Because you knew they'd be relying upon you, right?

12    A.    Yes.

13    Q.    And you told them that Mr. Guzman was driving the Toyota?

14    A.    I said it was an SUV.  Maybe it was a Toyota, maybe it was

15    a Honda, but it was definitely an SUV.

16          MR. LOPEZ:  May I have the document camera for the

17    witness, your Honor.

18    Q.    Now, I think you just said that it was a sports utility

19    vehicle?

11:48AM 20          THE INTERPRETER:  I'm sorry.

21    Q.    An SUV, a sports utility vehicle?

22    A.    It was a closed vehicle like that.

23    Q.    Was it an SUV?

24    A.    Yes.

25    Q.    Was it a Toyota?

1   A.   I'm not sure if it was a Toyota or what, but it was

2   definitely an SUV.

3   Q.   But you told the government in October, 2016, more than a

4   year from today, that it was a Toyota sports utility vehicle,

5   didn't you?

6   A.   Yes.

7   Q.   Do you recall what model SUV?

8   A.   I don't know a lot about cars.  I don't know what model

9   SUV it was.

11:50AM 10   Q.   So you can't tell us whether it was a 4runner?

11   A.   4runner, no, I don't know.

12   Q.   Or Rav4?

13   A.   It was something like that.  I don't know much about cars.

14   Q.   A Highlander?

15          MR. POHL:  Objection, your Honor.

16          THE COURT:  All right.

17   Q.   Do you know what model year it was?

18   A.   No.

19   Q.   Do you remember the color?

11:50AM 20   A.   I recall it was like a cream color.

21   Q.   Cream?

22   A.   Yeah, like a tan, cream color.

23   Q.   What if I told you Mr. Guzman didn't own a Toyota in --

24          MR. POHL:  Objection.

25          THE COURT:  Sustained, sustained.

1    Q.    Now, do you know whether or not --

2          THE COURT:  Mr. Lopez, let me caution you, okay.

3    You're not a witness.

4    Q.    Do you know whether or not Mr. Guzman owned an Infinity in

5    2008?

6    A.    I don't know.

7    Q.    Now, in October, 2016, you said that this assault took

8    place under a bridge between East Boston and Winthrop, right?

9    A.    Yes, at the entrance going towards Revere.

11:51AM 10    Q.    The entrance, it was a bridge from East Boston to Winthrop

11    heading toward Revere?

12    A.    No, there's a bridge that goes to Revere, and there's a

13    stop sign there, and then at the stop sign, you turn left and

14    if you go in there, you go towards Revere.

15    Q.    But that's not what you told the government in October of

16    2016, was it?

17    A.    I don't remember.

18    Q.    Well, you told them that the assault took place under a

19    bridge between East Boston and Winthrop, right?

11:52AM 20    A.    Winthrop is far away from where we were.  I said it had

21    occurred at the exit where one takes -- goes towards Revere.

22    Q.    Well, look at the document and see the last line that I've

23    highlighted.

24          THE INTERPRETER:  Should the interpreter read it?

25    Q.    Well, let me just -- and this is -- see on the first page,

1    it says, "October 14, 2016," and it talks about you being

2    interviewed, and there were assistant U.S. attorneys there and

3    FBI agents there and State Police there, and they were taking

4    down what you said, and Ms. Huacuja was interpreting what you

5    said.

6                MR. LOPEZ:  And could you read him the line that I've

7    highlighted.

8    Q.    Did you tell them that the assault took place under a

9    bridge between East Boston and Winthrop?

11:54AM 10    A.    I said that the attack had been there at the exit between

11    East Boston and Revere.

12    Q.    So, the agents took down their notes incorrectly?

13    A.    I don't know.

14    Q.    And Ms. Huacuja didn't interpret what you said correctly?

15                MR. POHL:  Objection.

16                THE COURT:  He cannot answer that question, as you

17    know, Mr. Lopez.

18    Q.    Because you agree that the report says that you said the

19    assault took place under a bridge between East Boston and

11:55AM 20    Winthrop, right?

21    A.    The attack occurred in the exit that goes towards Revere.

22    Q.    Do you know how many bridges run or connect East Boston to

23    Winthrop?

24    A.    I don't know.

25    Q.    Do you know if there's more than one bridge that connects

1  East Boston to Winthrop?

2  A.    I think there's only one.

3  Q.    Do you know the name of the bridge that connects East

4  Boston to Winthrop?

5  A.    No.

6  Q.    Do you know the name of the street that connects East

7  Boston to Winthrop?

8  A.    Bennington Street, I think.

9  Q.    You're not sure?

11:56AM 10  A.    No.

