UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA            )
                                    )
vs.                                 )  Criminal Action
                                    )
HERZZON SANDOVAL,                   )  No. 15-10338-FDS
EDWIN GUZMAN,                       )
CESAR MARTINEZ,                     )
ERICK ARGUETA LARIOS,               )
                Defendants          )

BEFORE:  THE HONORABLE F. DENNIS SAYLOR, IV

JURY TRIAL DAY 14

TESTIMONY ONLY

John Joseph Moakley United States Courthouse
Courtroom No. 2
1 Courthouse Way
Boston, MA 02210

16th day of February, 2018

Valerie A. O'Hara
Official Court Reporter
John Joseph Moakley United States Courthouse
1 Courthouse Way, Room 3204
Boston, MA 02210
E-mail: vaohara@gmail.com

1    APPEARANCES:

2    For The United States:

3        United States Attorney's Office, by CHRISTOPHER J. POHL,
     ASSISTANT UNITED STATES ATTORNEY, and KELLY BEGG LAWRENCE,
4    ASSISTANT UNITED STATES ATTORNEY, 1 Courthouse Way, Suite 9200,
     Boston, Massachusetts 02110;

5

6    For the Defendant Herzzon Sandoval:

7        Foley Hoag LLP, by MARTIN F. MURPHY, ESQ. and
     MADELEINE K. RODRIGUEZ, ATTORNEY,
     155 Seaport Boulevard, Boston, Massachusetts 02210;

8

9    For the Defendant Edwin Guzman:

10       Lawson & Weitzen, by SCOTT P. LOPEZ, ESQ.,
     88 Black Falcon Avenue, Suite 345, Boston, Massachusetts 02210

11   For the Defendant Erick Arueta Larios:

12       THOMAS J. IOVIENO, ESQ., 345 Neponset Street
     Canton, MA 02021;

13

14   For the Defendant Cesar Martinez:

15       Stanley W. Norkunas, 11 Kearney Square,
     Howe Building, Suite 202, Lowell, Massachusetts 01852.

16       ROBERT M. SALTZMAN, ESQ., 1 Central Street, Suite 5,
     Stoneham, Massachusetts 02180.

17

18

19

20

21

22

23

24

25

1                          I N D E X

2     WITNESS                    DIRECT   CROSS  REDIRECT  RECROSS

3     MAURICIO SANCHEZ
          By Mr. Lopez                      4
4         By Mr. Iovieno                    8
          By Ms. Rodriguez                 13
5         By Mr. Norkunas                  17
          By Ms. Lawrence                          21
6         By Mr. Lopez                                        25

7     BRIAN ESTEVEZ
          By Ms. Lawrence         26               85
8         By Mr. Murphy                    53                88
          By Mr. Iovieno                   81
9         By Mr. Lopez                     84

10

11    EXHIBITS                          FOR I.D.   IN EVIDENCE

12       232                                          97
         233                                          98
13

14

15

16

17

18

19

20

21

22

23

24

25

1                        TESTIMONY ONLY

2              THE CLERK:  All rise for the jury.

3              (JURORS ENTERED THE COURTROOM.)

4              THE CLERK:  Thank you.  You may be seated.

5              THE COURT:  Good afternoon, everyone.  Good morning.

6    I think it's morning.  Mr. Sanchez, you understand that you're

7    still under oath?

8              THE WITNESS:  Yes.

9              THE COURT:  All right.  Mr. Lopez.

09:04AM 10              MR. LOPEZ:  Thank you, your Honor.

11                        MAURICIO SANCHEZ

12                   CROSS-EXAMINATION, CONTINUED

13    BY MR. LOPEZ:

14    Q.   Good morning, Mr. Sanchez.

15    A.   Good morning.

16    Q.   Now, Mr. Sanchez, do you remember after signing your

17    proffer agreement how many times you met with the government?

18    A.   Several times.

19    Q.   Did you meet with them on February 16, 2016?

09:05AM 20    A.   Yes.

21    Q.   And March 3, 2016?

22    A.   I don't remember the dates, I just remember that I met.

23    Q.   And August 16, 2016?

24    A.   Yes.

25    Q.   And, again, on September 30, 2016?

1          THE INTERPRETER:  September 30th?

2    Q.   September 30, 2016?

3    A.   Yes.

4          MR. LOPEZ:  Your Honor, I've created a chalk which I'd

5    ask to have on the screen.

6          THE COURT:  All right.

7    Q.   Now, directing your attention to your February 16, 2016

8    proffer, do you recall telling the government that the Eastside

9    clique is not that active of a clique?

09:06AM 10   A.   I did tell them that.

11   Q.   Okay.  And you said that the most violent member of the

12   clique was Muerto?

13   A.   Yes.

14   Q.   And in your -- in your March proffer, did you tell them

15   that Muerto was a drug dealer?

16   A.   Yes.

17   Q.   And you told them that Muerto supplied MS gang members

18   with cocaine?

19   A.   Not just to MS-13, he sold cocaine to non-MS members as

09:07AM 20   well.

21   Q.   Well, I was going to get there, but not only -- others as

22   well?

23   A.   Yes.

24   Q.   And he supplied cocaine in $40 bags?

25   A.   Yes.

1    Q.    And $100 bags?

2    A.    Yes.

3    Q.    And he supplied you with cocaine?

4    A.    Yes.

5    Q.    And you paid for it?

6    A.    Yes.

7    Q.    And Muerto also used a runner to deliver his drugs; is

8    that correct?

9    A.    Sometimes he would send Chentino.

09:08AM 10    Q.    And Chentino would deliver the drugs?

11    A.    Yes.

12    Q.    And also collect the money?

13    A.    Yes.

14    Q.    And the money would go back to Muerto?

15    A.    Yes.

16    Q.    And Muerto didn't share his profits with the clique,

17    right?

18    A.    I don't know about that.

19    Q.    Okay.  Now, during your proffers, you also told the

09:08AM 20    government about crimes that you had committed, right?

21    A.    Yes.

22    Q.    And during those four proffer sessions, you never told the

23    government that you committed any murders, correct?

24    A.    No.

25    Q.    Because you've never committed any murders, right?

```
 1   A.   No.
 2   Q.   In fact, you testified yesterday about going with Animal
 3   to look for Gallo, you also told the government that you
 4   intentionally misled Animal because you were reluctant to be
 5   involved with a murder, right?
 6   A.   Yes.
 7   Q.   And you also told the government that you didn't shoot
 8   your mother?
 9   A.   Yes.
10   Q.   Rather, you told the government that you witnessed an
11   attack on your mother in Honduras by organized crime figures,
12   right?
13   A.   Yes.
14   Q.   But that's not what you told members of the Eastside
15   clique, right?
16   A.   No.
17   Q.   You told them that you shot your mother, right?
18   A.   Yes.
19   Q.   And you told them that you had committed murders, right?
20   A.   Yes.
21   Q.   In fact, you told them that you committed seven murders,
22   right?
23   A.   Yeah, I used to show off like that.
24        MR. LOPEZ:  No further questions, your Honor.
25        THE COURT:  Okay.
```

CROSS-EXAMINATION

1

2   BY MR. IOVIENO:

3   Q.   Good morning, Mr. Sanchez.

4   A.   Good morning.

5   Q.   My name is Thomas Iovieno.  I represent Mr. Larios and I

6   just have a few questions for you.  I believe you testified

7   that you met Mr. Larios in 2010?

8   A.   Yes.

9   Q.   And you were working for a trash removal company?

09:11AM 10   A.   Yes.

11   Q.   And when you met Mr. Larios, you understood that he had a

12   family?

13   A.   I met him.  I did not meet his family.

14   Q.   But you've known him from 2010, you still know him today,

15   you know during that period of time that Mr. Larios was married

16   and had children?

17   A.   Yes.

18   Q.   And you also knew that he was working in the community

19   with Russell Disposal, a trash removal company?

09:12AM 20   A.   Yes.

21   Q.   And I think you testified that you were jumped in to

22   Eastside in March of 2013, right?

23   A.   It was in 2013.  I don't recall the month or the date.

24   Q.   Fair enough.  But I think you testified you also were

25   drunk at the time that you were jumped in?

1 A. Yes.

2 Q. Okay.  And that's against the rules, correct?

3 A. Yes.

4 Q. Is it fair to say that throughout your -- the period of

5 time that you were associated with Eastside, you had a

6 substance abuse problem, both with cocaine and with alcohol?

7 A. Yes.

8 Q. And it's fair to say that you didn't hang around with

9 Mr. Larios that much, did you?

09:13AM 10 A. No.

11 Q. And you would see him periodically at meetings, right?

12 A. You asked me if it was, and I said no, it wasn't correct,

13 I did hang out with him a lot.

14 Q. Oh, you hung with him outside of meetings?

15 A. Almost every weekend.

16 Q. Okay.  And you would see Lobo in restaurants and bars?

17 A. Yes.

18 Q. And you also saw him at meetings that you attended, right?

19 A. Yes.

09:14AM 20 Q. Okay.  And is it fair to say at some point in 2015 that

21 Lobo, he had missed some meetings, correct?

22 A. Yes.

23 Q. And he was questioned about that at a meeting, right?

24 A. Yes.

25 Q. And they wanted an explanation from him of where he had

1    been, where are you?

2    A.    Yes.

3    Q.    And is it also fair to say that during this period of time

4    you were hanging around with Muerto and Pelon quite a bit,

5    right?

6    A.    I hung around with everyone in the clique.  All of us who

7    were active would go out on weekends to look for chavalas, so I

8    don't know why you're focusing only on Muerto and Pelon because

9    we were all MS-13.

09:15AM 10    Q.    Well, you said that you were close with Muerto?

11    A.    I got along well with him, yes.

12    Q.    And you described him as well respected and solid in your

13    mind, right?

14    A.    Yes.

15    Q.    And you testified that you hung around in October of 2015

16    with Animal?  You met Animal and you hung around with him a

17    little bit?

18    A.    No, I met him in October of 2015 but I started hanging out

19    with him in December.

09:16AM 20    Q.    Okay.  That's when you committed the beating and the

21    stabbing, correct, with Animal?

22    A.    Yes.

23    Q.    And Muerto at the time, around the fall of 2015, it's fair

24    to say that you were at a meeting when Muerto complained that

25    nobody was out in the street, right?

1          MR. MURPHY:  Objection, your Honor.

2          THE COURT:  Overruled.

3          THE INTERPRETER:  I'm sorry, could you repeat the

4     question?

5     Q.   You were at a meeting when Muerto complained that nobody

6     was out in the street?

7     A.   That's what he was saying but, in fact, we were going out

8     every weekend.  I was going out with the runners, with Lobo,

9     and with various members of the clique.

09:17AM 10    Q.   Okay.  But at that meeting you said no one is in the

11    street, correct?

12         MR. MURPHY:  Can I have a standing objection, your

13    Honor.

14         THE COURT:  Yes.

15    Q.   You were at that meeting, correct?

16    A.   Yes.

17    Q.   And you said no one was out in the street.  That's what

18    you said?

19    A.   That's what they were saying so I was just following

09:18AM 20    along.

21    Q.   Okay.  Because it's fair to say that during meetings --

22    Mr. Lopez asked you questions, and it wasn't unusual for you to

23    show off, to brag and embellish about what you were doing,

24    right?

25    A.   Mostly the time when I would go, I was drunk.  A drunk

1    person always like to make things up.  It's not the same as a

2    person that is sober.

3    Q.   So you were drunk at a lot of meetings and you made a lot

4    of things up, right?

5    A.   Not at the meetings, more on the weekends when I was

6    drunk.

7    Q.   But it was important for you to appear tough, strong, and

8    to be feared, right?

9    A.   That's what I wanted them to think.

09:19AM 10    Q.   Because it gave you status within the Eastside clique,

11    right?

12    A.   Because not just the Eastside, but in all of MS-13, you

13    can't show any weakness, you have to show that you're strong

14    and bad.

15    Q.   And you did that by making things up, right?

16    A.   Yes.

17    Q.   And Mr. Lopez asked you a question about a conversation

18    you had with the government about Eastside not being that

19    active a clique, right?  Do you remember that?

09:20AM 20         THE INTERPRETER:  I'm sorry, could you repeat for the

21    interpreter?

22    Q.   Yes.  Mr. Lopez asked you a question a few minutes ago

23    about your statements to the government in February that you

24    said that Eastside was not that active a clique?

25    A.   At that time that's what I said, but in fact, Eastside was

1    one of the biggest cliques in Boston.  It had the -- one of the

2    cliques that had the most members.

3    Q.   It had the most members but you told them it wasn't that

4    active, right?

5    A.   During the time that I was there, yes.

6    Q.   And you also told the government that the members were

7    mostly older?

8    A.   Yes.

9    Q.   And they mostly engage in bar fights, right?

09:21AM 10   A.   Yes.

11        MR. IOVIENO:  Thank you, I have no further questions.

12        THE COURT:  Ms. Rodriguez.

13                     CROSS-EXAMINATION

14   BY MS. RODRIGUEZ:

15   Q.   Good morning, Mr. Sanchez.

16   A.   Good morning.

17   Q.   My name is Madeleine Rodriguez, and I represent

18   Mr. Sandoval, and I just have a few questions for you this

19   morning.

09:21AM 20   A.   All right.

21   Q.   Mr. Sanchez, it was your testimony yesterday that you

22   bought a gun for personal use in December 2014, correct?

23   A.   Yes.

24   Q.   And you also testified that Mr. Sandoval took it away from

25   you because he was concerned that you might hurt someone,

1    correct?

2    A.    The truth is this.  As I told you, I bought the gun

3    because I had a problem at work.  A guy had threatened to beat

4    me up, so I bought a gun and so that I would beat him up first.

5    That was the reason I bought the gun.

6    Q.    But after you bought the gun, you were getting drunk and

7    acting a little crazy and so Mr. Sandoval took the gun away

8    from you as a result of that.  That was your testimony,

9    correct?

09:23AM 10    A.    Yes.

11    Q.    And, in fact, you had already shot the gun accidentally

12    before Mr. Sandoval took it away from you, correct?

13    A.    Yes.

14    Q.    One day you were driving in the car with Chentino and

15    Flaco?

16    A.    Yes.

17    Q.    You were drunk?

18    A.    Yes.

19    Q.    And you pulled out the gun in the car and you accidentally

09:23AM 20    shot around, correct?

21    A.    Yes.

22    Q.    And that bullet almost hit Flaco, correct?

23    A.    No.

24    Q.    It was after that incident that Mr. Sandoval took the gun

25    away from you, correct?

1    A.    Yes.

2    Q.    Okay.  You also testified that you met Animal in October

3    2015, correct?

4    A.    Yes.

5    Q.    And you knew that Animal had entered the United States

6    illegally, correct?