11  Q.    Have you ever been on the bridge that connects East Boston

12  to Winthrop?

13  A.    I know that the attack occurred by the station to Rhode

14  Island, the blue line.

15  Q.    But you told the government in October of 2016 that the

16  assault took place under a bridge between East Boston and

17  Winthrop?

18  A.    No, I said I had run -- I said that what had happened had

19  occurred at the exit from East Boston to Revere under a bridge.

11:57AM 20  Q.    And you've just testified that there's only one bridge

21  between East Boston and Winthrop, right?

22  A.    I don't know if it's to Winthrop or East Boston, that

23  bridge.  I just know that it's by that station.

24        MR. LOPEZ:  Your Honor, may I have the Elmo for the

25  witness.

1   Q.   Sir, do you recognize that bridge?

2   A.   You can't see the bridge here.

3   Q.   You can't see that bridge, sir?

4   A.   Yeah, I see that bridge.

5   Q.   Do you know whether that bridge is the Saratoga Street

6   Bridge?

7   A.   I don't know.

8   Q.   Do you know whether that's the only bridge that connects

9   East Boston to Winthrop?

11:59AM 10         MR. POHL:  Objection.

11        THE COURT:  Overruled.

12   A.   I don't know.

13   Q.   And you would agree with me at least with respect to this

14   picture that underneath that bridge is only a body of water?

15   A.   Yes.

16   Q.   And you don't recognize that as the bridge from East

17   Boston to Winthrop?

18   A.   I don't know.

19        MR. LOPEZ:  Your Honor, may I approach?

12:00PM 20         THE COURT:  Let me take a break.  You mean approach

21   sidebar?

22        MR. LOPEZ:  I was going to approach sidebar.  We can

23   do it at the break.

24        THE COURT:  Let's approach sidebar while we take our

25   break.

1          THE CLERK:  All rise.

2          (THE FOLLOWING OCCURRED AT SIDEBAR:)

3          MR. LOPEZ:  Your Honor, I'd like to admit this picture

4    notwithstanding the witness' reluctance to give me a

5    foundation.  I believe you can take judicial notice of it.

6    It's a readily ascertainable fact, and under Rule 201, I think

7    we're able to do that.  I think the jury should see.

8          THE COURT:  Mr. Pohl.

9          MS. LAWRENCE:  I don't know what the relevance of this

12:01PM 10   bridge is because the defendant hasn't given any foundation for

11   recognizing it as the bridge.  But for what it's worth, I don't

12   think there's any dispute that that's where he says the assault

13   took place.

14         THE COURT:  It's on the boarder of judicial notice

15   since I have no familiarity with the area, but it seems to me

16   you can stipulate like that so you don't have to call them.

17         MS. LAWRENCE:  We don't want to do that.  We only

18   object for relevancy.

19         THE COURT:  I'll admit it with that objection.

12:02PM 20   (SIDEBAR CONFERENCE WAS CONCLUDED)

21         ( A recess was taken.)

22         THE CLERK:  All rise for the jury.

23         (JURORS ENTERED THE COURTROOM.)

24         THE CLERK:  Thank you.  You may be seated.  Court is

25   now back in session.

1           THE COURT:  Mr. Lopez.

2           MR. LOPEZ:  Your Honor, I move to admit the photo.

3           THE CLERK:  The next number would be 227.

4           THE COURT:  227.  All right.  It's admitted.  227.

5           (Exhibit No. 227 received into evidence.)

6           MR. LOPEZ:  Can I show it to the jury, your Honor?

7           THE COURT:  Yes.

8    Q.    Sir, do you know whether or not that is the only bridge

9    that connects East Boston --

12:16PM 10          THE COURT:  You've asked him that.  It's really quite

11   repetitive.

12          MR. LOPEZ:  That's fine, your Honor.

13   Q.    Now, you also testified about an assault that took place

14   near the Maverick Station in East Boston?

15   A.    Yes.

16   Q.    And you participated in that attack by using a bat?

17   A.    Yes.

18   Q.    And I think you were asked on cross-examination whether

19   you took Exhibit 50 out of your house, meaning your machete?

12:17PM 20   A.    I don't understand the question.