7    A.    He didn't tell me that.

8    Q.    Did you ever talk to him about his immigration status?

9    A.    Later on in December when we got together, he did tell me

09:24AM 10   that.

11   Q.    And he told you that he was in the United States

12   illegally, correct?

13   A.    Yes.

14   Q.    And you've already testified that you also entered the

15   country illegally, correct?

16   A.    Yes.

17   Q.    And you've known people who have come into this country

18   without any legal status who have been deported, correct?

19   A.    Yes.

09:25AM 20   Q.    And you know some clique members who have been deported,

21   correct?

22   A.    Yes.

23   Q.    And it's your understanding, sir, correct, based on these

24   experiences and observations that if you were in this country

25   illegally, you could be arrested by immigration at any time,

1    correct?

2    A.    Yes.

3    Q.    That's a risk as an immigrant in this country without

4    status that you have to be concerned about on a day-to-day

5    basis?

6    A.    Yes.

7    Q.    But by joining a clique, you were at least guaranteed that

8    if you did get deported, your fellow clique members would

9    collect money to possibly bring you back into the

09:26AM 10    United States, correct?

11    A.    I didn't join with that end.  I realized that after I had

12    already joined the clique when members had been deported and

13    were down below that would call the clique to get help to come

14    back.

15    Q.    So it was one of the benefits of joining the clique.  If

16    you got deported, the clique would collect money and help bring

17    you back into this country, correct?

18    A.    Yes.

19    Q.    And they could also possibly help your family by

09:27AM 20    collecting money to assist your family while you were outside

21    the country, correct?

22    A.    Possibly, yes.

23    Q.    Mr. Sanchez, you've testified a few times now about having

24    a drinking and drug problem, correct?

25    A.    I had a problem.

1    Q.    Is it fair to say that the more you drank, the more

2    trouble you got in?

3    A.    Every person that's drunk will have more and more problems

4    the more he drinks.

5    Q.    And the same, the more you did drugs, the more problems

6    you had, correct?

7              MS. LAWRENCE:  Objection, your Honor.

8              THE COURT:  I'll allow it.

9    A.    Not exactly when I used drugs did I get in trouble or look

09:28AM 10    to get in trouble, but I was always looking to get in trouble.

11    Q.    And Mr. Sandoval tried to get you to stop drinking and

12    doing drugs, correct?

13    A.    Yes.

14              MS. RODRIGUEZ:  May I have a moment, your Honor?

15              THE COURT:  Yes.

16              MS. RODRIGUEZ:  No further questions, your Honor.

17                        CROSS-EXAMINATION

18    BY MR. NORKUNAS:

19    Q.    Good morning, sir.

09:29AM 20    A.    Good morning.

21    Q.    In relation to what you have told us about Muerto's sale

22    of drugs, do you recall a time when -- that you had gone to his

23    shop and when you were purchasing some drugs, he had numerous

24    other bags set up for distribution?

25    A.    Yes.

1    Q.    Now, was there a time when you were with Mr. Muerto and

2    Pelon and you were in Pelon's car and Pelon showed you a hidden

3    compartment where he kept a firearm and there was a firearm in

4    there?

5    A.    It wasn't a hidden compartment.  It was just a gun that he

6    had in the car in some compartment.

7    Q.    And from your familiarity with Muerto and Pelon, was that

8    a gun that he consistently kept in the car?

9            MR. LOPEZ:  Objection, your Honor.  May we be heard?

09:31AM 10            MR. NORKUNAS:  I'll withdraw the question.

11            THE COURT:  All right.

12    Q.    Now, you were asked to look at a series of photographs of

13    various people, correct?

14    A.    Yes.

15    Q.    And once you were able to identify anybody in the

16    photograph, you were then asked by the government what you knew

17    about that person in relation to what they would do or not do,

18    right?

19    A.    Yes.

09:31AM 20    Q.    Mr. Lopez had set up a listing of four different proffer

21    sessions in which you went into the government and you spoke to

22    them about the people you had identified in the photographs,

23    right?

24    A.    Yes.

25    Q.    And in each of those sessions, you weren't restrained as

1   to what you could say, you could say whatever you felt you

2   needed to, right?

3   A.   No.

4   Q.   Well, you were asked questions about different people,

5   right?

6   A.   Yes.

7   Q.   And you had to be as truthful and as full in your answers

8   as you could be, right?

9   A.   Yes.

09:32AM 10   Q.   And you identified, at one point in time, a particular

11   photograph that you said was my client, Cesar Martinez,

12   correct?

13   A.   Yes.

14   Q.   And then you had told the government at that time that he

15   was a person that operated a tow truck business, correct?

16   A.   Yes.

17   Q.   And that he also did mechanical work at the shop where you

18   would have the meetings?

19   A.   Yes.

09:33AM 20   Q.   And when you had talked about Cesar Martinez, you had

21   indicated that he was a person known to the people and

22   yourself, he would not show up for any fights or any other gang

23   activities, correct?

24   A.   I don't recall having said that.

25        MR. NORKUNAS:  If I could have the Elmo just for the

1   witness.

2   Q.   Sir, I'm calling your attention to the proffer session of

3   August 16, 2016, and I have the interpreter read to you what

4   would be listed as I think line 21 or item 21.

5        Having read that, sir, do you recall having told the

6   government that Cesar Martinez was known for not showing up for

7   any fights or other gang activity?

8   A.   Yes.

9   Q.   Was there a time when -- on the weekends, when you were

09:35AM 10   visiting the bars and the restaurants when you encountered

11   Mr. Martinez and his daughter?

12   A.   I don't remember.

13   Q.   Did you see him on weekends with his daughter?

14   A.   I remember one time, yes.  Okay.  It was during the day he

15   was having a meal.

16   Q.   And his daughter was with him?

17   A.   Yes.

18   Q.   Now, you had indicated that Brujo was an individual that

19   had talked to you about some incidents or some attacks on

09:36AM 20   potential rivals and he also had a discussion or was made a --

21   was telling about Vida Loca and the shooting that Vida Loca was

22   involved in, correct?

23   A.   Yes.

24   Q.   And when Brujo had told you about that, he had indicated

25   that he, Brujo, had gone into the building where Vida Loca did

1    the shooting, correct?

2    A.    During the shooting when he murdered, did the murder,

3    Brujo was with him, behind him.

4    Q.    And he also told you that -- in relating that tale, that

5    Crazy and Chentino had been outside waiting in their car,

6    right?

7    A.    No, Chentino was not in the car.  It was Crazy and Danger.

8    Q.    And that's the tale that he had related to you about that

9    episode, correct?

09:38AM 10    A.    Yes.

11    Q.    Now, you indicated that you were familiar with Mr. Muerto

12    and you and he would hang out together somewhat; is that

13    correct?

14    A.    Yes.

15    Q.    And do you know what type of car Mr. Muerto drove?

16    A.    I saw a Nissan.

17    Q.    Okay.  And would you ever ride with him in that car?

18    A.    He gave me a ride one time.

19        MR. NORKUNAS:  I have nothing further, Judge,

09:39AM 20    thank you.

21        THE COURT:  All right.  Redirect.

22        MS. LAWRENCE:  Certainly.

23                    REDIRECT EXAMINATION

24    BY MS. LAWRENCE:

25    Q.    Mr. Sanchez, when Casper took your gun away from you, did

1    the clique pay you for that gun?

2    A.    Yes.    That was on a Sunday, and when I saw him at work, he

3    told me that the clique was going to buy that gun.

4    Q.    And I'm going to talk to you a little bit about the

5    questions you were just asked regarding Vida Loca's murder.

6    You testified earlier that Chentino got a beating for not

7    assisting Vida Loca during that event, right?

8              MR. LOPEZ:    Objection, your Honor.

9              THE COURT:    Overruled.

09:40AM 10    A.    Yes.

11    Q.    And I believe you testified that he -- that Chentino had

12    been at the after hours beer hall the night that Vida Loca got

13    in a fight and the next night when he returned to shoot

14    Javier Ortiz?

15    A.    I had told you that on the night of the fight with the 18

16    he hadn't done anything to help, that Vida Loca had told him it

17    was an 18 and he, however, did not help.

18    Q.    Was Chentino also there when Vida Loca shot and killed a

19    man?

09:41AM 20    A.    That's what Brujo and Crazy told the clique that he had

21    been there and not helped also.

22    Q.    And Brujo told the clique that.    Did Brujo tell the clique

23    that he had been there that night when Vida Loca shot and

24    killed a man?

25    A.    Yes.

1    Q.    Mr. Sanchez, did Checha go to clique meetings?

2    A.    Yes.

3    Q.    Did he talk about MS-13 activities at clique meetings?

4    A.    Yes.

5    Q.    Did he -- was he also asked to and did he beat people,

6    beat other MS-13 members at clique meetings?

7    A.    Yes.

8    Q.    You testified and were asked some questions about meeting

9    Animal in October of 2015.  Can you tell us again who

09:42AM 10    introduced you to Animal?

11    A.    I met him through Brujo.

12    Q.    Okay.  You also testified earlier and were asked some

13    questions about what you did on the weekends as an MS-13

14    member.

15    A.    Yes.

16    Q.    What did you do on the weekends as an MS-13 member?

17    A.    What every gang member does, go out to look for rivals, to

18    gain respect with the clique.

19    Q.    Okay.  Who did you go out with?

09:43AM 20    A.    When I was first jumped in the people that called me the

21    most were Casper and Playa.  I used to go out with them a lot.

22    Q.    And later, later after you joined, who did you go out

23    with?

24    A.    I would hang out with all of them.

25    Q.    And where did you go?

1    A.    There were specific points.  There were bars where

2    chavalas would go often and so we would head out there.

3    Q.    Okay.  You said you went out to look for chavalas to earn

4    respect.  And earlier you also said that you were one of the

5    more respected members of your clique?

6    A.    In certain ways with some.

7    Q.    Okay.  Well, how did you earn respect from those that did

8    respect you?

9           MR. MURPHY:  Objection, your Honor.

09:44AM 10          THE COURT:  I'll allow it as to his understanding.

11    Obviously he can't testify about what others were thinking.

12    A.    Because they would see that I was one of the most -- one

13    of the ones that would fight the most.

14    Q.    And you also testified that you believe and your opinion

15    is that Muerto was one of the most solid members of the clique?

16    A.    The entire clique thought that.

17    Q.    Why did you think he was?

18    A.    That's what I heard and also he told me that he had done

19    several hits in El Salvador.

09:45AM 20    Q.    Okay.  Why was it important for you to have this respect

21    among your fellow clique members to look tough or to be solid?

22          MR. MURPHY:  Objection, your Honor.

23          THE COURT:  I'll sustain as to the leading.

24    Q.    Earlier you testified that you tried to make yourself look

25    tough.  Why did you do that?

1    A.    Because like I said before, in order to be in a gang, you

2    can't show any weakness.  You either are or you are you not.

3              MS. LAWRENCE:  One moment, your Honor.  Nothing

4    further, your Honor.

5              THE COURT:  Any recross?

6              MR. LOPEZ:  Yes, your Honor.

7                        RECROSS-EXAMINATION

8    BY MR. LOPEZ:

9    Q.    Mr. Sanchez, after Vida Loca committed the murder that

09:47AM 10   we've been talking about, Chentino went into hiding, right?

11   A.    Yes.

12   Q.    And he went into hiding because he knew that he didn't

13   defend Vida Loca against rival gang members the night before

14   the murder, right?

15   A.    Only he knows that.

16   Q.    Well, when he was corrected, he was corrected because he

17   didn't defend Vida Loca the day before the murder, correct?

18   A.    Yes.

19             MR. LOPEZ:  Thank you.

09:48AM 20             THE COURT:  Anything else?

21             MR. IOVIENO:  No, your Honor.

22             THE COURT:  All right.  Thank you.  You may step down.

23             MS. LAWRENCE:  The government calls Brian Estevez,

24   please.  Recalls, I should say.

25             THE COURT:  We'll administer the oath again even

         1   though it's a recall.

         2         BRIAN ESTEVEZ, having been duly sworn by the Clerk,

         3   testified as follows:

         4                    DIRECT EXAMINATION

         5   BY MS. LAWRENCE:

         6   Q.   Good morning, Trooper Estevez.

         7   A.   Good morning, ma'am.

         8   Q.   When you testified before you, you talked about your

         9   investigation of MS-13 from approximately August, 2013 through

09:49AM 10   the beginning of early 2015?

        11   A.   Yes.

        12   Q.   Today, I want to turn your attention to the later stage of

        13   the investigation.  In early January, 2016, did you receive

        14   information that the Eastside clique was planning to make a new

        15   member?

        16   A.   Yes.

        17   Q.   And how did you receive that information?

        18   A.   Through CW-1.

        19   Q.   And did you have other sources to verify his information?

09:50AM 20   A.   Yes, recordings.

        21         MS. LAWRENCE:  Okay.  Could we have Exhibit 116?  It's

        22   been admitted, please.  If you'd like to open your transcript

        23   binders, it's tab 116.

        24         MR. POHL:  May I approach?

        25   Q.   Trooper Estevez, before you testified here today, did you

1    review transcripts and recordings?

2    A.    Yes.

3    Q.    And this is a transcript of a recording made on January 2,

4    2016.  Did you review this transcript?

5    A.    I did.

6    Q.    Okay.  And do you recall, just in general terms, what the

7    gist of this conversation is about in this transcript?

8    A.    It's about an incident that took place in January and a

9    conversation about Animal.

09:51AM 10    Q.    And who is Animal?

11    A.    An MS-13 member.

12    Q.    Down at the bottom of the page, toward the bottom, Tigre

13    says, "And we are running with the Hollywoods, homeboy.  We

14    talked about that at the meeting, you remember right?"

15          What are the Hollywoods?

16    A.    The Hollywoods are a -- they're a clique and there's also

17    a Hollywood program.

18    Q.    And do you know other programs, MS-13 programs?

19    A.    Yes.

09:51AM 20    Q.    Can you give us an example of one?

21    A.    There's --

22          MR. MURPHY:  Objection, your Honor.

23          THE COURT:  I'll allow it.

24    A.    There's the East Coast Program, the L.A. program, the -- I

25    mean, there's a lot of them.

Q.    Did you obtain information during the course of your
investigation regarding whether the Eastside clique belonged to
a particular program?

          MR. MURPHY:  Objection, your Honor.

          THE COURT:  Sustained.

Q.    All right.  After this incident on January 2nd, or
actually what do you know about what happened -- sorry.  In the
transcript we just reviewed, you said that they were talking
about an incident that occurred on January 1st or 2nd?

A.    Yes.

Q.    What do you know about that incident?

A.    It was a stabbing that took place in -- I believe it was
in Chelsea, and Animal and Tigre were involved and some other
individuals.