21   Q.    Okay.  Fair enough.  I think you testified that you never

22   took the machete out of your house?

23   A.    That machete over there?

24   Q.    This machete, Number 50.

25   A.    That machete was in the house.

1   Q.   Did you ever take any machete out of the house?

2   A.   No, what I had was a yatagan.

3   Q.   So you didn't typically carry a machete with you?

4   A.   No, that's why I had a yatagan like this.

5   Q.   And do you remember during your proffer in October of 2016

6   telling the government that you typically carried a machete?

7   A.   I carried a yatagan.

8   Q.   But that you left it home that day because you were going

9   to a barbecue with your girlfriend?

12:19PM 10   A.   I don't remember.

11   Q.   You don't remember telling them that?

12   A.   I don't remember.

13        MR. LOPEZ:  Your Honor, document camera for the

14   witness.

15        Can you read that first sentence that's highlighted,

16   Ms. Huacuja?

17        THE INTERPRETER:  Yes.

18   Q.   Did you tell the government that you typically carried a

19   machete but that you left it home that day because you were at

12:20PM 20   a barbecue with your girlfriend?

21   A.   Yes.

22   Q.   Now, you testified that after the attack, you called

23   Mr. Guzman and told him what happened, right?

24   A.   Yes.

25   Q.   And you further testified that Mr. Guzman told you to call

1      a taxi?

2      A.    Yes.

3      Q.    And he would pay for it?

4      A.    Yes.

5      Q.    And you called a taxi?

6      A.    Yes.

7      Q.    And you told the taxi to take you to Eastern Avenue in

8      Chelsea?

9      A.    Yes.

12:20PM 10    Q.    Because you knew there was a car wash there?

11     A.    Yes.

12     Q.    And you testified that Mr. Guzman picked you up there?

13     A.    Yes.

14     Q.    You testified that Mr. Guzman picked you up in Chelsea,

15     right?

16     A.    At the car wash.

17     Q.    And I think you also testified that at the time of this

18     attack, Checha's house was in East Boston?

19     A.    Yes.

12:21PM 20    Q.    But you're certain that Mr. Guzman picked you up in

21     Chelsea?

22     A.    Yes.

23     Q.    No doubt in your mind?

24     A.    No.

25     Q.    And you're certain that you told Mr. Guzman about the

1    assault near the Maverick Station?

2    A.   That was the reason I went to Eastern Avenue.  I told

3    Playa that the area was hot and that the police had come to

4    Checha's house.

5    Q.   Sir, let me ask you this.  Are you as certain about

6    telling Mr. Guzman about the assault as you are about where he

7    picked you up that night?

8         THE INTERPRETER:  I'm sorry, could you repeat the last

9    part of the question?

12:22PM 10  Q.   Let me try to break it down.  You're -- I'm asking you if

11   you're certain that you told Mr. Guzman about what happened

12   that night?

13   A.   If I had not said anything to Playa, then why would he be

14   picking me up there?

15   Q.   And I'm asking you if you're as certain about that as you

16   are about where he picked you up that night?

17        MR. POHL:  I object to the form of the question, your

18   Honor.

19        THE COURT:  It is argumentative, but I'll let it

12:23PM 20  stand.

21   A.   That's why I went there, that's why I took a taxi because

22   he said he would pay for the taxi to Eastern Avenue.

23   Q.   Well, sir, again, in your October 2016 proffer, you didn't

24   tell the government and the agents who were taking notes that

25   you were picked up by Mr. Guzman in East Boston -- I mean, in

80

1    Chelsea, were you?  Did you?

2    A.    (No response)

3    Q.    And you didn't tell them about the telephone conversation

4    you had with Mr. Guzman about calling a taxi and him paying for

5    it and him coming to pick you up, right?

6    A.    So how was I supposed to get to the car wash then?

7    Q.    Well, you did tell the agents that approximately 1:00 a.m.

8    the following morning, you called Mr. Guzman to pick you up at

9    Checha's house, right?

12:24PM 10    A.    At no time did I say to pick me up at Checha's house

11    because it was a hot area, the police were there.  How would I

12    be telling him to go pick me up there?

13    Q.    If you could just look at the document that I put on the

14    screen.

15          MR. LOPEZ:  And Ms. Huacuja, if you could just read

16    the last sentence I've highlighted.

17    Q.    Do you remember telling the government that at

18    approximately 1:00 a.m. the following morning, Hernandez Miguel

19    called Playa to pick him up at Checha's house?