Q.    Did you learn about any other stabbings that Animal was
involved with during this time frame?

          MR. MURPHY:  Objection, your Honor.

          THE COURT:  Sustained.

Q.    Trooper Estevez, did you receive information in early
January, 2016 that the Eastside clique was having a meeting, an
upcoming meeting?

A.    Yes.

Q.    What did you do after receiving that information?

A.    We do what we always do is try to surveil the meeting as
best as we can, make sure CW-1 had audio and video recording on

1    his person to record the meeting.

2    Q.   Where did you set up surveillance for this meeting in

3    early January?

4    A.   We usually just set up right outside the area of where the

5    meetings took place, which usually was at a garage in Everett.

6    Q.   And do you recall the date of the meeting when you set up

7    the surveillance outside the garage in Everett?

8    A.   I believe it was January 8th.

9    Q.   And was CW-1 able to record that meeting?

09:54AM 10   A.   Yes.

11   Q.   Have you reviewed a recording and transcript of that

12   meeting prior to your testimony here today?

13   A.   I have.

14          MS. LAWRENCE:  Could I have admitted Exhibit 32.1,

15   please.  32.3, please.

16   Q.   Trooper Estevez, I'm going to play some clips from this

17   January 8, 2016 ESLS clique meeting, and I'd like to ask you if

18   you recognize the individuals in the video?

19          (Video played)

09:54AM 20   Q.   Do you recognize that person in the video?

21   A.   I do.

22   Q.   Who is it?

23   A.   Lobo, Erick Argueta.

24   Q.   Thank you.  Who is that individual, if you know?

25   A.   Playa.

1    Q.    Playa, okay.

2              THE COURT:  I'm sorry, the individual on the right?

3              THE WITNESS:  Correct, sir, with the black

4    dark-colored hat.

5              (Video played.)

6    Q.    Who is the person in the knit winter cap?

7    A.    Brujo.

8    Q.    Brujo, okay.

9              (Video played.)

09:55AM 10   Q.    Who is the person in the yellow sweatshirt?

11   A.    Checha.

12             (Video played.)

13   Q.    Who is the individual who was on the frame to the right

14   for most of that clip?

15   A.    Casper.

16             MS. LAWRENCE:  I would like to read portions of the

17   recording -- I'm sorry, the transcript that is at tab 31 in

18   your transcript binder.  Can we have admitted Exhibit 31,

19   please?

09:57AM 20             Your Honor, may I approach the witness?

21             THE COURT:  Yes.

22             MS. LAWRENCE:  This is in the binder just make it

23   easier to read.

24   Q.    Okay.  Trooper Estevez, can you begin reading the

25   highlighted portions of the transcript that I just handed you,

1    please.

2    A.   Yes.  Casper:  "Hey, so, look, how are things then?  Are

3    we going to jump this homie today, or what?"

4         Continue at the bottom of the page?

5    Q.   Yes, please.

6    A.   Casper:  "You know how it is with you, man.  They are on

7    the street looking for you with everything, doggie.  Do you

8    agree?"

9    Q.   Animal:  "Yes."

09:58AM 10    A.   Casper:  "And the plan that we have for this homeboy once

11    he's in so that the police does not get him, we have to take

12    care of this dude, homies.  How are we going to do it?"

13    Q.   Muerto:  "Well, that's why."

14    A.   Casper:  "Do you have a place to stay right now?"

15    Q.   Muerto:  "That's the same thing, we're moving him."

16    A.   Casper:  "Where to stay and everything?"

17    Q.   Muerto:  "That's why we're moving him however we can,

18    dude.  Also several dudes don't want to give him a place to

19    stay dude, so then."

09:58AM 20         CW-1:  "No."

21         Muerto:  "Son of a bitch with this dude."

22    A.   Casper:  "No.  So you guys can't say you don't want to,

23    homeboy.  If we're not sure about what's really going on in

24    each guys's house."

25    Q.   Muerto:  "That's what I'm saying, many of the dudes don't

1   want him staying there anymore.  So what we're doing is moving

2   the guy."

3        CW-1:  "I've even paid for hotels for the dude and the

4   man can tell you out of my own pocket."

5        Muerto:  "Yeah."

6   A.  Casper:  "Fuck that's awesome, dog."

7        Lobo:  "There is -- there is room right now for 500

8   fucking bucks.  I don't know if you guys are in agreement."

9   Q.  Caballo:  "Where?"

09:59AM 10   A.  Lobo:  "Because I know that girl, I prefer not telling her

11   that this homie is with the Mara, you know."

12        Casper:  "Yes, but 500 bucks is expensive, son of a

13   bitch."

14   Q.  Caballo:  "No, man.  500 bucks is cheap, dude."

15        CW-1:  "And where is it, dude?"

16   A.  Lobo:  "Here in Chelsea next to the clock."

17   Q.  Caballo:  "And in Chelsea?"

18   A.  Casper:  "No, man.  This dude has to go far from there,

19   dude."

09:59AM 20        Casper:  "The thing right now, dudes, the move is that

21   this homeboy should not be in Mara turf.  We're in Lynn,

22   Chelsea, East Boston."

23   Q.  Unidentified male:  "And Lynn would be possible."

24   A.  Casper:  "In Somerville, Everett."

25   Q.  CW-1:  "Somerville is too hot."

1   A.   Casper:  "Those are the territories that this dude can't

2   be in, dude.  So then we're going to -- we are going to send

3   this dude to the clique, homeboy.  We have to hide him so that

4   he won't be arrested, dude.  Right now it is our priority that

5   this dude not be locked up, dude."

6        Casper:  "That's the bad thing.  Look, that's what I'm

7   referring to.  Talking when one kills.  Look, that's what I'm

8   referring to."

9   Q.   Vago:  "One can say."

10:00AM 10   A.   Casper:  "Right now, right now.  Let's see what we're

11   going to do, dudes.  They're going to get those two guys and

12   they're going to try to put blame on them.  They know that he's

13   not the one.  They know that they aren't the ones who did it.

14   They know that you did it, homie.  What they're doing right now

15   is trying to see if these dudes will turn into snitches,

16   homie."

17   Q.   Animal:  "Yes, but I don't know what the deal is because

18   to me at first they were coming down on me, right, but it was

19   just for some other shit that we had done with Crazy and

20   Chucho.  Yeah, but it's the culeros that are also after me

21   about that thing, because they already know what's going on."

22   CW-1:  "But the police doesn't know.  The police doesn't know

23   because they would have already put it on the news."

24        Animal:  "There were two guys that went into a

25   laundromat.  There were two of them and when they saw me they

1  ran out, but one of them went into the laundromat, right?  Yes

2  and since another guy was looking at me, I ran away."

3  A.   Casper:  "But if those fuckers know that you went to the

4  police, those dudes."

5  Q.   CW-1:  "No way, man.  The police would have already put

6  his photo in the newspaper."

7  A.   Casper:  "Oh, well.  Then the asshole has not been

8  able --"

9  Q.   CW-1:  "No."

10:01AM 10  A.   Casper:  "-- to identify him in the photo that the police

11  have."

12  Q.   CW-1:  "No, no, no.  Listen, dudes, yeah because they

13  would have already turned him over to the police.  Hey, just

14  like with Vida Loca.  By the third day, wasn't he already in

15  the?"

16  A.   Casper:  "That's right."

17  Q.   "In the newspaper and all that shit, in the newspaper and

18  everything, man."

19  A.   Casper:  "The culeros will snitch on you.  Right now they

10:02AM 20  are really high, dude.  The deal is that about the thing with

21  the two homies."

22  Q.   CW-1:  "It's not about disappearing, but rather not to go

23  out into the streets too much."

24       Vago:  "The dude that escaped called me, you know, and

25  he was asking me if the son of a bitch that they caught, you

1    know.  That they were asking about -- asking him about the

2    incident that happened in East Boston, you know, but supposedly

3    the Everetts had given it to him, you know, the dude."

4    A.   Casper:  "Well, dude let them say that."

5    Q.   (Unintelligible).

6    A.   Casper:  "That is better for us and that is good for you,

7    too, dude."

8    Q.   Vago:  "And the dude was telling me, you know, to warn the

9    homies you know to take care of themselves because that's the

10   trail they are pursuing, you know?"

11   A.   Casper:  "No, man that's great."

12   Q.   Muerto:  "Yeah.  The other guy that took off is still

13   around there, dude."

14   A.   Casper:  "As long as the police say that the Everetts did

15   it, dude, that's even better, dude."

16        Playa:  "If he could hide him for at least a month in

17   that house that would be awesome."

18   Q.   CW-1:  "Well, right now he's already over there in that

19   house, you know?"

20   A.   Playa:  "We have to look for a room."

21   Q.   CW-1:  "We have to look for another room for next month,

22   man."

23   A.   Playa:  "We can get a room between all of us, dude."

24   Casper:  "That's what fucked up about it, homie."

25   Q.   Caballo:  "The thing is we all have to be on the lookout.

1    We don't have anything.  You can go look around, because you

2    are driving a taxi and I will be looking around, too."

3            CW-1:  "No, man.  I've already looked around here, but

4    I found one, but they wanted a deposit."

5    A.    Lobo:  "Let's go tomorrow if you want and we'll do it

6    tomorrow.  I don't work tomorrow."

7            Playa:  "Well, that's the thing.  We have to look into

8    it to get the money together, homie, Brujo."

9            Brujo:  "I can give you the money depending on

10:04AM 10    what -- no, on Tuesday.  I'll give you what I'm supposed to

11    give, dude, plus what I owe for the (unintelligible)."

12    Q.    Unintelligible -- sorry.  Unidentified man:  "How much

13    would each have to give or even if we don't watch after him,

14    just as long as we get the money, homie.  Playa, how much more

15    or less would we have to give to more or less get a room for

16    this dude?"

17    A.    Casper:  "It's that it's not just us, it's everybody

18    because."

19    Q.    Muerto:  "That's right, all of us."

10:04AM 20    A.    Playa:  "I think that the entire clique (unintelligible).

21    Casper:  "Playa."

22    Q.    "The entire clique."

23    A.    Casper:  "The problem, the problem is this, look."

24    Q.    Caballo:  "Whoever does not want to give, no problem."

25    A.    Casper:  "I'm going to give you something to get a room

1    for this homeboy for 500 bucks.  I'm calculating that we all

2    have to meet twice a week, man.  The thing is like this, dude.

3    The homie has to learn how to look after himself, he has to

4    find a job."

5    Q.    CW-1:  "Exactly."

6          Animal:  "Well, yeah."

7    A.    Brujo:  "Well, we have to help him find a job."

8    Q.    Caballo:  "Look, dude."

9          Animal:  "That's right, that's what I'm doing right

10:05AM 10   now.  I'm trying to find work."

11         Caballo:  "There's a place by where you can get a job

12   as a dishwasher if you want to stay and make 12 bucks an hour,

13   dude."

14         Animal:  "12 bucks is good."

15   A.    Lobo:  "How are you with garbage, bro?"

16   Q.    Animal:  "Huh?"

17   A.    Lobo:  "How good are you with garbage?"

18   Q.    Animal:  "(Unintelligible)."

19   A.    Playa:  "Look I am quite relaxed here, dude.  That dude

10:05AM 20   has killed, dude, and look that homie is taking it easy.  A lot

21   of people found out about the murder that guy did, dude, and I

22   ran into the guy walking around with his glasses here and he's

23   all calm, dude, and he is working, man."

24   Q.    Animal:  "Yeah."

25   A.    Playa:  "Many of you since I started talking know whom I'm

1    talking about so you can do the same thing, too."

2    Q.    Caballo:  "The good thing is that look, homie, I work with

3    civilians.  We all work with civilians, dude, and right there

4    where the civilians are, if a son of a bitch fucks up, I will

5    break his trap and I've already done so.  I was fired from good

6    jobs, homie.  What I'm trying to tell you is that you can't be

7    telling civilians that you go here or there, dude.  You know?

8    You know what you are, homie, and we all know what you are."

9    A.    Playa:  "Without any problems, always, without any

10:06AM 10    problems."

11    Q.    Caballo:  "But because of that same shit, dude, we have to

12    be saying that we aren't because we know what we are here,

13    right?  Whatever problem we have, if you have problems and you

14    belong to the Side, then we are all going to have the same

15    problems that you have."

16           Animal:  "Yeah."

17           Caballo:  "But let that be clear, homie, understand?"

18    A.    Casper:  "You always deny it to police.  Tell them that

19    you don't know."

10:06AM 20    Q.    Caballo:  "Bullshit the fucking police.  You are nothing."

21           Animal:  "(Unintelligible)."

22    A.    Playa:  "And it's even better if they don't ask you.  If

23    they don't ask you, that's even better."

24           Casper.  "Hey, homie.  Do what they do when they do on

25    the news.  Keep running away from the violence in El Salvador."

1  Q.  Animal:  "(Unintelligible)."

2  A.  Casper:  "And how are going to get to Boston?  You have to

3  play low with those motherfuckers, man."

4  Q.  Animal: "Yeah, man."

5       MS. LAWRENCE:  Let's go to page 9.

6  A.  Casper:  "When you have to talk with the homeboys from the

7  Mara."

8       Playa:  "I did it alone for me."

9       Casper:  I did it, because I don't like those

10:07AM 10  culeros."

11  Q.  All right.  We're on page 9, middle of the page.

12       Animal:  "Yeah."

13  A.  Playa:  "I didn't do it for Everett.  You are no longer

14  being saying that you did it for (unintelligible), dude.

15  Q.  Duke:  "Hey, Animal, do you want to settle down here to be

16  a homie for the Eastsiders?"

17       Animal:  "Yes, yes, that's why I came to this clique.

18  Doggie.  I want to be here."

19  A.  Playa:  You feel the Eastsiders?  The Eastsides clique?"

10:08AM 20  Q.  Animal:  "Yes, yes, that's why I came over here."

21       Caballo:  Great, because he is looking for some

22  homies, man."

23       Caballo:  "Decide if you want to jump in the doggie,

24  or if you only want him to hang out with us, dude."

25       Duke:  "Hey, is it your decision or what?"

1          Chentino:  "Caballo."

2     A.   Casper:  "The dude already has an in, dude, I am preparing

3     that."

4          Brujo:  "Huh?  The homeboy did that thing with me."

5     Q.   CW-1:  "Hold on."

6     A.   Brujo:  "Twice in a short time he did it with me and that

7     is some serious shit, man."

8     Q.   Caballo:  "That's what I'm telling you, look."

9          CW-1:  "He did another one with Tigre, doggie."

10:08AM 10     Duke:  "Well, then let him in."