12:25PM 20    A.    No, I don't recall that.  I recall that I told Playa what

21    had happened and that there were police there and that was when

22    Playa told me to call a taxi and that he could pick me up by

23    the car wash in Chelsea.

24    Q.    But you would agree with me that the report that was

25    written by the agent who was at your interview in October of

1    2016 wrote down that you said that Playa picked you up at

2    Checcha's house, right?

3    A.    I never said to pick me up at Checha's house.

4    Q.    And you knew during that proffer session that you were

5    required to tell the government everything you knew, all the

6    details you knew because you knew they would be relying on them

7    and you did not say in that proffer session that you told

8    Mr. Guzman what happened, did you?

9    A.    How would I be going to Chelsea if I hadn't told Guzman?

12:27PM 10    In that case, I would have just gone home by myself.

11    Q.    You did not tell the agents in October of 2016 when

12    telling them about the assault near Maverick Station that you

13    told Mr. Guzman what happened, did you?

14    A.    Why would Playa then be paying for the taxi to go there?

15    Q.    And you didn't tell them that Playa told you to take a

16    cab, right?

17    A.    Playa told me to take a taxi and that he would pay for it.

18    Q.    And you didn't tell the agents in October, 2016 that

19    Mr. Guzman said he would pay for the cab, right?

12:28PM 20    A.    I went there because he told me to go there.  He told me

21    to go there to the car wash and that he would be waiting for me

22    at the car wash.

23    Q.    And you did not tell the agents in October 2016 that he

24    told you to go to the car wash, right?

25    A.    I don't remember.

1    Q.   And you didn't tell the agents in October, 2016 that

2    Mr. Guzman picked you up at the car wash, right?

3    A.   I spoke with the agents, and I told them what had

4    happened.

5    Q.   And you told the agents at approximately 1:00 a.m. the

6    following morning you called Playa to pick you up at Checha's

7    house, right?

8    A.   What I told him was that there were police outside of

9    Checha's house knocking on the door, and that's when Playa told

12:30PM 10   me to take a taxi and go to the car wash.

11   Q.   But you never told that to the government in October of

12   2016?

13            MR. POHL:  Objection.

14            THE COURT:  It's really quite repetitive.  Let's move

15   onto a different topic.

16   Q.   Now, you testified about some protection details that you

17   went on.  Do you remember that testimony?

18   A.   To protect what?

19   Q.   Do you remember that testimony?

12:30PM 20   A.   You aren't saying what I was protecting.

21   Q.   I said you gave some testimony in this case about being

22   involved in protection details where Pelon was selling drugs to

23   undercover police?

24   A.   Yes.

25   Q.   And did Mr. Guzman know about that beforehand?

1    A.    I don't know.

2    Q.    Did Mr. Guzman refuse to go on those protection details?

3    A.    He was asked if he wanted to participate, and he said no.

4    Q.    So he was asked to join in the protection detail and he

5    refused?

6    A.    Yes.

7    Q.    Now, directing your attention to December 14, 2014, which

8    was the shooting that Vida Loca was involved in.  I think you

9    testified that you knew before the shooting occurred that you

12:32PM 10    knew Vida Loca wanted to kill Mr. Ortiz?

11    A.    We were there with Crazy when Vida Loca was calling at the

12    garage.

13            MR. LOPEZ:  Could I have a second, your Honor?

14    Q.    My question, sir, is did you know before Crazy gave

15    Vida Loca the gun that Vida Loca was going to shoot someone

16    that night?

17    A.    That's why Vida Loca was calling Crazy.  I didn't know if

18    he was going to shoot or not.

19    Q.    Well, you did testify that he called Crazy and Vida Loca

12:34PM 20    was saying that the 18s were there again and to bring the gun

21    because he was going to shoot them?

22    A.    Yes.

23    Q.    So you knew before the shooting that it was Vida Loca's

24    intention to shoot someone?

25    A.    It was Crazy's speaking with Vida Loca.  I did not know if

1    Vida Loca was going to shoot him or not.

2    Q.   So when you got out of the car, when you asked to be

3    dropped off, did you or did you not know that Vida Loca was

4    going to shoot someone that night?

5    A.   I don't know.  Only he knew.

6    Q.   And you would agree that Mr. Guzman did not know

7    beforehand, right?