11          CW-1:  "No, but hold on, dog."

12          Caballo:  "You can go say that (unintelligible) looks

13     awesome and everything.  Yes to the Mara, right?  But the thing

14     is we have to see how we work, dog."

15          Animal:  "Yes."

16          Caballo:  "Because if we don't work, we're going to

17     get screwed, understand?"

18          Animal:  "Yeah, I know what it is."

19          Caballo:  "Because we have to work, dog."

10:09AM 20          Page 11, please.

21     A.   Lobo:  "What then, Casper?"

22          Casper:  "No, well the dude is firm there, is firm

23     there, homie."

24          Playa:  "Well, then do it."

25          Casper:  What I am doing right now, what we are doing

1    is right.  It's not good, you know, to get jumped in alone.  He

2    knows he's going through the same situation as us and at the

3    same time we have to see how we're going help him out, dude,

4    because we have to take care of that homie."

5           Lobo:  "All of us are" -- excuse me -- "all of us are

6    also aware of what's going on."

7    Q.   CW-1:  "What you're saying is fine, Lobo.  We have to find

8    a room."

9           Muerto:  "That, too."

10:10AM 10   A.   Playa:  "We have to be careful, homie, because it is

11   important because of the 40 bucks that we got together the

12   other day, we were here, was sent to El Salvador."

13   Q.   Unidentified male:  "Uh-huh?"

14   A.   Casper:  "Yeah, but it's going to be very difficult for us

15   to give 500 bucks for this dude's rent."

16   Q.   CW-1:  "No, no, no.  Not $500.  That's just to get

17   started, understand?  Just while he -- because we also have to

18   think about the move."

19          Caballo:  "All right, work, dog."

10:10AM 20          Unidentified male:  "That's right."

21   A.   Lobo:  "Look, if Caballo doesn't take you there to where

22   he's working, I'm going to try to get you into where I work,

23   where I took Duke."

24   Q.   Caballo:  "All right, go for it."

25   A.   Lobo:  "That's true, this dude."

1    Q.   Duke:  "Where you took me, where he took me."

2    A.   Playa:  "Well, he did take Duke, homie."

3    Q.   Caballo:  "I'm going to try.  I mean, I'm going to try."

4          CW-1:  Right, try.  Well, trying is one thing."

5          Unidentified male:  "I'm not -- not --"

6          Caballo:  "You'll see the money there, too, homie."

7    A.   Lobo:  "I'm not saying I'm going to get you in.  I'm

8    telling you that I'm going to try."

9          MS. LAWRENCE:  Page 13.

10:11AM 10    A.   Brujo:  "So are we going to get a guy just because he

11    wants to be with us at a bar?"

12          Brujo:  "Hey, let's get a dude now because hey we are

13    going to get to another bar."

14    Q.   Casper:  "No, several."

15    A.   Brujo:  "If a son of a bitch is looking for me

16    (unintelligible)."

17    Q.   Casper:  "Several stages.  He has to go through

18    several --"

19          Unidentified male:  "No, man."

10:11AM 20    A.   Casper:  "Several phases so that we can (unintelligible)."

21          Brujo:  (Unintelligible), that's what I'm saying."

22          Playa:  "It's like this, dude.  Look, how can this

23    dude snitch on someone else if he's got that problem on him,

24    whereas another guy who was just drunk and doing things like

25    that."

1    Q.   Duke:  "That's right."

2    A.   Brujo:  "They are here all the fucking time only because

3    they are here all the fucking time.  They are here all the

4    fucking time just because they are at the bars treating."

5    Q.   Caballo:  "Uh-huh."

6    A.   Brujo:  "Let's go to the side now."

7         Playa:  "Yeah."

8         Brujo:  "No, man, let them come and kill.  Let them

9    come and feel the pressure."

10:12AM 10         Playa:  "For them two (unintelligible) with the

11    chavalas, dude."

12         Brujo:  "They need to stick the knife in."

13    Q.   CW-1:  "Yeah, man."

14    A.   Brujo:  "To stick the knife in and see what happens."

15    Q.   Duke:  "That's right."

16    A.   Casper:  "Let me tell you something."

17    Q.   CW-1:  "There you can see who has balls."

18    A.   Casper:  "About the clique, the Eastside clique, homie."

19         Brujo:  "If you have love for the barrio, you will

10:13AM 20    show your balls there."

21         Casper:  "No, look, I'm going to tell you something,

22    homie.  We need the new generation of the Eastside, homie, and

23    thanks to the wisdom that we have gained over the years, homie,

24    we have to pass it along, dude.  So that the new Eastside

25    clique can come and not, not think badly that we're going to

1    fuck them over, because shit we are Maras and the fuckers here

2    will fuck it up.  We're always (unintelligible)."

3    Q.    Duke:  "The clique has to continue grow."

4    A.    Casper:  "But what I am trying to say is that you guys are

5    going to be the next generation.  Fuck, here, the majority of

6    us here, in five years we will be over 40, in another 5, we'll

7    be 45 until (unintelligible)."

8    Q.    Duke:  "Hey, it needs to keep growing, homie."

9    A.    Playa:  "Let's be clear on that."

10   Q.    Duke:  "I'm almost 40, homie.  Let the clique continue to

11   grow, homie."

12   A.    Playa:  "Casper."

13         Casper:  "Seriously everything will end up in the

14   hands of the new generation."

15   Q.    Duke:  "That's true, homie."

16   A.    Playa:  "Casper, Casper."

17         Casper:  "Who will make it easier?"

18         Playa:  "That's why I'm telling you the deal with that

19   homeboys, they don't drop the line, you understand?"

20         Brujo:  "(Unintelligible), throw signs for our gang

21   look because our, (unintelligible)."

22   Q.    Duke:  "No, no, no, man."

23   A.    Brujo:  "The one thing that is with me, what did he say to

24   me?  God willing, God willing, homie, they want to arrest me or

25   kill me for being with you out on the streets.  I'll fucking go

1    out on the streets with you and we did it.  We did it the right

2    way, (unintelligible)."

3    Q.    Duke:  "And it's going to be done, dude."

4    A.    Brujo:  "And there it is."

5    Q.    Duke:  "One way or the other, whatever, it's going to

6    done, understand?"

7        Unidentified male:  "That's right."

8    A.    Casper:  "Yeah, just remember that always, homie, what

9    we're teaching you right now, homie, and something else, homie,

10:15AM 10    is that a lot of people in this clique or in other cliques are

11    going to run to you with gossip that these guys here and these

12    guys there."

13    Q.    Animal:  "Uh-huh."

14    A.    Casper:  "They can tell you, hey, Muerto that Muerto is

15    doing this and doing that to me.  Never believe the gossip from

16    another person."

17    Q.    CW-1.  "Uh-huh."

18        Caballo:  "Come and ask this homie in person."

19    A.    Casper:  "There will always be, you'll have to listen to,

10:15AM 20    to several opinions so that you can make a decision about a

21    person.  Never, never make a decision.  Never think that

22    Chentino or me or Playa or Muerto or whomever, homie, that we

23    are fucking up if only one person speaks.  There always has to

24    be four people who speak, homie, when more than four people

25    make decisions regarding a person."

1    Q.    Duke:  "Have proof."

2    A.    Casper:  "There's something wrong there with that person,

3    understand?"

4    Q.    Muerto:  "Uh-huh."

5    A.    Casper:  "Never, never, never, let yourself be tricked,

6    homie."

7    Q.    Muerto:  "Don't justify."

8    A.    Casper:  "Because in this we're always some shit.  We

9    are -- we're like a nest full of was wasps, dude, and you're

10:16AM 10    never going to be okay with all the wasps, homie.  There will

11    always be one that's jealous or who will think."

12    Q.    Caballo:  "Or will want to sting you."

13    A.    CW-1:  "Uh-huh."

14    A.    Casper:  "Or they'll think or they'll try to fuck you

15    over."

16    Q.    Turning to page 17 now.  The middle of the page.

17    A.    Casper:  "You have to get ready to hit those guys in the

18    face who say, oh, the Everetts did the killing.  No, I did the

19    killing."

10:17AM 20    Q.    Duke:  "Look, you did.  It, you didn't do it for any

21    clique, you did it for the letters."

22          Animal:  "Yes."

23    A.    Playa:  "You will have to forgive me homie, but supposedly

24    the Everetts are trying to take credit for that murder, homie.

25    You know, that's the thing."

1          Casper:  "No, but look, Playa, and then they went to

2    loot the -- (unintelligible)."

3          Casper:  "Let it be heard on the streets."

4          Playa:  "(Unintelligible)."

5          Casper:  "Let it be heard on the streets and with the

6    police that the Everetts did it, homie.  It's to our

7    advantage."

8    Q.   Animal:  "Right."

9          Unidentified male:  "Yeah."

10:17AM 10   A.   Casper:  "It's good for you and it's good for us.  What is

11   good for us here is that when as a homeboy up for the Eastside,

12   which you will be, you say, hey, there goes Animal, a homeboy

13   from the Eastside, dude."

14   Q.   Caballo:  "And puff your chest out, dude."

15         Animal:  "Yes."

16   A.   Casper:  "And I'm the one that did it."  -- excuse me --

17   "and I'm the one that did that hit, yeah.  With the Mara, guys,

18   and if some civilian comes to ask you, hey, homie who did it,

19   you say it was the Everetts.  It was the Everetts and put the

10:18AM 20   blame on them.  That's good for you, dog."

21   Q.   Duke:  "Hey, but at that time when you did that hit or

22   whatever you weren't in in the Everett clique."

23         CW-1:  "You were on observation."

24   A.   Brujo:  "He was not with the Mara yet."

25   Q.   Duke:  "Right, so then what he did."

1    A.   Playa:  "And why did he do this hit as a paro?  They told

2    him that he was in the Mara?"

3    Q.   Duke:  "No, well, that's right because what he did then

4    was not a killing from Everett, instead he did it, you know."

5          Animal:  "Yeah, I was a paro there."

6          Duke:  "For himself.  He did it there representing the

7    letters."

8          MS. LAWRENCE:  Let's go to page 19, please.

9    A.   Lobo:  "Focus on the room.  I'm also going to look for a

10:19AM 10    room."

11          Casper:  "People are going to ask you

12    (unintelligible)."

13          Lobo:  "If anything comes up, I'll call you tomorrow."

14    Q.   CW-1:  "Let's look at that one, that one over there."

15    A.   Lobo:  "We can go in one car early tomorrow and one of us

16    can get out and the other one gets in and we can just drive

17    like that to see what the deal is in Somerville and Chelsea."

18    Q.   CW-1:  "Yeah, and if not.  And that one, that one over

19    there is in good area because as long as this guy is hiding out

10:19AM 20    and we just go to pick him up."

21    A.   Lobo:  "Dude, there is only a girl there and the old lady.

22    That's all.  It's behind City Hall."

23    Q.   Caballo:  "Why were you doing hits with the Everetts, why

24    are you now with the Eastsides, it's a bunch of things there."

25    A.   Lobo:  "Is it 122?"

1   Q.   CW-1:  "On Ford Street?  No, it's on --"

2   A.   Lobo:  "You have to talk to those people, dude."

3        Lobo:  "No, it's on that street by the cemetery

4   down --"

5   Q.   Muerto:  "And don't -- don't lower your head, walk with

6   your head held high and don't give a shit about what

7   (unintelligible)."

8        CW-1:  "Is it on Marlborough Street?  No?"

9   A.   Lobo:  "No, it's further down from Marlborough.  The one

10:20AM 10   that goes through by here and then from the school it goes up."

11  Q.   Muerto:  "Let's go then."

12  A.   Lobo:  "All right then."

13  Q.   CW-1:  "Let's go see."

14  A.   Lobo:  "I'll give you a call.  I'm going to speak to her

15  clearly tomorrow and I'll give you a call tomorrow around 5 or

16  3 in the afternoon to see what's going on."

17  Q.   CW-1:  "You got it."

18  A.   Casper:  "Look, I spoke to Pantera.  Do you know who

19  Pantera is?"

10:21AM 20  Q.   Animal:  "Oh, yeah.  I know that homeboy."

21  A.   Casper:  "So I already talked to that guy right and I

22  spoke about you with that dude, homie, and supposedly he was

23  going to meet with the Everetts to clear that thing up, homie.

24  From the looks of it he didn't clear it up too well because

25  they kept calling you but now we talked about what we're going

1   to do, you know?  The thing that's going to happen is that we

2   will also have to pay these homies that money.  What the dude

3   told me is that because they are going to start bugging us

4   about that money."

5   Q.   CW-1:  "Yes."

6   A.   Casper:  "Sooner or later, because we were bugging Crazy,

7   remember?"

8   Q.   Muerto:  "And how much money is it?"

9        CW-1:  "Hold on, but --"

10:21AM 10   A.   Casper:  "300 bucks."

11   Q.   CW-1:  "But there's one thing."

12        Caballo:  "Yeah, that's true because these homies gave

13   those dudes some money."

14   A.   Casper:  "What money?"

15   Q.   Caballo:  "That those guys gave some money to Chucho,

16   Chucho from the Everetts, because Chucho from the Everetts was

17   going to leave and Chucho never left and --"

18        CW-1:  "For that same killing, you know, that this guy

19   here did.  Supposedly Chucho had heat on him."

10:22AM 20   A.   Casper:  "But did that come from your pocket or from the

21   clique?"

22   Q.   Caballo:  "From the pocket of these homies."

23        Animal:  "No from our pockets."

24   A.   Casper:  "Whose pockets?  Which, dude?"

25   Q.   Unidentified male:  "From this one."

1    A.    Casper:  "From this one and who else?"

2    Q.    Animal:  "I gave him 100 and --"

3          Unidentified male:  "The kid running around with us."

4    A.    Casper:  "Huh?"

5    Q.    Unidentified male:  "The kid running around with us."

6          Animal:  "I did gave him 10, David gave him 100, Luis

7    gave him 50, Sergio gave him 50 and Chamuco gave him 40."

8    A.    Casper:  "None of them are in the Everetts clique?"

9    Q.    Animal:  "No."

10:23AM 10          Unidentified male:  "That's what I'm saying, doggie."

11   A.    Casper:  "Oh, well.  It's done."

12         Casper:  "Then that debt is paid up."

13         Playa:  "We gave money and they are still charging

14   us."

15         Playa:  Remember that I told you that if you were with

16   us, I told you that whatever happened to you would happen to

17   all of us."

18   Q.    Animal:  "No, yes."

19   A.    Playa:  "And I literally said this to you, didn't I,

10:23AM 20   dude?"

21         Casper:  "Hey, Animal, I hope, homie, it's not for

22   anything, homie, but this stuff that we're talking about right

23   now won't be, dude, because homie you want to fix the problem

24   with them and I don't know if it is from the heart that."