8    A.   I imagine not.

9    Q.   Now, you also talked about a stabbing in Highland Park,

12:35PM 10    and, trust me, I'm not going to go over what's already been

11    gone over, focusing only on Mr. Guzman.  You testified that

12    after the stabbing you went to Mr. Guzman's house with Pelon

13    and Domingo, right?

14    A.   Yes.

15    Q.   And you testified that Mr. Guzman was upset because

16    Domingo was a kid and he wasn't a member of the Eastside

17    clique?

18    A.   What he said was why had we brought Domingo over there,

19    that we shouldn't bring over boys that we don't know.

12:36PM 20    Q.   Because you were exposing his home to someone he didn't

21    know, right?

22    A.   I don't know.  He opened the door for us because we were

23    MS dudes and I was wounded.

24    Q.   And you testified that Mr. Guzman gave you some clothes?

25    A.   Yes.

1    Q.   And that he disposed of the shorts and shirt you were

2    wearing during the assault?

3    A.   Yes.

4    Q.   But in your July proffer to the government, you didn't

5    mention going to Mr. Guzman's house, did you?

6    A.   I don't remember.

7    Q.   And you didn't mention getting clothes from Mr. Guzman,

8    did you?

9    A.   I spoke with the agents about that.

12:37PM 10    Q.   On that date in July?

11    A.   I don't remember if it was that dated, but I did talk to

12    them about it.

13    Q.   And in July of 2016, when you were describing the stabbing

14    that you participated in in Highland Park, you didn't mention

15    getting clothes from Mr. Guzman that evening, did you?

16    A.   I don't remember.

17    Q.   And you didn't mention anything about Mr. Guzman agreeing

18    to dispose of your clothing, did you?

19    A.   I don't remember that, but I do know that he told me that

12:39PM 20    he would take the clothes and throw them away because he worked

21    for the garbage.

22    Q.   But you didn't tell the government that in July of 2016,

23    right?

24    A.   I don't remember, but I did tell them.

25    Q.   In fact, in your July, 2016 proffer, you told the agents

1    that you did not talk about the stabbing with Mr. Guzman,

2    didn't you?

3    A.    How would I not have spoken if I went to his house?

4    Q.    Well, let me show you your proffer report from July, 2016.

5              MR. LOPEZ:  And, Ms. Huacuja, if you could read

6    the highlighted portion to Mr. Miguel -- Hernandez Miguel.

7    Q.    Would you agree with me, sir, that that report says you

8    did not talk about the stabbing with Playa?

9    A.    How would I not have spoken with Playa about the stabbing

12:40PM 10    if I went to his house and I was wounded?

11    Q.    My question, sir, is does that report -- does that report

12    say that you did not talk about the stabbing with Playa?

13    A.    I don't understand.

14    Q.    Well, the report has been read to you?

15    A.    Yes.

16    Q.    And the report reads, "Hernandez Miguel" --

17              MR. POHL:  Objection.

18              THE COURT:  Overruled.

19    Q.    -- "did not talk about the stabbing with Playa," right?

12:41PM 20              THE INTERPRETER:  I thought there was an objection.

21              THE COURT:  I've overruled the objection.

22              THE INTERPRETER:  Sorry.  Could you repeat the

23    question?

24    Q.    Does the report say, "Hernandez Miguel did not talk about

25    the stabbing with Playa"?

1    A.    The report says that.

2    Q.    And Playa is Mr. Guzman?

3    A.    Yes.

4    Q.    Now, with respect to the East Coast Program, Mr. Guzman

5    didn't want to join the East Coast Program, right?

6    A.    I don't know.  It was the clique that had to decide that.

7    Q.    Well, he was outvoted, right?

8          MR. POHL:  Objection.

9          THE COURT:  Overruled.

12:42PM 10    A.    He was one of the runners.

11    Q.    But he was outvoted?

12    A.    Everybody votes.

13    Q.    And the majority of the clique decided to join, right?

14    A.    Yes.

15    Q.    And that's because the majority rules in the Eastside

16    clique?

17    A.    If someone says they don't want to join but the runners

18    say yes.

19    Q.    Mr. Guzman didn't want to join, did he?

12:43PM 20    A.    I don't know.

21    Q.    And the attempted murder by Animal and Tigre in

22    December of 2015, Mr. Guzman didn't know about that beforehand,

23    did he?

24    A.    I don't know.

25    Q.    And jumping in the Animal.  Mr. Guzman didn't want him

1    jumped in, did he?