25   Q.    Duke:  "For sure, homie."

1          Animal:  "No, but it is from the heart, homeboy."

2     A.   Casper:  "All right."

3          MS. LAWRENCE:  Let's turn to page 23.

4     A.   "Hey homie, let's jump this guy in now.

5     (Unintelligible)."

6          MS. LAWRENCE:  32.2.  It's a clip of a video recording

7     of a different part of this meeting.  Trooper Estevez, we're

8     going to play this now.

9          (Video played.)

10:25AM 10   Q.   Trooper Estevez, what did we just see there?

11    A.   That's the 13-second jump in of Animal into the Eastside

12    Locos Salvatrucha clique to become a homeboy.

13    Q.   And did you understand -- it's in the transcript, but did

14    you hear in Spanish anything that was said of interest to you?

15    A.   At the end once the beating was done, he was approached

16    and told, "Welcome to La Mara."

17    Q.   And did you see any actions taken by any of the

18    individuals after the jump-in that was significant?

19    A.   Yes, they all threw up the MS-13 hand sign, someone threw

10:26AM 20   up the MS-13 hand sign.

21    Q.   After this meeting on January 8, 2016, what happened next

22    in the investigation?  Well, did the investigation conclude

23    shortly after this meeting?

24    A.   Yes.

25    Q.   And what happened?

1    A.    There was a take-down of the investigation and all the

2    people that were charged were -- well, some of them were

3    arrested, some of them were arrested later on.

4    Q.    And when approximately was that that the arrests were

5    made?

6    A.    The initial arrest?

7    Q.    The initial arrest and the take-down.

8    A.    The exact date escapes me, but I believe it was

9    January 16th; is that correct?

10:26AM 10        MS. LAWRENCE:  All right.  No further questions at

11    this time.  Thank you.

12        THE COURT:  We might as well take our break now.

13        THE CLERK:  All rise.

14        (A recess was taken.)

15        THE CLERK:  Thank you.  You may be seated.  Court is

16    now back in session.

17        THE COURT:  Mr. Murphy, cross-examination.

18        MR. MURPHY:  Thank you, your Honor.

19                    CROSS-EXAMINATION

20    BY MR. MURPHY:

21    Q.    Good morning, Mr. Estevez.  My name is the Marty Murphy

22    and I represent Herzzon Sandoval.

23    A.    Good morning, sir.

24    Q.    Let me ask you, since you began working on this

25    investigation, at the very outset, you actually picked CW-1 up

54

1    at the airport?

2    A.    Yes.

3    Q.    And when was that, sir?

4    A.    I believe it was on August 2013.

5    Q.    And as of that time, sir, how long had you been a trooper?

6    A.    Six years.

7    Q.    And, sir --

8    A.    I'm sorry, as of that time?

9    Q.    As of that time.

10:42AM 10    A.    Five years.

11    Q.    Five years.  Thank you, sir.  Now, you said on direct

12    examination earlier in the week that CW-1 had a personal car

13    that he used to give folks rides, correct?

14    A.    Yes.

15    Q.    And that he posed as a gypsy cab driver, correct?

16    A.    Correct.

17    Q.    And that was in a car that was actually supplied by the

18    FBI, correct?

19    A.    The car wasn't supplied by the FBI.  He used his money to

10:42AM 20    buy it.

21    Q.    And did the money that he get from -- to buy that car, was

22    that supplied by the FBI?

23    A.    Oh, he was paid.  Yes.

24    Q.    He was paid by the FBI, he used the money the FBI gave him

25    to buy the car, correct?

```
 1    A.    I suppose.
 2    Q.    Now, sir, CW-1 had a phone that the task force had what
 3    was known as a consensual Title III on, correct?
 4    A.    Yes.
 5    Q.    And a consensual Title III just means that CW-1 agreed
 6    that the FBI could record all the calls that he made and all
 7    the calls that were made to him, correct?
 8    A.    Yes.
 9    Q.    And during the investigation, CW-1 had a second phone,
10    correct?
11    A.    Yes.  Yeah, we allowed him to have a personal phone, a
12    second phone, so he can contact family and make personal calls
13    on it.
14    Q.    Right.  And those were the rules he was supposed to
15    follow, correct?
16    A.    I mean, that was his phone, it was his personal phone.  We
17    also had a pen register on that phone.
18    Q.    And that recorded -- and what a pen register does is
19    record the phone numbers that are called by the phone?
20    A.    Correct, it's almost like when you get the bill at the end
21    of the month.  It has all the calls you made with the telephone
22    numbers that you made.
23          THE COURT:  I don't think they send bills like that
24    anymore.
25    Q.    In the old days when they used to send bills like that?
```

1    A.    Correct.

2    Q.    And so that allowed you to know the numbers that CW-1

3    dialed and the numbers that dialed him, correct?

4    A.    Yes.

5    Q.    But it didn't allow you to record those conversations,

6    correct?

7    A.    Correct.  It was his personal phone.

8    Q.    It's fair to say, though, that CW-1 decided which phone he

9    was going to use whenever he placed a phone call, correct?

10:44AM 10    A.    Yes.  I mean, he had two phones, one was for what I would

11    call his work, which was for contacting the members, the MS-13

12    members and having conversations and the other one was his

13    personal phone that he used to contact his family and whoever

14    he wanted to contact that was on a personal matter.

15    Q.    But it was up to him to decide which phone to use?

16    A.    Right.

17    Q.    And he told you that he was going to use the personal

18    phone for only personal phone calls, correct?

19    A.    I mean, that's what I had known it was for.  You know, I

10:45AM 20    didn't have that conversation with him.  I didn't give him the

21    phones.

22    Q.    But you were relying on him to use the work phone for work

23    calls, correct?

24    A.    That's what it was for.

25    Q.    And to make sure that he didn't use the personal phone for

1    work calls, too, correct?

2    A.    Yes.

3    Q.    And you had no control of whether he gave the personal

4    phone to people that he wanted to talk to that were involved in

5    criminal activity, correct?

6    A.    No.

7    Q.    Now, there was a recording device that was installed in

8    CW-1's car, correct?

9    A.    Yes.

10:45AM 10    Q.    And it was up to CW-1 to decide when to turn it on and

11    when to turn it off, correct?

12    A.    Yeah, he would turn it on when he had members in the car

13    and he was able to collect evidence and when he had time to.

14    Sometimes the situations were fluid and they would jump in the

15    car and -- you know, it was kind of a little bit of process to

16    turn the recorder on, so if he had people in the car maybe it

17    wasn't safe for him to turn it on.

18    Q.    Fair enough, sir.  But you would agree that it was up to

19    him to decide when to turn it on, correct?

10:46AM 20    A.    Yes.

21    Q.    The task force wasn't doing that remotely, correct?

22    A.    Correct.

23    Q.    And you were relying on him to decide what conversations

24    should be recorded and what conversations shouldn't be,

25    correct?

58

1    A.   Of course.  I mean, we weren't in the car with him at the

2    time.

3    Q.   And you didn't regularly conduct surveillance of him,

4    correct?

5    A.   We did when we knew in advance we had something planned.

6    There was a clique meeting or there was going to be a

7    controlled buy of narcotics, but when he was on his own time,

8    he was on his own time.

9    Q.   Right.  And on a routine basis, day-to-day, you were not

10:47AM 10    following him around unless there was something planned?

11    A.   Correct.

12    Q.   Now, one of the things that CW-1 did after he was set up

13    with the gypsy cab was to listen to individuals who came into

14    the cab to talk about crimes they committed, correct?

15    A.   Correct.

16    Q.   And his role in that situation was simply to keep people

17    talking, correct?

18    A.   Yes.

19    Q.   But CW-1, Pelon, also did things proactively, correct?

10:47AM 20    A.   Yes.

21    Q.   And he worked with the members of the task force to decide

22    how to approach those situations where he was going to do

23    something proactively, correct?

24    A.   Correct.

25    Q.   So, for example, we've had heard evidence in this case

1    about the so-called drug protection details, right?

2    A.    Yes.

3    Q.    And you participated in each of those drug protection

4    details, correct?

5    A.    I did.

6    Q.    And you worked closely with CW-1 to set those up, correct?

7    A.    We worked all as a task force, yes.

8    Q.    The task force worked closely with CW-1 to set those up?

9    A.    Correct.

10:48AM 10    Q.    And I think to state the obvious, the FBI really had no

11    reason to want to take drugs from its evidence locker, from

12    Boston to New Hampshire, right?

13    A.    I don't understand the question.

14    Q.    Well, there was no reason that the FBI needed to have

15    drugs that were safe in its evidence locker taken to

16    New Hampshire, correct?

17    A.    Correct.

18    Q.    Those drugs were safe in the FBI evidence locker?

19    A.    Correct.

10:48AM 20    Q.    And where is that?  Is that in Chelsea?

21    A.    I have no idea.

22    Q.    Okay.  But the FBI agents that you were working with

23    retrieved the drugs and brought them to Chelsea, correct?

24    A.    Yes.

25    Q.    And they arranged for them to be transported to

1    New Hampshire, correct?

2    A.    Yes.

3    Q.    And, sir, the FBI agents and the task force members who

4    were involved were actually like actors, correct?

5    A.    Actors?

6    Q.    Sure, they were playing a role.  You played a role, for

7    example, in a number of these.

8    A.    I played one role, yes.  I made a telephone call.

9    Q.    And you pretended to be someone you were not, correct?

10:49AM 10    A.    Correct.

11    Q.    So the FBI got the drugs out of the evidence locker,

12    brought them to New Hampshire and Pelon, CW-1, was pretending

13    to play a part, too, correct?

14    A.    Right.

15    Q.    And in those situations, he was pretending to play the

16    part of a drug dealer, correct?

17    A.    Courier.

18    Q.    Courier?

19    A.    Yes.

10:49AM 20    Q.    And that was a role that he had some experience with in

21    real life?

22    A.    Yes.

23    Q.    And you were playing a role in one of them, you said?

24    A.    Yes.

25    Q.    And what role were you playing?

1   A.    I made the phone call acting as the drug dealer.

2   Q.    And when people went to pick up the drugs, was that at the

3   Kowloon parking lot in Saugus?

4   A.    Yes.

5   Q.    And were there people there playing the role of

6   individuals delivering the drugs to Pelon?

7   A.    Yes, undercover officers.

8   Q.    And so they were essentially acting the part of drug

9   dealers, correct?

10:50AM 10   A.    Yes.

11   Q.    And there were people in New Hampshire on the receiving

12   end -- undercover agents, correct?

13   A.    Correct.

14   Q.    And they were, you know, essentially acting out a role as

15   well, correct?

16   A.    Yes.

17   Q.    They were acting out the role of receiving the drugs?

18   A.    Right.

19   Q.    And there were video recordings that were set up for these

10:50AM 20   transactions, correct?

21   A.    Correct.

22   Q.    And still photographs taken, correct?

23   A.    Yes.

24   Q.    And it was essentially -- Trooper, this may be before your

25   time, but it was like an episode of *Candid Camera* where

1    everybody but the people who were involved in the drug

2    transaction knew what was really going on, correct?

3    A.    Well, they knew what was going on.  They thought they were

4    transferring a large quantity of drugs from one drug dealer to

5    another one.

6    Q.    Well, you'd agree, sir, that everybody who was working

7    with law enforcement knew that these were the FBI drugs and

8    they were being brought to New Hampshire solely for the purpose

9    of making a case, correct?

10:51AM 10    A.    Well, we knew, yes.

11    Q.    But none of the other people did, of course, correct?

12    A.    Right, they thought that they were protecting drugs.

13          MR. IOVIENO:  Objection.  Motion to strike.

14          THE COURT:  I'll let it stand in context.

15    Q.    Now, so that was one kind of occasion when CW-1 helped you

16    do some things that were proactive, correct?

17    A.    Correct.

18    Q.    And there were other kinds of things that he did that you

19    worked with him to do proactive things, correct?

10:51AM 20    A.    Right.

21    Q.    So, you testified on your first day of direct examination

22    about events that took place on May 12, 2015, correct?

23    A.    Okay.

24    Q.    That was a stabbing that took place in Highland Park in

25    Chelsea, do you recall that?

1    A.    Yes, I do.

2    Q.    In that case, you recall, sir, from your work on the task

3    force that Muerto was with Pelon, CW-1, correct?

4    A.    Yes.

5    Q.    And they got a call from some individuals who were at a

6    park in Chelsea, correct?

7    A.    Yes.

8    Q.    And those individuals were members of the Eastside clique?

9    A.    Yes, some were, some were from a different clique.

10:52AM 10    Q.    And as a result of that call, sir, you know from your work

11    on the task force, Pelon and Muerto were together, right?

12    A.    Yes.

13    Q.    And Pelon or Muerto called another person, correct?

14    A.    Yes.

15    Q.    And who was that?

16    A.    He went by Mingo.  His real name is Domingo DeSol.

17    Q.    Domingo, correct?

18    A.    Yes.

19    Q.    And you've learned from your work on the investigation

10:53AM 20    that Pelon asked Domingo to get a knife and meet them, correct?

21    A.    Yes.  There was one version of it like that, yes.

22    Q.    And that was Muerto's version, correct?

23    A.    Yes.

24    Q.    And Muerto was a person that you interviewed in detail

25    about this, correct?

1   A.   Yes.

2   Q.   And that was in one of the meetings that you had with him,

3   correct?

4   A.   Correct.

5   Q.   And that was a meeting that you had with him when he was

6   under an obligation to tell the complete and accurate truth,

7   correct?

8   A.   Correct.

9   Q.   And after Pelon asked Domingo to bring the knife, Pelon

10  and Muerto and Domingo went to the park, correct?

11  A.   Yes.

12  Q.   And an individual named Minor Ochoa was stabbed, correct?

13  A.   Yes.

14  Q.   Stabbed by Muerto, correct?

15  A.   One story, yes.

16  Q.   According to Muerto.

17  A.   According to Muerto, yes, he stabbed him.

18  Q.   And according to Muerto, when you met with him, he told

19  you that Pelon helped, right?

20  A.   Yes.

21  Q.   And you'd agree, sir, that that was proactive activity

22  that the task force members had not authorized, correct?

23        MS. LAWRENCE:  Objection.

24        THE COURT:  Overruled.

25  A.   Correct.

1    Q.    So, Muerto was out there -- pardon me, so Pelon was doing

2    some proactive work at the direction of the FBI, correct?

3    A.    Yes.

4    Q.    And the task force, and some proactive work that was on

5    his own, correct?