2    A.   I don't know.

3    Q.   In fact, many of the clique members didn't want him jumped

4    in, right?

5    A.   Then why was he jumped in?  If the runners say we're not

6    jumping him, then they don't jump him, and that's that.

7         MR. LOPEZ:  Well, if I could just have a second, your

8    Honor.

9    Q.   You do recall meeting with the government in July, 2016?

12:44PM 10        MR. POHL:  I object to this.  We've been over this,

11   your Honor.

12        THE COURT:  Overruled.

13   A.   Yes.

14   Q.   And do you recall telling them that many ESLS members

15   opposed jumping Animal into the clique but eventually the

16   clique beat Animal into the gang?

17   A.   Checha was the one that was saying that no, he didn't want

18   Animal and all that because Checha wanted to bring a friend of

19   his in.

12:45PM 20   Q.   But, sir, the question is do you recall telling the

21   government that many ESLS members opposed jumping Animal into

22   the clique but eventually the clique beat Animal into the gang?

23   A.   If the runners say they're going to jump him, they jump

24   him.

25   Q.   Sir, let me try this one more time.  Did you tell the

1    government and its agents that "Many ESLS members opposed

2    jumping Animal into the clique but eventually the clique beat

3    Animal into the gang"?

4    A.    Yes.

5    Q.    And one of the people who was against that idea was

6    Mr. Guzman, right?

7    A.    I don't know because if Guzman had spoken since he was a

8    runner, he would have been understood better.  If he had spoken

9    up and said no, we're not jumping him, then perhaps he would

12:47PM 10    not have been jumped in.

11    Q.    But that's not how it went down, was it?

12    A.    No.

13    Q.    He was outvoted?

14    A.    I don't remember if he was outvoted or silenced.

15    Q.    But you wanted the Animal into the clique, right?

16    A.    He's a member that goes to barrio.  It's not that I

17    wanted, because if I had wanted, I would have jumped him.

18    Animal said that he had spoken to Casper to run with the

19    clique.  I didn't say to him come to my clique.

12:47PM 20    Q.    Did you oppose him coming into your clique?

21    A.    No.

22    Q.    What about Pelon?  Did Pelon want him in the clique?

23    A.    No, I was with Pelon, and since Pelon was always with me,

24    sometimes we'd go to hang out with the dudes, and many dudes

25    met him in that way and started taking down his phone number.

1    That's how Pelon entered hanging out with the clique until one

2    day Casper told him at the garage that he was going to jump him

3    in, and Pelon said no, that he didn't want to get beaten up, he

4    didn't want to be jumped in.

5            MR. MURPHY:  Objection, your Honor.

6            THE COURT:  Let's stop there and put another question

7    to the witness.

8            MR. MURPHY:  I'd ask for that testimony to be stricken

9    as non-responsive, your Honor.

12:48PM 10            THE COURT:  Well, it wasn't responsive, but it was

11    also something we've been over multiple times, so I'll let it

12    stand.

13            Mr. Lopez.

14            MR. LOPEZ:  I just need a second, your Honor.

15    Q.    I'm about to move into some translations, assuming my

16    program opens.  Now, Mr. Hernandez Miguel, you testified that

17    meetings of the clique were monthly?

18    A.    Each month, but if there were problems in the clique, they

19    would be more often.

12:50PM 20    Q.    And was that true in December of 2014?

21    A.    I don't understand the question.

22    Q.    In December of 2014, was the clique meeting on a monthly

23    basis?

24    A.    It could be every month or every two weeks or even every

25    week.

1    Q.   And isn't it true then in December of 2014, you had not

2    seen Mr. Guzman for a few months?

3    A.   We hadn't spoken, but we would always see each other

4    including when we were hanging out.

5    Q.   Do you recall a conversation with Caballo that you had in

6    December of 2014?

7    A.   Yes.

8    Q.   Where you asked Caballo when you last saw Mr. Guzman?

9    A.   Yes.

12:51PM 10    Q.   And do you recall saying that you hadn't seen Mr. Guzman

11    for about three months?

12              MR. POHL:  Objection.

13              THE INTERPRETER:  I'm sorry.

14              THE COURT:  You're asking him --

15              MR. LOPEZ:  If he had a conversation with Mr. Caballo

16    and if he recalls saying to Caballo that he hadn't seen

17    Mr. Guzman in about three months.

18              THE COURT:  I'll let it stand.

19    Q.   That you had not spoken with Mr. Guzman in about three

12:52PM 20    months?