6    A.    Well, I mean, in that situation, it was difficult.

7    There's a few different versions of it, but, you know, Pelon at

8    the time, CW-1 was with other MS-13 members and he's an MS-13

9    member, and they believed him to be an MS-13 member and, you

10   know, if he were involved in a situation where there was a

11   violent act like that being committed and they didn't see him

12   acting, or trying to help, or make an attempt to help, that

13   would put his safety at risk, so when you say he helped,

14   there's different versions of how he helped.

15   Q.    Okay.  Well, you talked in detail to Muerto about it,

16   correct?

17   A.    I did.

18   Q.    And the government you know in this case has put Muerto on

19   the stand, correct?

20   A.    Yes, sir.

21   Q.    And what Muerto said is that he was in the car with Pelon

22   and that Pelon --

23          MS. LAWRENCE:  Objection, your Honor.

24          THE COURT:  Overruled.

25   Q.    And that they were going to --

1          MR. POHL:  Judge, may we approach?

2     Q.    -- get something to eat, correct?

3          THE COURT:  Yes.

4          (THE FOLLOWING OCCURRED AT SIDEBAR:)

5          MR. POHL:  I don't think it's proper for Mr. Murphy to

6     ask as to what Hernandez Miguel testified at during the trial,

7     how could he possibly know that?  And how would he be in a

8     position to comment on it?

9          THE COURT:  I guess it's fair that he didn't know what

10:56AM 10    was said at the trial, but I was also assuming it was a set up

11    to something.

12          Mr. Murphy, where are you going with this?  He

13    obviously can't comment on Muerto's credibility.

14          MR. MURPHY:  No, your Honor.  I was talking really

15    about authorized and unauthorized acts and --

16          THE COURT:  Where is that leading?

17          MR. MURPHY:  Well, first of all, I'm asking about

18    what -- this officer was present at Muerto's proffer when he

19    told about this, so --

10:56AM 20          THE COURT:  Well, you can ask about the proffer.

21          MR. MURPHY:  I'll make it clear about that.  The

22    answer, the question, your Honor, is that in terms of -- the

23    government has offered testimony through Muerto that it was

24    essentially Herzzon Sandoval, my client, arranged to get

25    Animal, Joel Martinez, back from New Jersey.

1          THE COURT:  Right.

2          MR. MURPHY:  I think I'm entitled to explore what the

3     government was doing to cause certain events to happen rather

4     than what Mr. Sandoval was doing, and this is a lead-in to

5     that.

6          THE COURT:  I'm not sure I follow that.  In other

7     words, first off, you can't impeach Muerto through prior

8     inconsistent statements, or otherwise through this witness.

9     It's not clear to me who you're impeaching or what you're

10    establishing, and none of this has to do with Animal.  If I

11    have my facts right, aren't we in Highland Park still?

12         MR. POHL:  Yes.

13         THE COURT:  So I'm not following where you're going

14    with this.

15         MR. MURPHY:  First off, I think I should be allowed to

16    impeach Muerto through this witness.  He was there at the

17    proffer where he made statements inconsistent with his

18    testimony.

19         THE COURT:  Hasn't Muerto already been impeached with

20    his prior inconsistent statements?  I mean, what does this

21    witness add that isn't extrinsic evidence of a prior

22    inconsistent statement through a different witness when Muerto

23    himself testified, and I think he --

24         MR. MURPHY:  No, but he denied, your Honor, saying

25    those things.  He admitted that the statements said it, but he

1    denied saying those things.  He denied a number of those

2    things.

3           MR. POHL:  And then the proffer statements were read

4    in, and that's --

5           THE COURT:  And I think that's the way you do it.  You

6    don't call another witness to impeach that.  I think you read

7    in the prior inconsistent statements, which I think is what

8    happened.  I mean, I'd have to take it on a

9    question-by-question basis, but that's my memory of it.

10:58AM 10          But --

11          MR. LOPEZ:  Your Honor, with all due respect, there's

12   two ways to put in an inconsistent statement.  One is

13   confronting the witness who said it, but also putting another

14   witness on the stand who was present when the inconsistent

15   statement was made.

16          MR. POHL:  But that -- you don't get to do it three or

17   four times, right?  You can do it one way or you can do it the

18   other way.  I don't think you can do it both ways.  And now

19   that the -- the point is to make sure that the witness'

10:59AM 20   inconsistent statement is before the jury.  That happened

21   through the witness.

22          MR. LOPEZ:  He --

23          THE COURT:  I allowed the proffer statement to be read

24   even though it was a 302 and it wasn't a statement.

25          MR. LOPEZ:  But then he said that's what the report

1    says.  He didn't say that's what I said.

2         MR. MURPHY:  Your Honor, given where we've stopped

3    with this witness, which he has just essentially given a long

4    explanation for why Pelon, you know, might or might not have

5    participated with the stabbing, I would like to ask one

6    question.  The FBI did not instruct or the task force did not

7    instruct Pelon to call Domingo to bring the knife that day and

8    then move on.  I think that would be fair, give where he has

9    left and then I'll move onto a different subject.

11:00AM 10         THE COURT:  Why don't we handle it that way.

11         (SIDEBAR CONFERENCE WAS CONCLUDED)

12         THE COURT:  Go ahead, Mr. Murphy.

13         MR. MURPHY:  Thank you, your Honor.

14   Q.   You'd agree, sir, that nobody from the FBI or the task

15   force instructed CW-1 to call Domingo and say bring a knife,

16   correct?

17   A.   Yes.

18   Q.   Now, sir, the stabbing of Irvin De Paz took place on

19   September 20, 2015, right?

11:00AM 20   A.   It sounds about right.

21   Q.   And it's fair to say that during the course of this

22   investigation.  There's been no evidence developed that anyone

23   from Eastside knew about that stabbing in advance, correct?

24   A.   Correct.

25   Q.   Now, you have determined however that Pelon, CW-1, did

1   know Joel Martinez before September 20, 2015, correct?

2   A.   I'm not sure.

3   Q.   Okay.  You don't know one way or the other whether he --

4   A.   I think he met him after that incident.

5   Q.   Okay.  Now, if we could go to, with the Court's

6   permission, Exhibit 103 for the witness.  And, Trooper Estevez,

7   have you seen this transcript before, Exhibit 103?

8           THE CLERK:  This is in evidence?

9           THE COURT:  Yes, it is in evidence.  You just want it

11:01AM 10   for the witness?

11          MR. MURPHY:  For the witness, if I may, first.

12   A.   Yes, I've seen it.

13   Q.   And do you recognize that as a conversation that took

14   place between Mr. Martinez, also known as Animal, and Pelon,

15   CW-1, on October 2, 2015?

16   A.   Yes.

17          MR. MURPHY:  If we could show it to the members of the

18   jury, please.

19   Q.   Do you know whether Mr. Martinez and Pelon, CW-1, had ever

11:02AM 20   spoken before October 2, 2015?

21   A.   I don't think so.

22   Q.   Now, Pelon says to CW-1 at the bottom of the page, and

23   "Hey, you just didn't take down any motherfucker, some idiot."

24          Did I read that correctly?

25   A.   Yes.

1    Q.   And Animal says, "No, a major culero."

2    A.   Correct.

3    Q.   And CW-1 says, "A major culero, I had already smashed his

4    head, dude, didn't they tell you?"

5    A.   Yes.

6    Q.   Did I read that correctly?

7    A.   Correct.

8    Q.   And in the course of your investigation, did you try to

9    learn whether CW-1 had, in fact, had a prior altercation with

11:03AM 10   Irvin De Paz?

11   A.   During these conversations with these MS-13 members, he

12   would often embellish and make things up to make himself sound

13   better and make himself sound like he's out there doing things.

14   He would often ask us about incidents that had happened

15   non-related in the area, and that way he could say that he saw

16   it, or he was there, or he would make things up from things

17   that he's heard on the news and things like that so they can

18   believe that when he talked to them that he was being active

19   out there, being proactive for the MS-13.

11:04AM 20   Q.   If we could turn to the next page, please.  About a third

21   of the way down, he says, "Scooby and I -- ask Snoopy.  I gave

22   him a fucking beating with Snoopy."

23        Did I read that correctly?

24   A.   Yes.

25   Q.   Are those real people that you know of from the course of

1    the investigation?

2    A.    Correct, I do.

3    Q.    So if CW-1 was concerned about verifying his credentials

4    to Mr. Martinez, is it fair to say that he had given them some

5    names that Mr. Martinez could check with?

6    A.    He did.

7    Q.    And if he hadn't done it, that is, if he hadn't beaten

8    Mr. De Paz and Mr. Martinez checked with those individuals,

9    Mr. Martinez would find out that CW-1 was lying, correct?

11:05AM 10    A.    I mean, there's a lot of people with the same nicknames

11    out there.  I don't know if Animal at the time knew who Scooby

12    or Snoopy were.  He could have just made it up on the fly, so

13    I'm not sure that's correct.

14    Q.    But you don't know.  You're just guessing.  You don't know

15    one way or the other, correct?

16    A.    I don't.

17    Q.    But it is true that CW-1 said that he had beaten

18    Irvin De Paz, correct?

19    A.    Correct.

11:05AM 20    Q.    And it is true that he told Mr. Martinez, Animal, if you

21    don't believe me, ask these two other people, correct, in

22    essence?

23    A.    That's what he said, yes.

24    Q.    And it's a fact, sir, is it not, that you don't know one

25    way or the other whether CW-1 had actually beaten up

1  Irvin De Paz before his stabbing by Joel Martinez?

2  A.   I don't.

3  Q.   Now, after this conversation, Mr. Martinez went to

4  New Jersey, correct?

5  A.   Yes.

6  Q.   And the FBI and the task force knew that he had gone to

7  New Jersey, correct?

8  A.   We had heard information from CW-1 that he had moved to

9  New Jersey.

11:06AM 10  Q.   Because he was in regular contact with CW-1, correct?

11  A.   Correct.

12  Q.   And CW-1 was calling him regularly, correct?

13  A.   Yes.

14  Q.   To stay in touch with him, correct?

15  A.   Correct.

16  Q.   And you had known by this point that Mr. Martinez had

17  confessed to the murder of Mr. De Paz, correct?

18  A.   We had the video, yes.

19  Q.   Now, was there a time when CW-1 went down to visit

11:06AM 20  Mr. Martinez in New Jersey?

21  A.   Yes.

22  Q.   And did you go with him?  Was there surveillance?

23  A.   I did not go with him.

24  Q.   Did you debrief him afterwards?

25  A.   I'm sure someone did.  I didn't.  I don't think I did

1    personally.

2    Q.    And when that debriefing took place, do you know whether

3    Pelon, CW-1, told the agents who debriefed them where

4    Mr. Martinez was living?

5    A.    I believe he did.

6    Q.    So the task force knew where he was living in New Jersey,

7    correct?

8    A.    I believe so, yes.

9    Q.    Now, at that point, sir, you knew that Mr. Martinez had

11:07AM 10    been involved in a murder, correct?

11    A.    Yes.

12    Q.    And you knew where he was living in New Jersey, correct?

13    A.    Yes.

14    Q.    Is it fair to say that at no time during this

15    investigation before Mr. Martinez was arrested, the members of

16    the gang task force give a photograph of Mr. Martinez to the

17    Boston Police to put in a photo array for a witness?

18    A.    That we never did?

19    Q.    Yes.

11:07AM 20    A.    Photo array?

21    Q.    Before Mr. Martinez' arrest as part of the big --

22    A.    The only evidence that this task force had developed was

23    the video evidence from the vehicle that CW-1 was driving, so

24    we had a picture from that particular video.  That's all we had

25    at that point.  So at this point, if we were to give that video

1    or that picture or take a picture of the video of the face and

2    put that in a photo book, it would, 1, identify that we had a

3    video, and I don't know what police department wouldn't ask for

4    that video at that point.

5         And that picture was also taken in a car, which I'm

6    sure that if that picture was shown, people would understand

7    that we had a car and Animal would be able to put that later

8    on, two and two together, that that was his conversation with

9    CW-1, and, again, it would put the safety of CW-1 at risk and

11:08AM 10   the safety of -- not the safety, but the entire case and all

11    the other individuals, the leaders that we were trying to get

12    to and the other members that we were trying to arrest with

13    time and identify at risk of them fleeing because, as you know,

14    MS-13 is a very transient gang, and --

15         MR. MURPHY:  Your Honor, I'm going to ask the witness

16    to cease the answer at that point.

17    Q.   Sir, your testimony is that's the only photograph you had

18    of Joel Martinez?

19    A.   Well, there was a video at the time.

11:09AM 20   Q.   And it's your testimony there was no other photograph that

21    the police had?

22    A.   That I knew of at the time, right after the confession,

23    that's the only evidence.

24    Q.   And you weren't here when --

25    A.   I'm sorry?

1    Q.    You weren't here when Special Agent Wood testified?

2    A.    I was not.

3    Q.    Now, did the task force conduct any investigation as to

4    whether Mr. Martinez was in the country legally?

5    A.    I'm sure we did.

6    Q.    All right.  And do you know what the results of that

7    investigation were?

8    A.    I believe he was undocumented.

9    Q.    And so you're aware, sir, that immigration authorities can

11:09AM 10    pick up an undocumented alien at any time for any purpose?

11    A.    Yes.

12    Q.    And it's fair to say that the task force didn't request

13    that immigration pick up Mr. Martinez at any time after his

14    confession to murder on November 2, 2015, correct?

15    A.    That's correct, because the immigration system -- let me

16    finish the answer, sir.  I'm going to give you the reason why

17    that didn't happen, and that is because --

18    Q.    Please, sir.

19          THE COURT:  Hold on.  Do you want the reason why,

11:10AM 20    Mr. Murphy?

21          MR. MURPHY:  I think --

22    Q.    Let me ask you this.  If the immigration -- if he had

23    been -- if you had alerted the immigration authorities, they

24    could have deported him?  Yes or no, sir.

25    A.    Immigration has one job, and that's to round up

1    undocumented individuals and deport them.

2    Q.   Yes.

3    A.   And once they're in immigration custody --

4         THE COURT:  Hold on.  The question will be asked on

5    redirect why you didn't do that.

6    Q.   Now, after Pelon visited Mr. Martinez in New Jersey, Pelon

7    came back, correct?

8    A.   Yes.

9    Q.   And then he and the agents on the task force devised

11:11AM 10    another proactive plan, correct?

11    A.   Yes.

12    Q.   And that was for him and Muerto to go down to New Jersey

13    to bring him back, correct?

14    A.   Correct.

15    Q.   And that was something that the task force knew about,

16    correct?

17    A.   Yes.

18    Q.   And the task force knew that Mr. Martinez was back in the

19    Boston area, correct?

11:11AM 20    A.   Yes.

21    Q.   Because the task force knew that he was at odds with the

22    Everett clique, correct?

23    A.   Correct.

24    Q.   And that was because he owed money, correct, to the

25    Everett clique?

1    A.    There was a debt owed and there was some issues because

2    they didn't want to promote him to become a homeboy.