21              THE INTERPRETER:  I'm sorry, could you repeat the

22    entire question for the interpreter?

23    Q.   Do you recall having a conversation with Mr. Caballo --

24              THE INTERPRETER:  I'm sorry.

25    Q.   Do you recall having a conversation with Mr. Caballo --

```
 1    A.    Yes.

 2    Q.    -- where you told him that it was about three months that

 3    you had not spoken to Playa?

 4    A.    Yes, spoken on the phone.  There was a period of time

 5    where we hardly spoke on the phone, but we always saw each

 6    other when we were hanging out.

 7    Q.    Okay.  And are you saying that you didn't speak to him

 8    when you went to meetings?

 9    A.    No, that perhaps I hadn't talked to him on the phone.
```

12:54PM 10    When you go to the meetings, of course, you see all the dudes

```
11    there.

12               MR. LOPEZ:  Your Honor, can I approach for a second?

13               THE COURT:  All right.

14               (THE FOLLOWING OCCURRED AT SIDEBAR:)

15               MR. LOPEZ:  I have some tapes, some translations and

16    some tapes that I want to play, Mr. Pohl, but I'm having some

17    technical difficulties.  For some reason, it was up and then it

18    went back down, so I can try to boot it back up or since we

19    have five minutes, I thought maybe --
```

12:54PM 20               THE COURT:  You said your whole exam was an hour and a

```
21    half, and it's been nearly three hours, so how much more do you

22    have?

23               MR. LOPEZ:  I just want to go through these tapes.

24               THE COURT:  How long is that going to take assuming

25    the equipment is working?
```

1          MR. LOPEZ:  Less than a half hour.

2          THE COURT:  Mr. Pohl.

3          Let's do this, let's try to use the time --

4          Yes.

5          MR. POHL:  Can I -- sorry, before we leave, let's see

6    how long that takes and without definitively committing myself

7    to this plan of action, if this goes the way that I think it's

8    going to, I would expect not to have redirect questions, so I'm

9    thinking -- I don't know if the Court has any interest and

12:55PM 10   inquiry whether they want to stay.

11         THE COURT:  Let's here how it goes.  Less than half an

12   hour is like on the order of 20 minutes.

13         (SIDEBAR CONFERENCE WAS CONCLUDED)

14         THE COURT:  All right.  Let's go.

15         MR. LOPEZ:  With the Court's permission, I wanted to

16   begin -- I'm having technical difficulties, your Honor.

17         THE COURT:  Why don't you try it without playing it.

18   Why don't you see what happens if you just ask the witness

19   about the word or the translation issue.

12:57PM 20   Q.    Sir, do you remember having a conversation with Muerto in

21   July of 2015?

22   A.    I spoke to myself?

23   Q.    No, with Mr. Caballo?

24   A.    Yes.

25   Q.    And do you recall expressing frustration in your

1   conversation with him that the members of the Eastside clique

2   didn't want to do Mara things?

3   A.   Yes.

4   Q.   And when you said that the members didn't want to do Mara

5   things, were you referring to Mr. Guzman?

6   A.   I don't remember.

7   Q.   Now, directing your attention to December 6, 2015, do you

8   remember a conversation that you were having with Pelon and an

9   unidentified male regarding the clique again?

12:59PM 10        THE INTERPRETER:  I'm sorry, what?  I was speaking

11   while you spoke.  I didn't hear the last part.

12   Q.   Regarding the clique again?

13   A.   I don't remember.

14   Q.   Well, do you remember expressing to Pelon your

15   disappointment that people weren't doing anything for the

16   clique?

17   A.   No, I don't remember.

18   Q.   Do you recall telling him, "You're my friend, if you need

19   something, let me know what's up."  Do you remember saying

01:00PM 20   that?

21   A.   I don't remember.

22   Q.   Do you remember saying to Pelon, "These dudes don't know,

23   these dudes are not in the Mara anymore, dude"?

24        MR. POHL:  Objection.

25        THE COURT:  Overruled.

1    A.   I don't remember.  How would they not be in the MS if

2    they're in there?  If they go to the meetings and they go

3    everywhere, then they're gang members.

4    Q.   My question, sir, is do you recall telling Pelon that

5    "These dudes don't know, these dudes are not in the Mara

6    anymore, dude"?