3    Q.    Because at one point he had been an 18th Street member, is

4    that correct, or hung around with 18th Street members?

5    A.    He first wanted to be promoted to become a homeboy, and

6    the reason they weren't doing that is because they had -- there

7    was information that they were saying that before becoming

8    MS-13, or hanging out with MS-13, he had 18th Street friends,

9    one of which he attacked also.

11:12AM 10    Q.    And so those were the things that he was at odds with the

11    Everett clique about, correct?

12    A.    Yes.

13    Q.    And the -- and you knew that he was at odds with the

14    Everett clique, correct?

15    A.    Yes.

16    Q.    And so the plan was to try to see whether he could be

17    introduced to members of the Eastside clique, correct?

18    A.    Correct.  We wanted Animal to come back and stay in Boston

19    because obviously we had pending charges on him, and we didn't

11:13AM 20    want him to be in New Jersey where -- like, again, they're very

21    transient, they could disappear, go to a different state and

22    then we'd lose them, so we had to get him back to Boston so we

23    could keep an eye on him and keep him here.

24    Q.    Okay.  And because you wanted to introduce him to members

25    of the Eastside clique, correct?

1    A.    That was the idea.

2    Q.    That was the idea, correct?

3    A.    For Mako to introduce him, yes.

4    Q.    Now, you said you wanted to keep an eye on him, correct?

5    A.    Correct.

6    Q.    What exactly did you do to keep an eye on Joel Martinez

7    between the time he came back and the time that he was jumped

8    into Eastside on January 8th?

9    A.    Well, he was in close contact with CW-1 and CW-1 was

11:13AM 10    reporting on him constantly.

11    Q.    He committed at least one stabbing, correct?

12    A.    That is correct.

13    Q.    And he may have committed a second, correct?

14    A.    Correct.

15    Q.    After he was brought back here?

16    A.    Yes.

17    Q.    And while you were keeping an eye on him, correct?

18    A.    Well, again, he was reporting on Animal at the time.

19    Again, we couldn't have made the arrest on Animal because it

11:14AM 20    would have, again, put CW-1's safety at risk and the integrity

21    of the case at risk.

22    Q.    Your decision, you'd agree, to bring him back from

23    New Jersey back to Boston?

24    A.    The task force's decision, yes.

25    Q.    Now, you testified about a meeting that took place on

1    January 8, 2016 of the Eastside clique?

2    A.    Yes.

3    Q.    And that was the meeting that -- where Mr. Martinez,

4    Animal, was jumped into the clique, correct?

5    A.    Yeah, he was jumped in because of the homicide.

6    Q.    And we've heard the tape, correct?

7    A.    Yes.

8    Q.    And you'd agree, sir, that he was jumped in after that

9    homicide was completed, correct?

11:15AM 10    A.    Yes.

11    Q.    After the fact, correct?

12    A.    Yes.

13    Q.    And he was arrested shortly thereafter, correct?

14    A.    Yes.

15    Q.    And you testified earlier that you have no evidence from

16    the task force that anyone from the task force knew of

17    Mr. Martinez' participation in the murder of Mr. De Paz before

18    it took place, correct?

19    A.    Yes.

11:15AM 20    Q.    So, jumping him in and all the other statements that were

21    made.  And in that meeting -- sorry, your Honor.  In that

22    meeting, in addition to jumping him in, they also agreed to

23    help him find a place to stay, correct?

24    A.    Yes.

25    Q.    And hide him from the police, correct?

1    A.    Correct.

2    Q.    And all of those things were things that they did, you'd

3    agree, almost three months after Mr. De Paz' murder?

4    A.    Yes.

5    Q.    And they were all done, you'd agree, after the fact?

6    A.    Yes.

7            MR. MURPHY:  May I have a moment, your Honor?

8            THE COURT:  Yes.

9            MR. MURPHY:  No further questions, your Honor,

11:16AM 10    thank you.

11            THE COURT:  All right.  Mr. Iovieno.

12            MR. IOVIENO:  Thank you, your Honor.

13                         CROSS-EXAMINATION

14    BY MR. IOVIENO:

15    Q.    Good morning, again.

16    A.    Good morning, sir.

17    Q.    You testified that the video that you identified here on

18    your prior testimony, there are a number of people present

19    inside that garage, right?

11:16AM 20    A.    For the Animal beating?

21    Q.    Yes.

22    A.    Yes.

23    Q.    And the camera didn't catch all the people that were

24    present at that meeting, right?

25    A.    I don't know.  It's a long video.  It probably did.  It

1    maybe missed one or two people, I don't know.

2    Q.    Okay.  But the camera was focused at periods of times up,

3    and then it moved down because CW-1 was moving up and down?

4    A.    Yes.

5    Q.    Okay.  And you understand that there were conversations

6    that were occurring overlapping each other, right?

7    A.    Yeah, there was a lot of people talking.

8    Q.    A lot of people talking at once?

9    A.    Yes.

11:17AM 10    Q.    And there was a lot of people talking off camera?

11    A.    Yes.

12    Q.    And you didn't identify everybody who was in that meeting,

13    did you?

14    A.    Again, there might have been one or two people that

15    weren't identified.

16    Q.    There could have been more than one or two people, right?

17    How many people were there?

18    A.    I'm not sure.  I have -- I'm sure there's a list of people

19    that were there from a debrief with CW-1 which usually happens.

11:17AM 20    Q.    But you don't know how many people?

21    A.    Not off the top of my head.  No, I don't.

22    Q.    And, again, from your testimony previously, you identified

23    another individual who was identified as Lobo, correct?

24    A.    On the video?

25    Q.    No, you identified in your investigation another person

1    named Lobo, right?

2    A.    It wasn't another person.  They just had the wrong name.

3    It was early in the investigation.  Are you taking about the

4    name that was different?

5    Q.    It was Jose Argueta Rodriguez.  It was another person

6    named Lobo, correct?

7    A.    It's not another person.  It's the same person with a

8    different name.

9    Q.    You said the other day it was another person?

11:18AM 10    A.    You said -- I never said it was a different person.  You

11    said is this the person you identified as Lobo, and I said yes.

12    Q.    You identified another person identified as Lobo in the

13    drug protection detail of December 14th as a target, did you

14    not?

15    A.    I'm not sure I understand.

16    Q.    You don't remember your testimony from the other day?

17    A.    I'm not sure I understand the question, sir.

18    Q.    Did you or did you not testify that the target of the

19    investigation for the December 8, 2014 drug protection detail

11:18AM 20    identified another individual by the name of Lobo?

21    A.    I don't know.  I don't think so.  I don't know.

22    Q.    You don't think so, or you just don't remember?

23    A.    I don't remember.

24          MR. IOVIENO:  Thank you.

25          THE COURT:  Mr. Lopez.

<u>CROSS-EXAMINATION</u>

BY MR. LOPEZ:

Q.   Trooper Sanchez.

A.   Estevez.

Q.   Estevez.  The transcripts that you've reviewed, have you

reviewed them as you were listening to the tapes?

A.   In the past, yes, I have.

Q.   And did you have any role in identifying who the speakers

were?

A.   On which transcript?

Q.   On any of the transcripts.

A.   Did I have a role?

Q.   Yes.

A.   In identifying who the speakers were?

Q.   Yes.

A.   You'd have to be more specific.  I've listened to a lot of

transcripts and videos.

Q.   There's been testimony in this case that it was Muerto who

identified the speakers in the transcripts that the government

is offering?

A.   Correct.

Q.   Is that what your understanding is?

A.   I believe so, yes.

Q.   So you did not have a role with identifying the speakers

in the transcripts that have been presented in this case,

1    correct?

2              MS. LAWRENCE:  Objection, your Honor.

3              THE COURT:  Overruled.

4    A.    In this final transcript?  No.

5              MR. LOPEZ:  Thank you.

6              MR. NORKUNAS:  Nothing, Judge.

7              THE COURT:  Redirect.

8                      REDIRECT EXAMINATION

9    BY MS. LAWRENCE:

11:20AM 10   Q.    Trooper Estevez, why didn't you tell the immigration

11   authorities to arrest Animal on administrative immigration

12   charges in the fall of 2015?

13   A.    So through our time with this investigation, immigration

14   has, like I said, one job, and that's to deport undocumented

15   immigrants from the country.  Once that process is started,

16   once they have that person in custody -- I know through the

17   investigation, because it happened to us before, once that

18   person is in custody with them, it's about a two to three-week

19   turnaround before they're on the plane, and we know through the

11:21AM 20   investigation that MS-13 members who have committed crimes and

21   know that they're possibly pending charges against them would

22   expedite their deportation out of the country, so they're not

23   charged with those crimes, and they're forced to stay here in

24   jail.

25              So once they're in custody, they can waive their right

1    to -- I believe it's like an immigration trial, or I don't know

2    exactly what the process is, but they waive that right, and

3    they're swiftly on the plane back home to wherever they're

4    from.

5            In that case, we would have, again, lost Animal to

6    El Salvador, or I believe he's Salvadorean, to his country of

7    origin, and the murderer would have been gone.

8    Q.    You said that happened to you before the investigation?

9    A.    Yes.

10    Q.    Was there a particular individual you were referring to?

11    A.    Smiley/Danger.

12    Q.    And you explained who that was, but can you remind the

13    jury how he's related to this investigation?

14    A.    He was involved in a homicide that occurred in Lawrence,

15    Massachusetts where an individual by the name of Fantasmo was

16    murdered.

17    Q.    And Trooper Estevez, was CW-1's safety the only reason you

18    didn't immediately arrest Animal once you heard him confess on

19    tape?

11:22AM 20    A.    No.  Again, it was a very large case with a lot of moving

21    parts.  There were a lot of targets, and instead of, as we say,

22    maybe putting a Band-Aid on the problem and arresting Animal

23    right away and not being able to get to the leaders and the

24    leadership here in Massachusetts who are kind of, you know, the

25    person that works the puppets from behind the scene.

1          MR. LOPEZ:  Objection, your Honor.

2          THE COURT:  I'll strike that piece of it.

3          MR. MURPHY:  Objection, your Honor.

4    A.   We needed to get to the leadership --

5          MR. MURPHY:  Objection, your Honor.

6          THE COURT:  I think the topic of why the investigation

7    wasn't taken down immediately was raised, and I'll let him

8    explain it.  I just don't want you to characterize individuals

9    or their roles, but go ahead.

11:23AM 10   A.   Again, we knew that there was a lot of different cliques,

11   a lot of different crimes being committed by these cliques, a

12   lot of different charges, a lot of violent acts that we were

13   doing, and we were trying to identify the majority of the

14   clique leaders and establish good cases against them, so we can

15   take down the entire organization here in Massachusetts and try

16   to create a void of MS-13 here for a while and stop the violent

17   acts that we were having.

18         THE COURT:  Let's stop there.

19   Q.   Trooper Estevez, you were asked some questions about the

11:23AM 20   drug protection details.  Just to be clear, the person that you

21   saw and identified as Lobo on surveillance during the

22   December 8, 2014 drug protection detail is the same person you

23   identified as Lobo here in this courtroom, correct?

24   A.   Correct.

25   Q.   Okay.

1          MS. LAWRENCE:  I have nothing further, your Honor.

2          THE COURT:  Mr. Murphy.

3                    RECROSS-EXAMINATION

4     BY MR. MURPHY:

5     Q.    Trooper, you were working -- there was a Homeland Security

6     agent detailed to the task force, correct?

7     A.    Yes.

8     Q.    And who was that person?

9     A.    They change, but the last one was Agent Flynn.

11:24AM 10   Q.    And having a Homeland Security person assigned to the task

11    force allows you to work closely with immigration, correct?

12    A.    Correct.

13    Q.    And you testified about Danger/Smiley being deported,

14    correct?

15    A.    Yes.

16    Q.    Did you know that Danger/Smiley had gone into immigration

17    custody before he was deported?

18    A.    No.

19    Q.    So it wasn't a case where you would have requested that

11:25AM 20   immigration take a person into custody, correct?

21    A.    Correct.

22    Q.    And you don't know, you did not have an experience in this

23    case of having a person go into immigration custody and having

24    law enforcement say please keep him in the country, correct?

25    That did not happen in this case, correct?

1  A.   That we had somebody arrested by immigration and tried to

2  keep him?

3  Q.   And that you tried to keep him, correct?

4  A.   I don't remember.

5  Q.   And you know for a fact, sir, given immigration's

6  cooperation with law enforcement that if you had made that

7  request, Mr. Martinez would not have been immediately deported;

8  isn't that true, sir?

9  A.   I don't know for a fact.

11:25AM 10  Q.   You don't know one way or the other?

11  A.   I believe that they need a reason to hold him and to keep

12  them, and if he waives his right of whatever it is to see a

13  Judge, an immigration Judge, I believe that he's entitled to

14  his swift deportation out of the country.

15  Q.   And it's your testimony that a request from law

16  enforcement would not have been enough to keep him?

17  A.   I don't know that to be true.

18  Q.   You're guessing one way or the other, correct?

19  A.   I believe that they would need more.

11:26AM 20  Q.   But you don't know, sir, correct?

21  A.   Correct.

22  Q.   Because that's not something that you have ever tried in

23  your experience to do?

24  A.   To do what?

25  Q.   To try to have a person arrested on an -- in an

1    immigration custody and have law enforcement keep him there,

2    correct?

3    A.    Yeah.  We've done that.

4    Q.    You have done that?

5    A.    Yeah.

6         MR. MURPHY:  I have no further questions, thank you.

7         THE COURT:  Anything else?

8         MR. IOVIENO:  No, your Honor.

9         THE COURT:  All right.  You may step down.

11:26AM 10    MS. LAWRENCE:  No, thank you, your Honor.  We're

11    finished.

12        THE COURT:  The government rests?

13        MR. POHL:  I'm sorry, your Honor.  Yes.  The

14    government rests.

15        THE COURT:  All right.  Why don't we take a break.

16        THE CLERK:  All rise.

17        THE COURT:  A break for the jury.

18        I'll see counsel at sidebar.

19        (THE FOLLOWING OCCURRED AT SIDEBAR:)

11:27AM 20    THE COURT:  First, before we get to the motions, I

21    want to express my appreciation to all of you for expediting

22    the case.  What could have been a very lengthy case, I think,

23    was streamlined, and I very much appreciate that.

24        Is there a defense motion?  I guess I'll take it one

25    at a time, Mr. Lopez.

1          MR. LOPEZ:  Yes, your Honor.

2          THE COURT:  Motion for acquittal?

3          MR. LOPEZ:  Yes, motion for acquittal.

4          MR. NORKUNAS:  I join in that motion for acquittal for

5     this defendant.