7    A.   I don't recall.  How would I say that they're not in the

8    Mara?

9    Q.   So you're not saying you didn't say, you're just saying

01:01PM 10   you don't recall saying it, correct?

11   A.   What I'm saying is how would I be saying that they're not

12   in MS if they have been jumped in?

13            THE COURT:  How much more do you have, Mr. Lopez?

14            MR. LOPEZ:  Not much more, your Honor.

15            THE COURT:  Why don't we -- if it's all right with the

16   jury, why don't we stay here for a bit and see if we can't

17   finish this.

18   Q.   Now, do you recall a conversation with Caballo where you

19   were discussing what some kids did to someone's house?

01:02PM 20   A.   No, I don't remember.

21   Q.   Do you recall discussing going up to shoot up Casper's

22   house?

23   A.   I don't remember.

24   Q.   And do you recall telling Caballo, "The same way we did it

25   that day"?

1  A.    I don't remember.

2  Q.    Well, do you recall being involved with vandalizing

3  someone's house previously?

4  A.    No.

5  Q.    Do you recall a plan that you and Pelon hatched to try to

6  motivate Mr. Guzman to participate in gang activities?

7  A.    How would I be motivating somebody else to participate in

8  gang activities?

9  Q.    Well, did you hear about the vandalism that occurred to

01:04PM 10  Mr. Guzman's home and car?

11  A.    I never heard about that.

12  Q.    In July of 2015 around the same time you were complaining

13  that they weren't doing Mara things?

14        MR. POHL:  Objection.

15        THE COURT:  Overruled.

16  A.    I never heard about that.  Playa never said anything, at

17  least not to me.

18        MR. LOPEZ:  Your Honor, could I have the document just

19  for the witness.

01:04PM 20  Q.    Do you recognize the word on this photo?

21  A.    A word?

22  Q.    "Escalade"?

23  A.    No, I don't recognize any of this.

24  Q.    Do you recall what kind of car Mr. Guzman was driving in

25  July, 2015?

97

1    A.    I think it was an Escalade.

2    Q.    A black Escalade?

3    A.    I don't remember.

4    Q.    And, in any event, you don't know anything about how that

5    car was vandalized?

6    A.    How would I recall if I don't know anything about it?

7    Playa never told me anything about that, and I didn't hear

8    anything about it from a different dude or a different person.

9    Q.    Let me show you another photo.  Did you know anything

01:06PM 10    about how the car was vandalized?

11          MR. POHL:  Objection.

12          THE COURT:  He said he didn't know anything about

13    the -- that the car was vandalized.  I'll allow it, go ahead.

14    A.    How would I know?

15    Q.    Did you -- strike that.  Sir, these are my final questions

16    to you.  Are you a father today?

17    A.    Yes.

18    Q.    How old is your son?

19    A.    He's almost turning two.

01:07PM 20    Q.    And are you hoping to be a part of his life soon?

21    A.    Some day.

22          MR. LOPEZ:  Thank you, no more questions, your Honor.

23          THE COURT:  Any redirect?

24          MR. POHL:  Mr. Hernandez Miguel, I don't have any

25    further questions for you.  Thank you.

1          THE WITNESS:  Thank you, your Honor.

2          THE COURT:  All right.  We will break there for the

3     day.  Thank you, ladies and gentlemen, for allowing us to

4     finish that.  Please remember all of my cautions not to discuss

5     the case among yourselves or with anyone else, and, again, let

6     me emphasize you're not to read or look at or listen to any

7     media reports, and the MBTA willing, we will start tomorrow at

8     9:00.

9          THE CLERK:  All rise.

10          (Whereupon, the hearing was adjourned at 1:08 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3    UNITED STATES DISTRICT COURT )

4    DISTRICT OF MASSACHUSETTS ) ss.

5    CITY OF BOSTON )

6

7            I do hereby certify that the foregoing transcript was

8    recorded by me stenographically at the time and place aforesaid

9    in Criminal Action No. 15-10338-FDS, UNITED STATES vs. HERZZON

10   SANDOVAL, et al., and thereafter by me reduced to typewriting

11   and is a true and accurate record of the proceedings.

12           Dated this 13th day of February, 2018.

13                        s/s Valerie A. O'Hara

14                   _____

15                        VALERIE A. O'HARA

16                        OFFICIAL COURT REPORTER

17

18

19

20

21

22

23

24

25