6          MR. MURPHY:  A required finding of not guilty.  I

7     guess I'm not going to ask all the way for acquittal.

8          MR. IOVIENO:  I join in that motion.

9          THE COURT:  All right.  Those motions are denied.

11:28AM 10     All right.  Will there be a defense case?

11          MR. MURPHY:  Your Honor, Mr. Sandoval will read a

12     stipulation to the jury, which I think hopefully we now have,

13     that will be Mr. Sandoval's defense.

14          THE COURT:  Okay.  He's not going to read it, you're

15     going to read it, though?

16          MR. MURPHY:  One of us will read it.  Ms. Rodriguez

17     has been the most effective lawyer in the courtroom.

18          THE COURT:  I'm prepared to make that finding.

19          MR. MURPHY:  I was planning to read it, yes.  It's

11:28AM 20     about two pages long.

21          THE COURT:  Okay.  And is that it?

22          MR. NORKUNAS:  I have two documents to be introduced.

23     One is his work authorization form, and I think we had an

24     argument relative to relevance the other day.  I'm not sure if

25     the government is still pressing that, and the second one is a

1    portion of the January 8th transcript, and the government

2    wanted to ensure that I had the right version because there had

3    been multiple drafts, three pages of that.

4        THE COURT:  Okay.  Why don't I take a look at the work

5    authorization.  Are you still objecting to the work

6    authorization form?  It's either yes or no, either you object

7    or you don't.  You can say you don't object with a grimace on

8    your face.  I accept that.

9        MR. POHL:  All right, with a grimace, yes.  Can I just

11:29AM 10    say this before you put it in?  I just want to make sure that

11    this is 100 percent clear.  The phone number that is -- that we

12    used to tie Cesar Martinez to the drug protection detail is on

13    that form, all right, so I want to make sure that Mr. Norkunas

14    understands that before he offers this.  But if that's the

15    position that Mr. Norkunas that he wants it, then with a

16    grimace I will allow it.

17        THE COURT:  All right.  If it's offered, I don't

18    understand the government to object, and the transcript, is

19    that an issue?

11:29AM 20    MR. POHL:  No, give us 30 seconds to work it out, but

21    I think not.

22        MR. LOPEZ:  Your Honor, I anticipate calling my

23    wife -- my client's wife for some brief testimony.  I also have

24    some --

25        THE COURT:  Is she here today?

1          MR. LOPEZ:  She's not here today.

2          THE COURT:  Okay.  How far away is she?

3          MR. LOPEZ:  She's working.  I don't know if I can get

4    to her.  She doesn't pick up her phone.

5          THE COURT:  Is this something that we could handle

6    Tuesday without really -- because otherwise what I was about to

7    say was I'd send the jury home, and we will -- when we're done

8    with this and have arguments and instruction on Tuesday and

9    tell the jury that they're likely to get the case on Tuesday,

11:30AM 10   but if we have 15 minutes of testimony --

11          MR. LOPEZ:  It's not going to be a long witness, and I

12   also have some Registry of Motor Vehicle documentation and some

13   other business records that I think we can just agree on.

14          MR. POHL:  We'll talk.  It is whatever it is.  I agree

15   with the calculus about getting the case to the jury on

16   Tuesday.

17          THE COURT:  What we'll do, as soon as the jury is

18   ready, we'll bring them in.  We'll accomplish what we can

19   accomplishing today, including Ms. Rodriguez reading the

11:31AM 20   stipulation clearly and effectively, and I'll tell the jury

21   what's going on and that they should be prepared to be here all

22   day Tuesday, and then I'll send them home, and then we'll talk

23   about logistics, including the charge conference, the length of

24   closings, that sort of thing.  Okay.

25          MR. POHL:  Thank you, your Honor.

1          (SIDEBAR CONFERENCE WAS CONCLUDED)

2          THE CLERK:  All rise for the jury.

3          (JURORS ENTERED THE COURTROOM.)

4          THE CLERK:  Thank you.  You may be seated.  Court is

5     now back in session.

6          THE COURT:  All right.  Ms. Rodriguez, are we starting

7     with you?

8          MS. RODRIGUEZ:  Your Honor, with the Court's

9     permission, I'd like to read a stipulation between the

11:44AM 10     United States and Herzzon Sandoval.

11          THE COURT:  All right.  I may have given you this

12     instruction, ladies and gentlemen.  A stipulation is sort of a

13     fancy legal word.  It just means something that the parties

14     agree on, facts that they agree are true, and it appears that

15     the government and Defendant Sandoval have agreed that whatever

16     is about to be read is true and you may accept it as true.

17          Go ahead, Ms. Rodriguez.

18          MS. RODRIGUEZ:  The United States and Herzzon Sandoval

19     hereby stipulate and agree to the following facts:

11:44AM 20          On May 28th, 2013, CW-1, also known as Pelon, advised

21     agents that he participated in a telephone conference led by

22     MS-13 member Little Donkey, who was incarcerated in the

23     Ciudad Barrios Prison in El Salvador.

24          The parties discussed the MS-13 leadership's need for

25     money from MS-13 cliques based in the United States.  CW-1

1    advised agents that others present for the call included

2    Blacky, incarcerated in Cuidad Barrios, formerly a leader of

3    the Virginia Program in the United States, which is now called

4    the East Coast Program; Sicano from Chalatenango, El Salvador;

5    Delinquente from the Psycho Locos Salvatrucha PLS clique in

6    Massachusetts, Noe Perez Vazquez, a.k.a. Crazy, from the

7    Everett Locos Salvatrucha ELS clique in Massachusetts; Pacho,

8    from the East Boston Salvatrucha EBS clique in Massachusetts,

9    and Scrappy, or Little Scrappy, from Kansas City, Missouri.

11:45AM 10    On November 15, 2013, CW-1 advised agents that

11    Herzzon Sandoval, a.k.a., Casper, and Jose Hernandez-Miquel,

12    a.k.a. Muerto, spoke with MS-13 leaders in El Salvador who

13    wanted to make Muerto the leader of MS-13's Eastside Loco

14    Salvatrucha ESLS clique.  Additionally, MS-13 wants to make a

15    rule requiring members of the gang to send money to other MS-13

16    members who are imprisoned.

17    On February 7th, 2014, CW-1 advised agents that

18    Herzzon Sandoval, a.k.a. Casper, talked about the shooting of

19    an MS-13 member named Tecolote and instructed the members of

11:46AM 20    ESLS to not go anyone alone and to travel in groups of two or

21    three.

22    CW-1 also spoke with Jose Hernandez-Miquel, a.k.a.

23    Muerto, who said that Noe Perez Vazquez, a.k.a. Crazy, knew

24    about the meeting that ESLS had the previous week at the auto

25    garage in Everett.  Muerto told CW-1 that he was going to tell

1   Casper about this because Casper wants to keep the ESLS

2   meetings a secret from MS-13 in El Salvador.

3         CW-1 said that MS-13 leaders in El Salvador want the

4   United States based MS-13 cliques to follow the rules set by

5   MS-13 leadership in El Salvador.  For example, if an MS-13

6   member in El Salvador breaks two rules in one year, he will be

7   shot with a shotgun in the leg.

8         MS-13 in El Salvador also extorts money from local

9   businesses.  Casper said that he does not want to follow those

11:47AM 10   rules because the police are more active in the United States.

11         On February 8th, 2014, CW-1 advised agents that the

12   ESLS clique hung out yesterday at the garage in Everett

13   drinking and talking about MS-13 in El Salvador.

14   Herzzon Sandoval, a.k.a. Casper, and Edwin Guzman, a.k.a.

15   Playa, talked about MS-13 members Simpson and Crazy getting

16   beaten up in El Salvador.

17         Casper said he wanted to talk to the other clique

18   leaders in the Boston area about no longer sending money to

19   MS-13 in El Salvador because they do not know where the money

11:48AM 20   is going.  Casper said he wanted the money sent by ESLS to

21   El Salvador to go to deported ESLS clique members.

22         On April 22nd, 2014, CW-1 advised agents that

23   Herzzon Sandoval, a.k.a Casper, was angry that MS-13 member

24   Tremendo was acting like he's in El Salvador.  Casper made this

25   statement in connection with Tremendo's alleged involvement in

1    the recent shooting of an 18th Street gang member:  Casper told

2    members of ESLS that Tremendo is stupid.

3         CW-2, also known as Clacker, advised agents that he

4    was a paro of an MS-13 clique, not the Eastside

5    Locos Salvatrucha clique, CW-2 and his clique committed

6    racketeering acts in furtherance of the MS-13 enterprise,

7    including robberies.  CW-2 also advised that when his clique

8    leader was incarcerated, he participated with others in his

9    clique and an individual from a different clique in a large

11:49AM 10    number of robberies without telling the acting clique leader.

11         Thank you, your Honor.  That's all.

12         THE COURT:  All right.  Thank you.

13         All right.  Mr. Norkunas.

14         MR. NORKUNAS:  Your Honor, I would have two documents

15    that I would be introducing on behalf of Mr. Martinez.

16         THE COURT:  Okay.

17         MR. NORKUNAS:  And I believe by agreement with the

18    first one, it could be Exhibit Number 232.

19         THE COURT:  What is 232?

11:50AM 20         MR. NORKUNAS:  This would be a copy filed by my

21    client, Cesar Martinez, in 2008.  It's a Department of Homeland

22    Security form, an application for his employment authorization,

23    and that shows where he was living at that time in 2008.

24         THE COURT:  All right.  It's admitted, 232.

25         (Exhibit No. 232 received into evidence.)

1          MR. NORKUNAS:  And if I could just show the cover

2    page, Judge.

3          THE COURT:  Yes.

4          MR. NORKUNAS:  And it bears the signature of the

5    defendant at the bottom, and it shows a listed home address of

6    20 Summer Street in Revere, Mass. for 2008.

7          THE COURT:  All right.  And for the final version,

8    I'll ask you to black out that social security number.

9          MR. NORKUNAS:  And there's an alien registration

11:50AM 10    number.  I would do both.  I think I'd be compelled to do that,

11    Judge, yes.

12          THE COURT:  Thank you.

13          MR NORKUNAS:  And the other would be an excerpt from

14    the transcript -- portions of which have already been

15    introduced -- of January 8, 2016.  I would be introducing two

16    additional pages, Judge, and I would -- I don't have it here,

17    but I would add to a cover sheet to that showing that, and I

18    believe that would be Exhibit 233.

19          THE COURT:  All right.  It's admitted, 233.

11:51AM 20          (Exhibit No. 233 received into evidence.)

21          MR. NORKUNAS:  And I would just show that, but not

22    read that, Judge, to the jury.

23          THE COURT:  All right.

24          MR. NORKUNAS:  At this point in time.  And that would

25    showing conversations, again, portions of which have already

1    come in to the jury by the various participants.  That's page

2    40 -- what is listed as page 40 and then page 41 as well.  That

3    would bear the number 233, Judge, and I will add a brief cover

4    sheet for that.

5         THE COURT:  All right.  And make sure the government

6    agrees with the cover sheet before --

7         MR. POHL:  Thank you.

8         MR. NORKUNAS:  I would have no other.

9         THE COURT:  All right.  Other than Mr. Lopez' witness,

11:52AM 10   any other evidence today?

11        MR. IOVIENO:  No, your Honor, not from us.

12        MR. LOPEZ:  Your Honor, some of the documentary

13   evidence will come in through the witness, so could I reserve

14   my right to admit that on Tuesday?

15        THE COURT:  Yes.

16        MR. LOPEZ:  Thank you, your Honor.

17        THE COURT:  All right.  Ladies and gentlemen, before I

18   forget, I should have done this this morning, and I forgot.

19   There was a media report last night on NPR, National Public

11:52AM 20   Radio, either about this case or about MS-13.  Did any of you

21   hear it or were you otherwise exposed to it?  All right.

22   Everyone is shaking their head.  All right.  Thank you.

23        The good news is we are way ahead of schedule.  The

24   evidence is almost closed.  We have a little bit that we're

25   going to do on Tuesday morning.  I think Mr. Lopez has a

1    witness who I think will probably be fairly short and I expect

2    that we'll proceed to the closing arguments and to the jury

3    instructions on Tuesday.

4         That means you need to be prepared to be here all day

5    on Tuesday.  I don't know how long this is going to take to do.

6    I think we have a lot of ground to cover.  We're going to try

7    to do all of that in one day.  You should be prepared to be

8    here all day, that is, until 5:00 every day until you render a

9    verdict, so it may spill into Wednesday and beyond.  It's

11:53AM 10   really kind of -- once you get the case, it's up to you.  You

11   can take as much time as you think you need, or if you don't

12   need much time, you can do that, too.  It's entirely up to you.

13   There's no pressure on you whatsoever, but that is the

14   anticipated schedule so I'm going to let you go for the day.

15        Again, we're going to start up Tuesday morning with

16   what I think is going to be a relatively short defense witness,

17   maybe some exhibits, proceed from there into the government

18   closing, defense closing, the government rebuttal, my

19   instructions, and I expect you will get the case on Tuesday.

11:54AM 20        You don't need to worry about lunch.  We'll bring you

21   lunch whenever you need to stay all day, so you don't have to

22   pack anything, but I do think, again, if you don't get the case

23   on Tuesday, you'll get it on Wednesday.  I think that's clearly

24   our timetable at this point.

25        So, remember my instructions.  It's a three-day

 1   weekend because of President's Day.  Please take extra care not

 2   to expose yourself to any media reports or to discuss the case

 3   among yourselves or with anyone else.  We're almost there and

 4   way ahead of schedule.

 5       I do want to express my appreciation to you, to the

 6   lawyers for streamlining the case.  The case could have taken

 7   much longer to try and the lawyers made a lot of efforts to

 8   streamline it, which I very much appreciate.

 9       So with that, I'll let you go.  Have a good weekend

11:55AM 10   all and we will see you Tuesday morning.

11       THE CLERK:  All rise.

12       (JURORS EXITED THE COURTROOM.)

13                   - - - -

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3    UNITED STATES DISTRICT COURT )

4    DISTRICT OF MASSACHUSETTS ) ss.

5    CITY OF BOSTON )

6

7              I do hereby certify that the foregoing transcript was

8    recorded by me stenographically at the time and place aforesaid

9    in Criminal Action No. 15-10338-FDS, UNITED STATES vs. HERZZON

10   SANDOVAL, et al., and thereafter by me reduced to typewriting

11   and is a true and accurate record of the proceedings.

12             Dated this 16th day of February, 2018.

13                    s/s Valerie A. O'Hara

14             _____

15                    VALERIE A. O'HARA

16                    OFFICIAL COURT REPORTER

17

18

19

20

21

22

23

24

25